JENNY M. MADKOUR, COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON
Veronica R. Rodriguez, OSB No. 181818
Assistant County Attorney
Multnomah County Attorney
501 S.E. Hawthorne Blvd., Suite 500
Portland, Oregon 97214
Telephone: (503) 988-3138
Facsimile: (503) 988-3377
E-mail: veronica.rodriguez@multco.us
*Of Attorneys for Defendants Cheryl Nelson and Jocelyn K. Johnson*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JASON MCGREW, individually,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PORTLAND, MULTNOMAH COUNTY, NOAH HARDING, in his individual capacity, JONATHAN IANOS, in his individual capacity, CHERYL NELSON, in her individual capacity, JOCELYN K. JOHNSON, in her individual capacity,<br><br>Defendants. | No. 3:23-CV-01082-HZ<br><br>DECLARATION OF VERONICA R. RODRIGUEZ IN SUPPORT OF DEFENDANT MULTNOMAH COUNTY, CHERYL NELSON, AND JOCELYN KLINE-JOHNSON'S MOTION TO DISMISS |

I, Veronica R. Rodriguez, do declare and state as follows:

1. I am an Assistant County Attorney for Multnomah County and represent Defendants Multnomah County, Cheryl Nelson, and Jocelyn Kline-Johnson ("County Defendants") in the above-captioned matter.

2. I make this declaration in support of *Defendant Multnomah County, Cheryl Nelson, and Jocelyn Kline-Johnson's Motion to Dismiss.*

3. Attached as Exhibit 1, is a true and accurate copy of the State of Kansas, District Court of Geary County, Kansas, Eighth Judicial District Court – Conditions of Probation dated February 9, 2021, signed by Plaintiff, Jason McGrew.

4. Attached as Exhibit 2, is a true and accurate copy of Oregon's eCourt Case Information ("OECI") Register of Actions in *State of Oregon v. Jason Alan McGrew*, Multnomah County Circuit Court Case No. 21CR38128 ("Criminal matter").

5. Attached as Exhibit 3, is a true and accurate copy of OECI's Register of Actions in *State of Oregon v. Jason Alan McGrew*, Multnomah County Circuit Court Case No. 22EX00615 ("Extradition matter").

6. On September 22, 2023, I provided relevant portions of DCJ's case management notes ("Chronos") to opposing counsel via email.

7. Attached as Exhibit 4, is a true and accurate copy of IACOS' Rules, https://interstatecompact.org/icaos-rules (accessed October 6, 2023).

8. Attached as Exhibit 5, is a true and accurate copy of IACOS' Bench Book, https://interstatecompact.org/bench-book (accessed October 6, 2023).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /


Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

9. Attached as Exhibit 6, is a true and accurate copy of IACOS's Advisory Opinion 2-2005, https://interstatecompact.org/advisory-opinions/2-2005 (accessed October 6, 2023).

PURSUANT TO 28 U.S.C. § 1746, I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 16th day of October 2023.

Respectfully submitted,

JENNY M. MADKOUR, COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON

/s/ Veronica R. Rodriguez
Veronica R. Rodriguez, OSB No. 181818
Assistant County Attorney
*Of Attorneys for Defendant*



Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I arranged for service of ***DECLARATION OF VERONICA R. RODRIGUEZ*** on:

Louren Oliveros
Oliveros Law PLCC
50 Charles Lindbergh Blvd., Suite 205
Uniondale NY 11553
Email: oliveros@trialwarrior.net

Trung D. Tu
Portland City Attorney's Office
1221 SW 4th Ave, Ste 430
Portland, OR 90204
Email: trung.tu@portlandoregon.gov

by the following method or methods as indicated:

☐ by **mailing** to said person(s) a true copy thereof, said copy placed in a sealed envelope, postage prepaid and addressed to said person(s) at the last known address for said person(s) as shown above, and deposited in the post office at Portland, Oregon, on the date set forth above.

☒ by e-filing and emailing to said person(s) at the email address shown registered with the Court, which is the last known email address for said person(s) on the date set forth above.

☐ by mailing via **certified mail, return receipt requested**, to said person(s) a true copy thereof, said copy placed in a sealed envelope, postage prepaid and addressed to said person(s) at the last known address for said person(s) as shown above, and deposited in the post office at Portland, Oregon, on the date set forth above.

☐ by **facsimile** to said person(s) a true copy thereof at the facsimile number shown above, which is the last known facsimile number for said person(s) on the date set forth above. A copy of the confirmation report is attached hereto.

☒ by **emailing** to said person(s) a true copy thereof at the email address shown above, which is the last known email address for said person(s) on the date set forth above.

DATED this 16th day of October 2023.

JENNY M. MADKOUR COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON

/s/ Veronica R. Rodriguez
Veronica R. Rodriguez, OSB No.181818
Assistant County Attorney
*Of Attorneys for Defendants Johnson and Nelson*

# STATE OF KANSAS
# DISTRICT COURT OF GEARY COUNTY, KANSAS
# EIGHTH JUDICIAL DISTRICT COURT SERVICES

| | |
|---|---|
| **STATE OF KANSAS, Plaintiff** | **Case Number:** |
| **Vs.** | |
| **Jason Alan Mcgrew, Defendant** | **2019-CR-000858** |

**CONDITIONS OF PROBATION**

In accordance with authority conferred by the laws of Kansas (K.S.A. 21-4602 and 21-4610), you have been placed on probation on **1/8/21** for a period of **12 months** or until **1/8/22**, for the conviction(s) **Criminal Transportation of Drug Proceeds and Possession of Marijuana**, by the Honorable Ryan W Rosauer, Judge of the District Court.

It is the order of the Court that you shall comply with the following standard conditions:

1. Report to the Court Services Officer as directed.
2. Receive permission from the Court Services Officer before changing your address, phone number, or employment.
3. Obey all Federal, State, and Municipal laws and report any contact with Law Enforcement to the Court Services Officer within 72 hours.
4. Be truthful with the Court Services Officer in all matters.
5. Comply with any reasonable conditions, restrictions, or recommendations imposed by the Court Services Officer.
6. Complete any program deemed appropriate by the Court Services Officer, and pay any ensuing costs associated with those programs.
7. Complete any hours of community service work as ordered by the Court or as directed by the Court Services Officer.
8. Do not illegally possess, use, or traffic any controlled substance, narcotic, or other drugs as defined by law, to include alcohol, except as prescribed by a licensed practitioner.
9. You shall not use or have in your possession any synthetic or natural substance designed or used to produce a high or state of intoxication, or other substances not intended for human consumption, including but not limited to Serenity Now, Spice, K-2, or Salvia.
10. Submit to random blood, breath, or urine testing upon the request of any Court Services Officer or Law Enforcement Officer and be responsible for all testing costs.
11. If your probation is based on a misdemeanor conviction involving domestic battery, firearms, explosives, or other dangerous weapons, or any felony conviction, you can not own, possess, purchase, receive, sell, or transport any firearms, explosives, or other dangerous weapons as defined by Federal, State, or Municipal laws or ordinance.
12. Do not engage in any disorder, fight, assaultive activities, violence, or threats of violence of any nature. Avoid persons and/or places of disreputable or harmful character in general and as directed by the Court Services Officer.
13. Make reasonable efforts to obtain and maintain employment and support your dependents or maintain a combination of employment and school as approved by the Court Services Officer.
14. Permit the Court Services Officer to visit you at your home, place of employment or elsewhere.
15. Permit the Court Services Officer or Law Enforcement Officer to search your person or property without probable cause.
16. Remain within the State of Kansas unless a Court Services Officer grants permission to leave and issues you a travel permit. All travel permits must be issued 72 hours prior to departure.
17. Pay the following amount of $858.00 as directed by the Court or Court Services Officer. If you are unable to follow the payment plan as directed or have your cost paid off by the end of the probation period, then your case may be referred to debt collection.

**TOTAL: $ 858.00 to be paid to the Clerk of the District Court as follows:**

Pay $86.00 per month, commencing February 2021 until paid in full.

**It is the order of the court that you shall comply with the following special conditions of probation:**

JM 1. The Defendant shall pay Court costs of $193.00, probation fee of $120.00, BIDS application fee of $100.00, KBI lab fee of $400.00, and a booking fee of $45.00, for a total of $858.00

JM 2. The Court authorizes the defendant's probation to compact to Oregon.

I understand that the Court may at any time revoke my probation for cause, modify the conditions of probation, and reduce or extend the period of probation, as provided by law. The Court may issue a warrant for my arrest, or the Court Services Officer may arrest me without a warrant, for violation of any of the conditions of probation.

I understand all terms and conditions of probation, as I have read or have had explained to me, agree to abide by said conditions.

Jason Alan Mcgrew, Defendant — Date

Amber Knapp, CSO I — Date 2/9/21

c: file
Probationer

# IN THE DISTRICT COURT OF
# GEARY COUNTY, KANSAS

STATE OF KANSAS,
Plaintiff

vs.

Jason Alan Mcgrew,
Defendant

Case Number: 2019-CR-000858

## WAIVER OF EXTRADITION

I, Jason Alan Mcgrew, in consideration of being granted probation by the Geary County District Court on 1/8/21, do hereby agree to waive extradition to the State of Kansas from a jurisdiction in/or outside the United States where I may be found, and also agree that I will not contest any effort by any jurisdiction to return me to the State of Kansas. Failure to comply with the above agreement will be deemed to be a violation of the terms and conditions of my Geary County District Court probation for which I may be returned to Geary County District Court, State of Kansas.

Signed_______________________
Jason Alan Mcgrew, Defendant

Dated: Feb 7, 2021

Place: **GEARY COUNTY DISTRICT COURT**

_______________________
Amber Knapp, CSO I

Skip to Main Content Logout My Account Search Menu Search Criminal, Traffic and Parking Case Records Refine Search Back Location : All Locations Images Help

# Register of Actions

## Case No. 21CR38128

| | | |
|---|---|---|
| **State of Oregon vs Jason Alan McGrew** | Case Type: | **Offense Felony** |
| | Date Filed: | **08/08/2021** |
| | Location: | **Multnomah** |
| | Booking Number: | **1521185** |

### Party Information

| | | | Attorneys |
|---|---|---|---|
| **Defendant** | **McGrew, Jason Alan**<br>1929 SW Elizabeth Street<br>Portland, OR 97201<br>Other Agency Numbers<br>131023 Multnomah County Sheriff | Male White<br>DOB: 1972<br>5' 11", 170 lbs | |
| **Plaintiff** | **State of Oregon** | | |

### Charge Information

| **Charges: McGrew, Jason Alan** | **Statute** | **Level** | **Date** |
|---|---|---|---|
| 1. Coercion | 163.275 | Felony Class C | 08/07/2021 |
| 2. Resisting Arrest | 162.315 | Misdemeanor Class A | 08/07/2021 |
| 3. Interfering w/ Peace/Parole and Probation Officer | 162.247 | Misdemeanor Class A | 08/07/2021 |
| 4. Criminal Mischief in the First Degree | 164.365 | Felony Class C | 08/07/2021 |

### Events & Orders of the Court

**DISPOSITIONS**

08/09/2021 **Disposition** (Judicial Officer: Kantor, Henry)
1. Coercion
   No Complaint
2. Resisting Arrest
   No Complaint
3. Interfering w/ Peace/Parole and Probation Officer
   No Complaint
4. Criminal Mischief in the First Degree
   No Complaint

Created: 08/09/2021 1:19 PM

**OTHER EVENTS AND HEARINGS**

08/09/2021 **Arraignment** (2:30 PM) (Judicial Officer Kantor, Henry)
Result: No Complaint
Created: 08/08/2021 5:21 AM

08/09/2021 **Order - No Contact** (Judicial Officer: Bushong, Stephen K. )
*SIGNED BY RAO*
Signed: 08/07/2021
Created: 08/09/2021 8:22 AM

08/09/2021 **Motion - Recognizance Release**
Created: 08/09/2021 8:29 AM

08/09/2021 **Closed**
Created: 08/09/2021 1:19 PM

08/09/2021 **Order** (Judicial Officer: Kantor, Henry )
*NO COMPLAINT*
Signed: 08/09/2021
Created: 08/09/2021 5:04 PM

10/20/2021 **Disposition - Reported**
Created: 10/20/2021 7:47 PM

Exhibit 2
Page 1 of 1

# Register of Actions
## Case No. 22EX00615

| | | |
|---|---|---|
| **State of Oregon vs Jason Alan McGrew** | Case Type: | **Procedural Matters - Extradition** |
| | Subtype: | **Extradition - Kansas** |
| | Date Filed: | **10/06/2022** |
| | Location: | **Multnomah** |
| | Booking Number: | **1546561** |

### Party Information

| | | | Attorneys |
|---|---|---|---|
| **Defendant** | **McGrew, Jason Alan**<br>12030 NE Russell Street<br>Portland, OR 97220<br>Other Agency Numbers<br>131023 Multnomah County Sheriff | Male White<br>DOB: 1972<br>5' 11", 170 lbs | |
| **Plaintiff** | **State of Oregon** | | |

### Charge Information

| Charges: McGrew, Jason Alan | Statute | Level | Date |
|---|---|---|---|
| 1. Fugitive from Justice | 133.747 | N/A | 10/05/2022 |

### Events & Orders of the Court

**DISPOSITIONS**

10/06/2022 **Disposition**
1. Fugitive from Justice
No Complaint
Created: 10/06/2022 1:15 PM

**OTHER EVENTS AND HEARINGS**

10/06/2022 **Closed**
Created: 10/06/2022 1:15 PM

10/07/2022 *CANCELED* **Arraignment** (9:00 AM) (Judicial Officer Dahlin, Eric L)
*Other*
Created: 10/06/2022 8:44 AM

Interstate Commission for Adult Offender Supervision

Ensuring Public Safety for the 21st Century

# ICAOS Rules

## General information

Effective Date: April 1, 2022



Introduction

ICAOS Rules

The Interstate Commission for Adult Offender Supervision is charged with overseeing the day-to-day operations of the Interstate Compact for Adult Offender Supervision, a formal agreement between member states that seeks to promote public safety by systematically controlling the interstate movement of certain adult offenders. As a creature of an interstate compact, the Commission is a quasi-governmental administrative body vested by the states with broad regulatory authority. Additionally, the Interstate Compact for Adult Offender Supervision has congressional consent under Article I, § 10 of the United States Constitution and pursuant to Title 4, Section 112(a) of the United States Code.

Through its rulemaking powers, the Commission seeks to achieve the goals of the compact by creating a regulatory system applicable to the interstate movement of adult offenders, provide an opportunity for input and timely notice to victims of crime and to the jurisdictions where offenders are authorized to travel or to relocate, establish a system of uniform data collection, provide access to information on active cases to authorized criminal justice officials, and coordinate regular reporting of Compact activities to heads of state councils, state executive, judicial, and legislative branches and criminal justice administrators. The Commission is also empowered to monitor compliance with the interstate compact and its duly promulgated rules, and where warranted to initiate interventions to address and correct noncompliance. The Commission will coordinate training and education regarding regulations of interstate movement of offenders for state officials involved in such activity.

These rules are promulgated by the Interstate Commission for Adult Offender Supervision pursuant to Article V and Article VIII of the Interstate Compact for Adult Offender Supervision. The rules are intended to effectuate the purposes of the compact and assist the member states in complying with their obligations by creating a uniform system applicable to all cases and persons subject to the terms and conditions of the compact. Under Article V, Rules promulgated by the Commission—"shall have the force and effect of statutory law and shall be binding in the compacting states[.]" All state officials and state courts are required to effectuate the terms of the compact and ensure compliance with these rules. To the extent that state statutes, rules or policies conflict with the terms of the compact or rules duly promulgated by the Commission, such statutes, rules or policies are superseded by these rules to the extent of any conflict.

To further assist state officials in implementing the Compact and complying with its terms and these rules, the Commission has issued a number of advisory opinions. Additionally, informal opinions can be obtained from the Commission as warranted. Advisory opinions, contact information and other important information, can be found on the Commission's website at https://www.interstatecompact.org.

**Chapter 1: Definitions - Rule 1.101** ..... 7
**Chapter 2: General Provisions** ..... 12
***Rule 2.101 - Involvement of interstate compact offices*** ..... 12
***Rule 2.102 - Data collection and reporting [Expired; See history]*** ..... 13
***Rule 2.103 - Dues formula*** ..... 14
***Rule 2.104 - Forms*** ..... 15
***Rule 2.105 - Misdemeanants*** ..... 16
***Rule 2.106 - Offenders subject to deferred sentences*** ..... 17
***Rule 2.107 - Offenders on furlough, work release*** ..... 18
***Rule 2.108 - Offenders with disabilities*** ..... 19
***Rule 2.109 - Adoption of rules; amendment*** ..... 20
***Rule 2.110 - Transfer of offenders under this compact*** ..... 22
***Rule 2.111 - Emergency suspension of enforcement*** ..... 23
**Chapter 3: Transfer of Supervision** ..... 25
***Rule 3.101 - Mandatory transfer of supervision*** ..... 25
***Rule 3.101-1 - Mandatory reporting instructions and transfers of military, families of military, family members employed, employment transfer, and veterans for medical or mental health services*** ..... 27
***Rule 3.101-2 - Discretionary transfer of supervision*** ..... 29
***Rule 3.101-3 - Transfer of supervision of sex offenders*** ..... 30
***Rule 3.102 - Submission of transfer request to a receiving state*** ..... 32
***Rule 3.103 - Reporting instructions; offender living in the receiving state at the time of sentencing or after disposition of a violation or revocation proceeding*** ..... 33
***Rule 3.104 - Time allowed for investigation by receiving state*** ..... 35
***Rule 3.104-1 - Acceptance of offender; issuance of reporting instructions*** ..... 36
***Rule 3.105 - Pre-release transfer request*** ..... 37
***Rule 3.106 - Request for expedited reporting instructions*** ..... 38
***Rule 3.107 - Transfer Request*** ..... 39
***Rule 3.108 - Victims' right to be heard and comment*** ..... 40
***Rule 3.108-1 - Victim notification and requests for offender information*** ..... 41
***Rule 3.109 - Waiver of extradition*** ..... 42
***Rule 3.110 - Travel Permits*** ..... 43
**Chapter 4: Supervision in Receiving State** ..... 45
***Rule 4.101 - Manner and degree of supervision in receiving state*** ..... 45
***Rule 4.102 - Duration of supervision in the receiving state*** ..... 46
***Rule 4.103 - Conditions of supervision*** ..... 47
***Rule 4.103-1 - Force and effect of conditions imposed by a receiving state*** ..... 48
***Rule 4.104 - Offender registration or DNA testing in receiving or sending state*** ..... 49
***Rule 4.105 - Arrival and departure notifications; withdrawal of reporting instructions*** ..... 50
***Rule 4.106 - Progress reports on offender compliance and non–compliance*** ..... 51
***Rule 4.107 - Fees*** ..... 52
***Rule 4.108 - Collection of restitution, fines and other costs*** ..... 53
***Rule 4.109 - Violation report(s) requiring retaking*** ..... 54
***Rule 4.109-1 - Authority to arrest and detain*** ..... 55
***Rule 4.109-2 - Absconding Violation*** ..... 56
***Rule 4.110 - Transfer to a subsequent receiving state*** ..... 57
***Rule 4.111 - Offenders returning to the sending state*** ..... 58
***Rule 4.112 - Closing of supervision by the receiving state*** ..... 59
**Chapter 5: Retaking** ..... 61
***Rule 5.101 - Discretionary retaking by the sending state*** ..... 61
***Rule 5.101-1 - Pending felony or violent crime charges*** ..... 62
***Rule 5.101-2 - Discretionary process for disposition of violation in the sending state for a new crime conviction*** ..... 63
***Rule 5.102 - Mandatory retaking for a new felony or new violent crime conviction*** ..... 64
***Rule 5.103 - Offender behavior requiring retaking*** ..... 65
***Rule 5.103-1 - Mandatory retaking for offenders who abscond*** ..... 66
***Rule 5.103-2 - Mandatory retaking for violent offenders and violent crimes [Repealed]*** ..... 67
***Rule 5.104 - Cost of retaking an offender*** ..... 68
***Rule 5.105 - Time allowed for retaking an offender*** ..... 69
***Rule 5.106 - Cost of incarceration in receiving state*** ..... 70
***Rule 5.107 - Officers retaking an offender*** ..... 71
***Rule 5.108 - Probable cause hearing in receiving state*** ..... 72
***Rule 5.109 - Transport of offenders*** ..... 74
***Rule 5.110 - Retaking offenders from local, state or federal correctional facilities*** ..... 75
***Rule 5.111 - Denial of bail or other release conditions to certain offenders*** ..... 76
**Chapter 6: Dispute Resolution and Interpretation of Rules** ..... 78
***Rule 6.101 - Informal communication to resolve disputes or controversies and obtain interpretation of the rules*** ..... 78
***Rule 6.102 - Formal resolution of disputes and controversies*** ..... 79
***Rule 6.103 - Enforcement actions against a defaulting state*** ..... 80
***Rule 6.104 - Judicial Enforcement*** ..... 81

Each rule references and links to appropriate Definitions, Advisory Opinions, Rule History, and Justifications where applicable. Justifications for rule amendments are available for 2009, 2010, 2011,

2013, 2015, 2016, 2017, 2019, 2020. **Disclaimer:* *The information contained in the justification statements is only for the limited purpose of explaining the purpose of a rule or proposed rule. It is not intended as an expression of interpretation, support or opposition to a proposed rule and, while believed to be accurate, is provided for informational purposes only.*

Chapter 1: Definitions

Rule 1.101

As used in these rules, unless the context clearly requires a different construction-

**Abscond** – means to be absent from the offender’s approved place of residence and employment; and failing to comply with reporting requirements.

**Adult** – means both individuals legally classified as adults and juveniles treated as adults by court order, statute, or operation of law.

**Application Fee** – means a reasonable sum of money charged an interstate compact offender by the sending state for each application for transfer prepared by the sending state

**Arrival** – means to report to the location and officials designated in reporting instructions given to an offender at the time of the offender’s departure from a sending state under an interstate compact transfer of supervision.

**Behavior Requiring Retaking** – means an act or pattern of non-compliance with conditions of supervision that could not be successfully addressed through the use of documented corrective action or graduated responses and would result in a request for revocation of supervision in the receiving state.

**By-Laws** – means those by-laws established by the Interstate Commission for Adult Offender Supervision for its governance, or for directing or controlling the Interstate Commission’s actions or conduct.

**Compact** – means the Interstate Compact for Adult Offender Supervision.

**Compact Administrator** – means the individual in each compacting state appointed under the terms of this compact and responsible for the administration and management of the state's supervision and transfer of offenders subject to the terms of this compact, the rules adopted by the Interstate Commission for Adult Offender Supervision, and policies adopted by the State Council under this compact.

**Compact Commissioner or “Commissioner”** – means the voting representative of each compacting state appointed under the terms of the Interstate Compact for Adult Offender Supervision as adopted in the member state.

**Compliance** – means that an offender is abiding by all terms and conditions of supervision, including payment of restitution, family support, fines, court costs or other financial obligations imposed by the sending state.

**Deferred Sentence** – means a sentence the imposition of which is postponed pending the successful completion by the offender of the terms and conditions of supervision ordered by the court.

**Detainer** – means an order to hold an offender in custody.

**Discharge** – means the final completion of the sentence that was imposed on an offender by the sending state.

**Extradition** – means the return of a fugitive to a state in which the offender is accused, or has been convicted of, committing a criminal offense, by order of the governor of the state to which the fugitive has fled to evade justice or escape prosecution.

*References:*
*ICAOS Advisory Opinion*
3-2012 [When an offender's supervision was never transferred to a receiving state under the Compact and no application for transfer or waiver of extradition ever occurred, neither the Compact nor the ICAOS rules apply to this offender who, as a 'fugitive from justice' having absconded from probation in California, must be apprehended and returned under the extradition clause of the U.S. Constitution.]

**Offender** – means an adult placed under, or made subject to, supervision as the result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections, or other criminal justice agencies, and who is required to request transfer of supervision under the provisions of the Interstate Compact for Adult Offender Supervision.

*Reference:*
*ICAOS Advisory Opinion*
9-2004 [CSL offenders seeking transfer of supervision are subject to ICAOS-New Jersey]

**Plan of Supervision** – means the terms under which an offender will be supervised, including proposed residence, proposed employment or viable means of support and the terms and conditions of supervision.

**Probable Cause Hearing** – a hearing in compliance with the decisions of the U.S. Supreme Court, conducted on behalf of an offender accused of violating the terms or conditions of the offender's parole or probation.

**Receiving State** – means a state to which an offender requests transfer of supervision or is transferred.

**Relocate** – means to remain in another state for more than 45 consecutive days in any 12 month period.

*Reference:*
*ICAOS Advisory Opinion*
4-2012 ['Relocate' does not appear to limit the cumulative number of days within which an offender may be permitted to remain in another state to a total of 45 cumulative days during the same 12 month period.]

**Reporting Instructions** – means the orders given to an offender by a sending or receiving state directing the offender to report to a designated person or place, at a specified date and time, in another state. Reporting instructions shall include place, date, and time on which the offender is directed to report in the receiving state.

**Resident** – means a person who

1. has resided in a state for at least 1 year continuously and immediately prior to either the supervision start date or sentence date for the original offense for which transfer is being

requested; and

2. intends that such state shall be the person's principal place of residence; and
3. has not, unless incarcerated or on active military orders, remained in another state or states for a continuous period of 6 months or more with the intent to establish a new principal place of residence.

**Resident Family** – means a parent, grandparent, aunt, uncle, adult child, adult sibling, spouse, legal guardian, or step-parent who

1. has resided in the receiving state for 180 calendar days or longer as of the date of the transfer request; and
2. indicates willingness and ability to assist the offender as specified in the plan of supervision.

**Retaking** – means the act of a sending state in physically removing an offender, or causing to have an offender removed, from a receiving state.

**Rules** – means acts of the Interstate Commission, which have the force and effect of law in the compacting states, and are promulgated under the Interstate Compact for Adult Offender Supervision, and substantially affect interested parties in addition to the Interstate Commission.

**Sending State** – means a state requesting the transfer of an offender, or which transfers supervision of an offender, under the terms of the Compact and its rules.

**Sex Offender** – means an adult placed under, or made subject to, supervision as the result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections, or other criminal justice agencies, and who is registered or required to register as a sex offender in the sending state or is under sex offender terms and conditions in the sending state and who is required to request transfer of supervision under the provisions of the Interstate Compact for Adult Offender Supervision.

**Shall** – means that a state or other actor is required to perform an act, the nonperformance of which may result in the imposition of sanctions as permitted by the Interstate Compact for Adult Offender Supervision, its by-laws and rules.

**Subsequent Receiving State** – means a state to which an offender is transferred that is not the sending state or the original receiving state.

**Substantial Compliance** – means that an offender is sufficiently in compliance with the terms and conditions of his or her supervision so as not to result in initiation of revocation of supervision proceedings by the sending state.

*Reference:*
*ICAOS Advisory Opinion*
7-2004 [determining "substantial compliance" when there are pending charges in a receiving state]

**Supervision** – means the oversight exercised by authorities of a sending or receiving state over an offender for a period of time determined by a court or releasing authority, during which time the offender is required to report to or be monitored by supervising authorities, and to comply with regulations and conditions, other than monetary conditions, imposed on the offender at the time of the offender's release to the community or during the period of supervision in the community.

*References:*
*ICAOS Advisory Opinions*
9-2004 [CSL offenders released to the community under the jurisdiction of the Courts]
3-2010 & 4-2010 [Offenders not subject to supervision by corrections may be subject to ICAOS if reporting to the courts is required.]

**Supervision Fee** – means a fee collected by the receiving state for the supervision of an offender.

**Travel Permit** – means the written permission granted to an offender authorizing the offender to travel from one state to another.

**Victim** – means a natural person or the family of a natural person who has incurred direct or threatened physical or psychological harm as a result of an act or omission of an offender.

**Violent Crime** – means any crime involving the unlawful exertion of physical force with the intent to cause injury or physical harm to a person; or an offense in which a person has incurred direct or threatened physical or psychological harm as defined by the criminal code of the state in which the crime occurred; or the use of a deadly weapon in the commission of a crime; or any sex offense requiring registration.

**Waiver** – means the voluntary relinquishment, in writing, of a known constitutional right or other right, claim or privilege by an offender.

**Warrant** – means a written order of the court or authorities of a sending or receiving state or other body of competent jurisdiction which is made on behalf of the state, or United States, issued pursuant to statute and/or rule and which commands law enforcement to arrest an offender. The warrant shall be entered in the National Crime Information Center (NCIC) Wanted Person File with a nationwide pick-up radius with no bond amount set.

**History:**

**Adopted November 3, 2003, effective August 1, 2004; "Compliance" amended October 26, 2004, effective January 1, 2005; "Resident" amended October 26, 2004, effective January 1, 2005; "Resident family" amended October 26, 2004, effective January 1, 2005; "Substantial compliance" adopted October 26, 2004, effective January 1, 2005; "Supervision" amended October 26, 2004, effective January 1, 2005; "Travel permit" amended September 13, 2005, effective January 1, 2006; "Victim" amended September 13, 2005, effective January 1, 2006; "Relocate" adopted September 13, 2005, effective January 1, 2006; "Compact" adopted September 13, 2005, effective January 1, 2006; "Resident" amended September 13, 2005, effective January 1, 2006; "Relocate" amended October 4, 2006, effective January 1, 2007; "Sex offender" adopted September 26, 2007, effective January 1, 2008; "Supervision" amended November 4, 2009, effective March 1, 2010; "Warrant" adopted October 13, 2010, effective March 1, 2011; "Violent Crime" adopted October 13, 2010, effective March 1, 2011; "Violent Offender" adopted October 13, 2010, effective March 1, 2011; "Resident" amended September 14, 2011, effective March 1, 2012 "Violent Offender" amended September 14, 2011, effective March 1, 2012; "Abscond" amended August 28, 2013, effective March 1, 2014; "Resident Family" amended August 28, 2013, effective March 1, 2014; "Temporary Travel Permit" amended August 28, 2013, effective March 1, 2014; "Warrant" amended August 28, 2013, effective March 1, 2014; "Violent Offender" repealed August 28, 2013, effective March 1, 2014; "Behavior Requiring Retaking" adopted September 14, 2016, effective June 1, 2017; "Significant Violation" repealed September 14, 2016, effective June 1, 2017; "Special Condition" repealed September 14, 2016, effective June 1, 2017; "Abscond" amended October**

**9, 2019, effective April 1, 2020; “Sex offender” amended October 9, 2019, effective April 1, 2020; “Temporary travel permit” repealed October 9, 2019, effective April 1, 2020; “Victim sensitive” repealed October 9, 2019, effective April 1, 2020; "Resident" amended September 29, 2021, effective April 1, 2022**

***Rules governing the general provisions of the Interstate Commission for Adult Offender Supervision***

Rule 2.101

Involvement of interstate compact offices

(a) Acceptance, rejection or termination of supervision of an offender under this compact shall be made only with the involvement and concurrence of a state's compact administrator or the compact administrator's designated deputies.

(b) All formal written, electronic, and oral communication regarding an offender under this compact shall be made only through the office of a state's compact administrator or the compact administrator's designated deputies.

(c) Transfer, modification or termination of supervision authority for an offender under this compact may be authorized only with the involvement and concurrence of a state's compact administrator or the compact administrator's designated deputies.

(d) Violation reports or other notices regarding offenders under this compact shall be transmitted only through direct communication of the compact offices of the sending and receiving states.

**History: Adopted November 3, 2003, effective August 1, 2004.**

## Rule 2.102

## Data collection and reporting [Expired; See history]

(a) As required by the compact, and as specified by the operational procedures and forms approved by the commission, the states shall gather, maintain and report data regarding the transfer and supervision of offenders supervised under this compact.

(b)

1. Each state shall report to the commission each month the total number of offenders supervised under the compact in that state.
2. Each state shall report to the commission each month the numbers of offenders transferred to and received from other states in the previous month.
3. Reports required under Rule 2.102 (b)(1) and (2) shall be received by the commission no later than the 15th day of each month.

(c) This Rule will not expire until the Electronic Information System approved by the commission is fully implemented and functional.

[Expired; See history]

**History: Adopted November 3, 2003, effective August 1, 2004; amended September 14, 2005, effective December 31, 2005. On November 4, 2009, the commission found that the electronic information system in (c) is fully implemented and functional, and ordered that this rule expire, effective December 31, 2009.**

Rule 2.103

Dues formula

(a) The commission shall determine the formula to be used in calculating the annual assessments to be paid by states. Public notice of any proposed revision to the approved dues formula shall be given at least 30 calendar days prior to the Commission meeting at which the proposed revision will be considered.

(b) The commission shall consider the population of the states and the volume of offender transfers between states in determining and adjusting the assessment formula.

(c) The approved formula and resulting assessments for all member states shall be distributed by the commission to each member state annually.

(d)

1. The dues formula is the—
   (Population of the state **divided by** Population of the United States) **plus** (Number of offenders sent from and received by a state **divided by** Total number of offenders sent from and received by all states) divided by 2.
2. The resulting ratios derived from the dues formula in Rule 2.103 (d)(1) shall be used to rank the member states and to determine the appropriate level of dues to be paid by each state under a tiered dues structure approved and adjusted by the Commission at its discretion.

**History: Adopted November 3, 2003, effective August 1, 2004; amended August 28, 2013, effective March 1, 2014.**

Rule 2.104

Forms

(a) States shall use the forms or electronic information system authorized by the commission.

(b) Section (a) shall not be construed to prohibit written, electronic or oral communication between compact offices.

**History: Adopted November 3, 2003, effective August 1, 2004; amended September 26, 2007, effective January 1, 2008; amended November 4, 2009, effective March 1, 2010; amended October 11, 2017, effective March 1, 2018.**

Rule 2.105

Misdemeanants

(a) A misdemeanor offender whose sentence includes 1 year or more of supervision shall be eligible for transfer, provided that all other criteria for transfer, as specified in Rule 3.101, have been satisfied; and the instant offense includes one or more of the following—

1. an offense in which a person has incurred direct or threatened physical or psychological harm;
2. an offense that involves the use or possession of a firearm;
3. a 2nd or subsequent misdemeanor conviction of driving while impaired by drugs or alcohol;
4. a sexual offense that requires the offender to register as a sex offender in the sending state.

*References:*
*ICAOS Advisory Opinions*
4-2005 [Misdemeanant offender not meeting criteria of 2.105 may be transferred under Rule 3.101-2, discretionary transfer]
7-2006 [There are no exceptions to applicability of (a)(3)based on either the time period between the 1st and subsequent offense(s) or the jurisdiction in which the convictions occurred]
16-2006 [If the law of the sending state recognizes the use of an automobile as an element in an assault offense and the offender is so adjudicated, Rule 2.105 (a)(1) applies]
2-2008 [Based upon the provisions of the ICAOS rules, offenders not subject to ICAOS may, depending on the terms and conditions of their sentences, be free to move across state lines without prior approval from the receiving state and neither judges nor probation officers are prohibited by ICAOS from allowing such offenders to travel from Texas to another state]
1-2011 [All violations involving the use or possession of a firearm, including hunting, are subject to Compact transfer.]

**History: Adopted November 3, 2003, effective August 1, 2004; amended March 12, 2004; amended October 26, 2004, effective January 1, 2005; amended October 7, 2015, effective March 1, 2016.**

## Rule 2.106

### Offenders subject to deferred sentences

Offenders subject to deferred sentences are eligible for transfer of supervision under the same eligibility requirements, terms, and conditions applicable to all other offenders under this compact. Persons subject to supervision pursuant to a pre-trial release program, bail, or similar program are not eligible for transfer under the terms and conditions of this compact.

*References:*
*ICAOS Advisory Opinions*
4-2004 [Determining eligibility should be based on legal actions of a court rather than legal definitions]
6-2005 [Deferred prosecution may be equivalent to deferred sentence if a finding or plea of guilt has been entered and all that is left is for the Court to impose sentence]

**History: Adopted November 3, 2003, effective August 1, 2004; amended March 12, 2004; amended October 26, 2004, effective January 1, 2005; amended November 4, 2009, effective March 1, 2010.**

## Rule 2.107

### Offenders on furlough, work release

A person who is released from incarceration under furlough, work-release, or other preparole program is not eligible for transfer under the compact.

**History: Adopted November 3, 2003, effective August 1, 2004.**

## Rule 2.108

### Offenders with disabilities

A receiving state shall continue to supervise offenders who become mentally ill or exhibit signs of mental illness or who develop a physical disability while supervised in the receiving state.

**History: Adopted November 3, 2003, effective August 1, 2004.**

Rule 2.109

Adoption of rules; amendment

Proposed new rules or amendments to the rules shall be adopted by majority vote of the members of the Interstate Commission in the following manner.

(a) Proposed new rules and amendments to existing rules shall be submitted to the Interstate Commission office for referral to the Rules Committee in the following manner:

1. Any Commissioner may submit a proposed rule or rule amendment for referral to the Rules Committee during the annual Commission meeting. This proposal would be made in the form of a motion and would have to be approved by a majority vote of a quorum of the Commission members present at the meeting.
2. Standing ICAOS Committees may propose rules or rule amendments by a majority vote of that committee.
3. ICAOS Regions may propose rules or rule amendments by a majority vote of members of that region.

(b) The Rules Committee shall prepare a draft of all proposed rules and provide the draft to all Commissioners for review and comments. All written comments received by the Rules Committee on proposed rules shall be posted on the Commission's website upon receipt. Based on the comments made by the Commissioners the Rules Committee shall prepare a final draft of the proposed rule(s) or amendments for consideration by the Commission not later than the next annual meeting falling in an odd-numbered year.

(c) Prior to the Commission voting on any proposed rule or amendment, the text of the proposed rule or amendment shall be published by the Rules Committee not later than 30 calendar days prior to the meeting at which vote on the rule is scheduled, on the official web site of the Interstate Commission and in any other official publication that may be designated by the Interstate Commission for the publication of its rules. In addition to the text of the proposed rule or amendment, the reason for the proposed rule shall be provided.

(d) Each proposed rule or amendment shall state—

1. The place, time, and date of the scheduled public hearing;
2. The manner in which interested persons may submit notice to the Interstate Commission of their intention to attend the public hearing and any written comments; and
3. The name, position, physical and electronic mail address, telephone, and telefax number of the person to whom interested persons may respond with notice of their attendance and written comments.

(e) Every public hearing shall be conducted in a manner guaranteeing each person who wishes to comment a fair and reasonable opportunity to comment. No transcript of the public hearing is required, unless a written request for a transcript is made, in which case the person requesting the transcript shall pay for the transcript. A recording may be made in lieu of a transcript under the same terms and conditions as a transcript. This subsection shall not preclude the Interstate Commission from making a transcript or recording of the public hearing if it so chooses.

(f) Nothing in this section shall be construed as requiring a separate public hearing on each rule. Rules may be grouped for the convenience of the Interstate Commission at public hearings required by this section.

(g) Following the scheduled public hearing date, the Interstate Commission shall consider all written

and oral comments received.

(h) The Interstate Commission shall, by majority vote of the commissioners, take final action on the proposed rule or amendment by a vote of yes/no. The Commission shall determine the effective date of the rule, if any, based on the rulemaking record and the full text of the rule.

(i) Not later than 60 calendar days after a rule is adopted, any interested person may file a petition for judicial review of the rule in the United States District Court of the District of Columbia or in the federal district court where the Interstate Commission's principal office is located. If the court finds that the Interstate Commission's action is not supported by substantial evidence, as defined in the federal Administrative Procedures Act, in the rulemaking record, the court shall hold the rule unlawful and set it aside. In the event that a petition for judicial review of a rule is filed against the Interstate Commission by a state, the prevailing party shall be awarded all costs of such litigation, including reasonable attorneys' fees.

(j) Upon determination that an emergency exists, the Interstate Commission may promulgate an emergency rule that shall become effective immediately upon adoption, provided that the usual rulemaking procedures provided in the compact and in this section shall be retroactively applied to the rule as soon as reasonably possible, in no event later than 90 calendar days after the effective date of the rule. An emergency rule is one that must be made effective immediately in order to—

1. Meet an imminent threat to public health, safety, or welfare;
2. Prevent a loss of federal or state funds;
3. Meet a deadline for the promulgation of an administrative rule that is established by federal law or rule; or
4. Protect human health and the environment.

(k) The Chair of the Rules Committee may direct revisions to a rule or amendment adopted by the Commission, for purposes of correcting typographical errors, errors in format or grammatical errors. Public notice of any revisions shall be posted on the official web site of the Interstate Commission and in any other official publication that may be designated by the Interstate Commission for the publication of its rules. For a period of 30 calendar days after posting, the revision is subject to challenge by any commissioner. The revision may be challenged only on grounds that the revision results in a material change to a rule. A challenge shall be made in writing, and delivered to the Executive Director of the Commission, prior to the end of the notice period. If no challenge is made, the revision will take effect without further action. If the revision is challenged, the revision may not take effect without approval of the commission.

**History: Adopted November 3, 2003, effective August 1, 2004; amended September 13, 2005, effective September 13, 2005; amended October 4, 2006, effective October 4, 2006; amended September 26, 2007, effective January 1, 2008; amended August 28, 2013, effective March 1, 2014.**

Rule 2.110

Transfer of offenders under this compact

(a) No state shall permit an offender who is eligible for transfer under this compact to relocate to another state except as provided by the Compact and these rules.

(b) An offender who is not eligible for transfer under this Compact is not subject to these rules and remains subject to the laws and regulations of the state responsible for the offender's supervision.

(c) Upon violation of section (a), the sending state shall direct the offender to return to the sending state within 15 business days of receiving such notice. If the offender does not return to the sending state as ordered, the sending state shall issue a warrant that is effective in all compact member states, without limitation as to specific geographic area, no later than 15 business days following the offender's failure to appear in the sending state.

*References:*
*ICAOS Advisory Opinions*
9-2006 [States which allow eligible offenders to travel to a receiving state pending investigations are in violation of Rule 2.110 and Rule 3.102. In such circumstances the receiving state may properly reject the request for transfer]
2-2008 [The provisions of Rule 2.110 (a) limit the applicability of the ICAOS rules regarding transfer of supervision to eligible offenders who 'relocate' to another state]
3-2012 [When an offender's supervision was never transferred to a receiving state under the Compact and no application for transfer or waiver of extradition ever occurred, neither the Compact nor the ICAOS rules apply to this offender who, as a 'fugitive from justice' having absconded from probation in California, must be apprehended and returned under the extradition clause of the U.S. Constitution.]
4-2012 ['Relocate' does not appear to limit the cumulative number of days within which an offender may be permitted to remain in another state to a total of 45 cumulative days during the same 12 month period.]

**History: Adopted November 3, 2003, effective August 1, 2004; amended September 13, 2005, effective January 1, 2006; amended November 4, 2009, effective March 1, 2010; amended August 28, 2013, effective March 1, 2014; amended September 29, 2021, effective April 1 2022.**

Rule 2.111

Emergency suspension of enforcement

(a) Upon a declaration of a national emergency by the President of the United States and/or the declaration of emergency by one or more Governors of the compact member states in response to a crisis, the Commission may, by majority vote, authorize the Executive Committee to temporarily suspend enforcement of Commission rules or parts thereof, but shall not suspend enforcement of any Compact powers and duties specified in the statute. Such suspension shall be justified based upon:

1. The degree of disruption of procedures or timeframes regulating the movement of offenders under the applicable provisions of the Compact, which is the basis for the suspension;
2. The degree of benefit (or detriment) of such suspension to the offender and/or public safety; and
3. The anticipated duration of the emergency.

(b) The length of any suspension shall be subject to the length of the national/state declaration(s) of emergency, or preemptively concluded by majority vote of the Executive Committee, whichever occurs sooner.

(c) States shall still maintain all of their duties under the Compact, unless instructed otherwise.

**History: Adopted April 21, 2020, effective April 21, 2020.**

***Rules governing transfer of supervision under the compact of the Interstate Commission for Adult Offender Supervision***

## Rule 3.101

### Mandatory transfer of supervision

At the discretion of the sending state, an offender shall be eligible for transfer of supervision to a receiving state under the compact, and the receiving state shall accept transfer, if the offender:

(a) has more than 90 calendar days or an indefinite period of supervision remaining at the time the sending state transmits the transfer request; and

(b) has a valid plan of supervision; and

(c) is in substantial compliance with the terms of supervision in the sending state; and

(d) is a resident of the receiving state; or

(e)

1. has resident family in the receiving state who have indicated a willingness and ability to assist as specified in the plan of supervision; and
2. can obtain employment in the receiving state or has means of support.

*References:*
*ICAOS Advisory Opinions*
7-2004 [While a sending state controls the decision of whether or not to transfer an offender under the Compact, the receiving state has no discretion as to whether or not to accept the case as long as the offender satisfies the criteria provided in this rule]
9-2004 [Upon proper application and documentation for verification of mandatory criteria of Rule 3.101, CSL offenders are subject to supervision under the Compact]
4-2005 [Are offenders who are not eligible to transfer under the provisions of Rule 3.101 (a) or Rule 2.105 of the Rules of the Interstate Compact for Adult Offender Supervision permitted to transfer under Rule 3.101 (c) as a discretionary transfer?]
8-2005 [The sending state determines if an offender is in substantial compliance. If a sending state has taken no action on outstanding warrants or pending charges the offender is considered to be in substantial compliance]
5-2006 [Time allowed for investigation by receiving state, Rule 4.101 - Manner and degree of supervision.]
6-2006 [Clarification of 90 day period of supervision is determined.]
13-2006 [An undocumented immigrant who meets the definition of “offender” and seeks transfer under the Compact is subject to its jurisdiction and would not be a per se disqualification as long as the immigrant establishes the prerequisites of Rule 3.101 have been satisfied]
2-2007 [A receiving state is not authorized to deny a transfer of an offender based solely on the fact that the offender intends to reside in Section 8 housing]
1-2010 [ICAOS member states may not refuse otherwise valid mandatory transfers of supervision under the compact on the basis that additional information, not required by Rule 3.107, has not been provided.]

**History: Adopted November 3, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended September 13, 2005, effective January 1, 2006; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; amended August 28, 2013, effective March 1, 2014.**

Rule 3.101-1

Mandatory reporting instructions and transfers of military, families of military, family members

employed, employment transfer, and veterans for medical or mental health services

(a) At the discretion of the sending state, an offender shall be eligible for transfer of supervision to a receiving state under the compact, and the receiving state shall accept transfer for:

1. *Transfers of military members*—An offender who is a member of the military and is under orders in another state, shall be eligible for reporting instructions and transfer of supervision. A copy of the military orders shall be provided at the time of the request.
2. *Transfer of offenders who live with family who are members of the military*—An offender who meets the criteria specified in Rules 3.101 (a), (b), & (c) and (e)(2) and who lives with a family member who is under orders in another state, shall be eligible for reporting instructions and transfer of supervision, provided that the offender will live with the military member in the receiving state. A copy of the military orders shall be provided at the time of the request.
3. *Employment transfer of family member to another state*—An offender who meets the criteria specified in Rules 3.101 (a), (b), & (c) and (e)(2) and whose family member, with whom he or she resides, is transferred to another state by their full-time employer, at the direction of the employer and as a condition of maintaining employment, shall be eligible for reporting instructions and transfer of supervision, provided that the offender will live with the family member in the receiving state. Documentation from the current employer noting the requirements shall be provided at the time of the request.
4. *Employment transfer of the offender to another state*—An offender who meets the criteria specified in Rules 3.101 (a), (b), & (c) and is transferred to another state by their full-time employer, at the direction of the employer and as a condition of maintaining employment shall be eligible for reporting instructions and transfer of supervision. Documentation from the current employer noting the requirements shall be provided at the time of the request.
5. *Transfers of veterans for medical or mental health services*—An offender who meets the criteria specified in Rules 3.101 (a), (b), & (c) and who is a veteran of the United States military services who is eligible to receive health care through the United States Department of Veterans Affairs, Veterans Health Administration and is referred for medical and/or mental health services by the Veterans Health Administration to a regional Veterans Health Administration facility in the receiving state shall be eligible for reporting instructions and transfer of supervision provided:

   (A) the sending state provides documentation to the receiving state of the medical and/or mental health referral or acceptance; and
   (B) the transfer of supervision will be accepted if the offender is approved for care at the receiving state Veterans Health Administration facility.

(b) The receiving state shall issue reporting instructions no later than 2 business days following receipt of such a request from the sending state.

(c) If the receiving state rejects the transfer request for an offender who has been granted reporting instructions and has arrived in the receiving state, the receiving state shall initiate the offender’s return to the sending state under the requirements of Rule 4.111.

(d) If the sending state fails to send a completed transfer request by the 15th business day for an offender who has been granted reporting instructions and has arrived in the receiving state, the receiving state may initiate the offender’s return to the sending state under the requirements of Rule 4.111.

**History: Adopted September 13, 2005, effective January 1, 2006; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; amended November 4, 2009, effective March 1, 2010; amended August 28, 2013, effective March 1, 2014; amended October 7, 2015, effective March 1, 2016; amended October 11, 2017, effective March 1, 2018; amended October 9, 2019, effective April 1, 2020.**

Rule 3.101-2

Discretionary transfer of supervision

(a) A sending state may request transfer of supervision of an offender who does not meet the eligibility requirements in Rule 3.101, where acceptance in the receiving state would support successful completion of supervision, rehabilitation of the offender, promote public safety, and protect the rights of victims.

(b) The sending state shall provide sufficient documentation to justify the requested transfer.

(c) The receiving state shall have the discretion to accept or reject the transfer of supervision in a manner consistent with the purpose of the compact specifying the discretionary reasons for rejection.

*References:*
*ICAOS Advisory Opinions*
4-2005 [Offenders not eligible for transfer under the provisions of Rule 2.105 and Rule 3.101 are eligible for transfer of supervision as a discretionary transfer]
8-2006 [Special condition(s) imposed on discretionary cases may result in retaking if the offender fails to fulfill requirements of the condition(s)]

**History: Adopted September 13, 2005, effective January 1, 2006; amended October 7, 2015, effective March 1, 2016.**

Rule 3.101-3

Transfer of supervision of sex offenders

(a) *Eligibility for Transfer*—At the discretion of the sending state a sex offender shall be eligible for transfer to a receiving state under the Compact rules. A sex offender shall not be allowed to leave the sending state until the sending state's request for transfer of supervision has been approved, or reporting instructions have been issued, by the receiving state. In addition to the other provisions of Chapter 3 of these rules, the following criteria will apply.

(b) *Application for Transfer*—In addition to the information required in an application for transfer pursuant to Rule 3.107, the sending state shall provide the following information, if available, to assist the receiving state in the investigation of the transfer request of a sex offender:

1. All assessment information, completed by the sending state;
2. Victim information if distribution is not prohibited by law
   (A) the name, sex, age and relationship to the offender;
   (B) the statement of the victim or victim's representative;
3. the sending state's current or recommended supervision and treatment plan.

(c) Additional documents necessary for supervision in the receiving state, such as a law enforcement report regarding the offender's prior sex offense(s), sending state's risk and needs score, or case plan may be requested from the sending state following acceptance of the offender. If available, the sending state shall provide the documents within 30 calendar days from the date of the request unless distribution is prohibited by law.

(d) A sending state shall provide the following for reporting instructions requests submitted pursuant to this section:

1. A narrative description of the instant offense in sufficient detail to describe the circumstances, type and severity of offense and whether the charge was reduced at the time of imposition of sentence;
2. Conditions of supervision;
3. Any orders restricting the offender's contact with victims or any other person; and
4. Victim information to include the name, sex, age and relationship to the offender, if available and if distribution is not prohibited by law.

(e) No travel permit shall be granted by the sending state until reporting instructions are issued by the receiving state; except as provided in Rule 3.102 (c).

(f) *Reporting instructions for sex offenders living in the receiving state at the time of sentencing, transfers of military members, families of military members, employment transfer of the offender or family member, or veterans for medical or mental health services*—Rules 3.101-1 & 3.103 apply to the transfer of sex offenders, as defined by the compact, except:

The receiving state shall issue reporting instructions no later than 5 business days following the receipt of such a request from the sending state unless similar sex offenders sentenced in the receiving state would not be permitted to live at the proposed residence

(g) Expedited reporting instructions for sex offenders – Rule 3.106 applies to the transfer of sex offenders, as defined by the compact; except, the receiving state shall provide a response to the sending state no later than 5 business days following receipt of such a request.

*References:*
*ICAOS Advisory Opinions*
1-2008 [An investigation in such cases would be largely meaningless without the cooperation of the sending state in providing sufficient details concerning the sex offense in question and a refusal to provide such information so as to allow the receiving state to make a reasonable determination as to whether the proposed residence violates local policies or laws would appear to violate the intent of this rule]

**History: Adopted September 26, 2007, effective January 1, 2008; editorial change effective February 17, 2008; amended October 7, 2015, effective March 1, 2016; amended October 9, 2019, effective April 1, 2020.**

## Rule 3.102

### Submission of transfer request to a receiving state

(a) Except as provided in sections (c) & (d), and subject to the exceptions in Rule 3.103 and 3.106, a sending state seeking to transfer supervision of an offender to another state shall submit a completed transfer request with all required information to the receiving state prior to allowing the offender to leave the sending state.

(b) Except as provided in sections (c) & (d), and subject to the exceptions in Rule 3.103 and 3.106, the sending state shall not allow the offender to travel to the receiving state until the receiving state has replied to the transfer request.

(c) An offender who is employed or attending treatment or medical appointments in the receiving state at the time the transfer request is submitted and has been permitted to travel to the receiving state for employment, treatment or medical appointment purposes may be permitted to continue to travel to the receiving state for these purposes while the transfer request is being investigated, provided that the following conditions are met:

1. Travel is limited to what is necessary to report to work and perform the duties of the job or to attend treatment or medical appointments and return to the sending state.
2. The offender shall return to the sending state daily, immediately upon completion of the appointment or employment, and
3. The transfer request shall include notice that the offender has permission to travel to and from the receiving state, pursuant to this rule, while the transfer request is investigated.

(d) When a sending state verifies an offender is released from incarceration in a receiving state and the offender requests to relocate there and the offender meets the eligibility requirements of Rule 3.101 (a), (b) & (c), the sending state shall request expedited reporting instructions within 2 business days of the notification of the offender's release. The receiving state shall issue the reporting instructions no later than 2 business days. If the proposed residence is invalid due to existing state law or policy, the receiving state may deny reporting instructions.

1. The receiving state shall assist the sending state in acquiring the offender's signature on the "Application for Interstate Compact Transfer" and any other forms that may be required under Rule 3.107, and shall transmit these forms to the sending state within 7 business days and mail the original to the sending state.
2. The provisions of Rule 3.106 (b), (c) & (d) apply.

*References:*
*ICAOS Advisory Opinions*
9-2006 [States which allow eligible offenders to travel to a receiving state, without the receiving state's permission, are in violation of Rule 2.110 and 3.102. In such circumstances, the receiving state can properly reject the request for transfer of such an offender]

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 26, 2007, effective January 1, 2008; amended November 4, 2009, effective March 1, 2010; amended August 28, 2013, effective March 1, 2014; amended October 7, 2015, effective March 1, 2016.**

## Rule 3.103

### Reporting instructions; offender living in the receiving state at the time of sentencing or after disposition of a violation or revocation proceeding

(a)

1. A request for reporting instructions for an offender who was living in the receiving state at the time of initial sentencing or after disposition of a violation or revocation proceeding shall be submitted by the sending state within 7 business days of the initial sentencing date, disposition of violation, revocation proceeding or release from incarceration to probation supervision. The sending state may grant a 7 day travel permit to an offender who was living in the receiving state at the time of initial sentencing or disposition of violation or revocation proceeding. Prior to granting a travel permit to an offender, the sending state shall verify that the offender is living in the receiving state.
2. The receiving state shall issue reporting instructions no later than 2 business days following receipt of such a request from the sending state.
3. The sending state shall ensure that the offender signs all forms requiring the offender's signature under Rule 3.107 prior to granting a travel permit to the offender. Upon request from the receiving state, the sending state shall transmit all signed forms within 5 business days.
4. The sending state shall transmit a departure notice to the receiving state per Rule 4.105.
5. This section is applicable to offenders incarcerated for 6 months or less and released to probation supervision.

(b) The sending state retains supervisory responsibility until the offender's arrival in the receiving state.

(c) A receiving state shall assume responsibility for supervision of an offender who is granted reporting instructions upon the offender's arrival in the receiving state. The receiving state shall submit an arrival notice to the sending state per Rule 4.105.

(d) A sending state shall transmit a completed transfer request for an offender granted reporting instructions no later than 15 business days following the granting to the offender of the reporting instructions.

(e) If the receiving state rejects the transfer request for an offender who has been granted reporting instructions and has arrived in the receiving state, the receiving state shall initiate the offender's return to the sending state under the requirements of Rule 4.111.

(f) If the sending state fails to send a completed transfer request by the 15th business day for an offender who has been granted reporting instructions and has arrived in the receiving state, the receiving state may initiate the offender's return to the sending state under the requirements of Rule 4.111.

*References:*
*ICAOS Advisory Opinions*
3-2007 [If the investigation has not been completed, reporting instructions are required to be issued as provided in Rule 3.103(a). Upon completion of investigation, if the receiving state subsequently denies the transfer on the same basis or upon failure to satisfy any of the other requirements of Rule 3.101, the provisions of Rule 3.103(e)(1) and (2) clearly require the offender to return to the sending state or be retaken upon issuance of a warrant]

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; editorial change effective February 17, 2008; amended August 28, 2013, effective March 1, 2014; amended October 7, 2015, effective March 1, 2016.**

Rule 3.104

Time allowed for investigation by receiving state

(a) A receiving state shall complete investigation and respond to a sending state's request for an offender's transfer of supervision no later than the 45th calendar day following receipt of a completed transfer request in the receiving state's compact office.

(b) If a receiving state determines that an offender transfer request is incomplete, the receiving state shall notify the sending state by rejecting the transfer request with the specific reason(s) for the rejection. If the offender is in the receiving state with reporting instructions, those instructions shall remain in effect provided that the sending state submits a completed transfer request within 15 business days following the rejection.
(c) If a receiving state determines that an offender's plan of supervision is invalid, the receiving state shall notify the sending state by rejecting the transfer request with specific reason(s) for the rejection. If the receiving state determines there is an alternative plan of supervision for investigation, the receiving state shall notify the sending state at the time of rejection. If the offender is in the receiving state with reporting instructions, those instructions shall remain in effect provided that the sending state submits a completed transfer request with the new plan of supervision within 15 business days following the rejection.

*References:*
*ICAOS Advisory Opinions*
5-2006 [45 calendar days is the maximum time the receiving state has under the rules to respond to a sending state's request for transfer]

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended September 13, 2005, effective June 1, 2009; amended November 4, 2009, effective March 1, 2010; amended August 28, 2013, effective March 1, 2014; amended October 11, 2017, effective March 1, 2018.**

Rule 3.104-1

Acceptance of offender; issuance of reporting instructions

(a) If a receiving state accepts transfer of the offender, the receiving state's acceptance shall include reporting instructions.

(b) Upon notice of acceptance of transfer by the receiving state, the sending state shall issue a travel permit to the offender and notify the receiving state of the offender's departure as required under Rule 4.105.

(c) A receiving state shall assume responsibility for supervision of an offender upon the offender's arrival in the receiving state and shall submit notification of arrival as required under Rule 4.105.

(d) An acceptance by the receiving state shall be valid for 120 calendar days. If the sending state has not sent a Departure Notice to the receiving state in that time frame, the receiving state may withdraw its acceptance and close interest in the case.

(e) A receiving state may withdraw its acceptance of the transfer request if the offender does not report to the receiving state by the 5th business day following transmission of notice of departure and shall provide immediate notice of such withdrawal to the sending state.

**History: Adopted October 26, 2004, effective August 1, 2004; amended September 13, 2005, effective January 1, 2006; amended October 4, 2006, effective January 1, 2007; amended November 4, 2009, effective March 1, 2010; amended August 28, 2013, effective March 1, 2014.**

Rule 3.105

Pre-release transfer request

(a) A sending state may submit a completed request for transfer of supervision no earlier than 120 calendar days prior to an offender's planned release from a correctional facility.

(b) If a pre-release transfer request has been submitted, a sending state shall notify a receiving state:

1. if the planned release date changes; or
2. if recommendation for release of the offender has been withdrawn or denied.

(c) A receiving state may withdraw its acceptance of the transfer request if the offender does not report to the receiving state by the 5th business day following the offender's intended date of departure and shall provide immediate notice of such withdrawal to the sending state.

*References:*
*ICAOS Advisory Opinions*
1-2009 [A sending state may request that a receiving state investigate a request to transfer supervision under the compact prior to the offender's release from incarceration when the offender is subject to a "split sentence" of jail or prison time and release to probation supervision.]
2-2012 [Neither the acceptance of a request for transfer by a receiving state nor approval of reporting instructions can be the basis for either the determination of whether the sending state will release an offender from a correctional facility or the planned release date.]

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 14, 2011, effective March 1, 2012; amended August 28, 2013, effective March 1, 2014.**

## Rule 3.106

## Request for expedited reporting instructions

(a)

1. A sending state may request that a receiving state agree to expedited reporting instructions for an offender if the sending state believes that emergency circumstances exist and the receiving state agrees with that determination. If the receiving state does not agree with that determination, the offender shall not proceed to the receiving state until an acceptance is received under Rule 3.104-1.
2. (A) A receiving state shall provide a response for expedited reporting instructions to the sending state no later than 2 business days following receipt of such a request. The sending state shall transmit a departure notice to the receiving state upon the offender's departure.
   (B) The sending state shall ensure that the offender signs all forms requiring the offender's signature under Rule 3.107 prior to granting reporting instructions to the offender. Upon request from the receiving state the sending state shall transmit all signed forms within 5 business days.

(b) A receiving state shall assume responsibility for supervision of an offender who is granted reporting instructions during the investigation of the offender's plan of supervision upon the offender's arrival in the receiving state. The receiving state shall submit an arrival notice to the sending state per Rule 4.105.

(c) A sending state shall transmit a completed transfer request for an offender granted reporting instructions no later than the 7th business day following the granting to the offender of the reporting instructions.

(d) If the receiving state rejects the transfer request for an offender who has been granted reporting instructions and has arrived in the receiving state, the receiving state shall initiate the offender's return to the sending state under the requirements of Rule 4.111.

(e) If the sending state fails to send a completed transfer request by the 7th business day for an offender who has been granted reporting instructions and has arrived in the receiving state, the receiving state may initiate the offender's return to the sending state under the requirements of Rule 4.111.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; amended August 28, 2013, effective March 1, 2014; amended October 7, 2015, effective March 1, 2016.**

Rule 3.107

Transfer Request

(a) A transfer request for an offender shall be transmitted through the electronic information system authorized by the commission and shall contain:

1. A narrative description of the instant offense in sufficient detail to describe the circumstances, type and severity of offense and whether the charge has been reduced at the time of imposition of sentence;
2. photograph of offender;
3. conditions of supervision;
4. any orders restricting the offender's contact with victims or any other person;
5. any known orders protecting the offender from contact with any other person;
6. information as to whether the offender is subject to sex offender registry requirements in the sending state along with supportive documentation;
7. pre-sentence investigation report, unless distribution is prohibited by law or it does not exist;
8. information as to whether the offender has a known gang affiliation, and the gang with which the offender is known to be affiliated;
9. supervision history, if the offender has been on supervision for more than 30 calendar days at the time the transfer request is submitted;
10. information relating to any court-ordered financial obligations, including but not limited to, fines, court costs, restitution, and family support; the balance that is owed by the offender on each; and the address of the office to which payment must be made;
11. summary of prison discipline and mental health history during the last 2 years, if available, unless distribution is prohibited by law.

(b) A copy of the signed Offender Application for Interstate Compact Transfer shall be attached to the transfer request.

(c) Additional documents, necessary for supervision in the receiving state, such as the Judgment and Commitment, may be requested from the sending state following acceptance of the offender. If available, the sending state shall provide the documents within 30 calendar days from the date of the request unless distribution is prohibited by law.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended September 13, 2005 (to be effective upon the implementation of electronic system; date to be determined by Executive Committee), effective October 6, 2008; amended September 26, 2007, effective January 1, 2008; amended November 4, 2009, effective March 1, 2010; amended October 13, 2010, effective March 1, 2011; amended September 14, 2011, effective March 1, 2012; amended August 28, 2013, effective March 1, 2014; amended October 11, 2017, effective March 1, 2018; amended October 9, 2019, effective April 1, 2020.**

Rule 3.108

Victims' right to be heard and comment

(a) When an offender submits a request to transfer to a receiving state or a subsequent receiving state, or to return to a sending state, the victim notification authority in the sending state shall inform victims of the offender of their right to be heard and comment. Victims of the offender have the right to be heard regarding their concerns relating to the transfer request for their safety and family members' safety. Victims have the right to contact the sending state's interstate compact office regarding their concerns relating to the transfer request for their safety and family members' safety. The victim notification authority in the sending state shall provide victims of the offender with information regarding how to respond and be heard if the victim chooses.

(b)

(1) Victims shall have 15 business days from receipt of notice required in Rule 3.108(a) to respond to the sending state. Receipt of notice shall be presumed to have occurred by the 5th business day following its sending.

(2) The receiving state shall continue to investigate the transfer request while awaiting response from the victim.

(c) The sending state shall consider victim related concerns. Victims' comments shall be confidential and shall not be disclosed to the public. The sending state or receiving state may impose conditions of supervision on the offender to address victim related concerns.

(d) The sending state shall respond to the victim no later than 5 business days following receipt of victim related concerns.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 11, 2017, effective March 1, 2018; amended October 9, 2019, effective April 1, 2020.**

## Rule 3.108-1

### Victim notification and requests for offender information

(a) *Notification to victims upon transfer of offenders*—Within 1 business day of the issuance of reporting instructions or acceptance of transfer by the receiving state, the sending state shall initiate notification procedures to victims of the transfer of supervision of the offender in accordance with its own laws.

(b) The receiving state shall respond to requests for offender information from the sending state no later than the 5th business day following the receipt of the request.

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 14, 2016, effective June 1, 2017; amended October 9, 2019, effective April 1, 2020.**

Rule 3.109

Waiver of extradition

(a) An offender applying for interstate supervision shall execute, at the time of application for transfer, a waiver of extradition from any state to which the offender may abscond while under supervision in the receiving state.

(b) States that are party to this compact waive all legal requirements to extradition of offenders who are fugitives from justice.

*References:*
*ICAOS Advisory Opinions*
2-2005 [In seeking a compact transfer of supervision, the offender accepts that a sending state can retake them at anytime and that formal extradition hearings would not be required.]
3-2012 [Whether an offender whose supervision was never transferred under the Compact, and who subsequently absconds supervision, is subject to the terms of the Compact or the Extradition Clause of the U.S. Constitution.]

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 3.110

Travel Permits

(a) Notification of travel permits - The receiving state shall notify the sending state prior to the issuance of a travel permit for an offender traveling to the sending state.
(b) This rule does not apply to offenders who are employed or attending treatment or medical appointments in the sending state, provided that the following conditions are met:

1. Travel is limited to what is necessary to report to work and perform the duties of the job or to attend treatment or medical appointments; and
2. The offender shall return to the receiving state immediately upon completion of the appointment or employment.

**Adopted October 9, 2019, effective April 1, 2020.**

***Rules governing supervision in the receiving state under the compact of the Interstate Commission for Adult Offender Supervision***

Rule 4.101

Manner and degree of supervision in receiving state

A receiving state shall supervise offenders consistent with the supervision of other similar offenders sentenced in the receiving state, including the use of incentives, corrective actions, graduated responses, and other supervision techniques.

*References:*
*ICAOS Advisory Opinions*
2-2005 [Arresting & Detaining Compact Probationers and Parolees. Authority of officers to arrest an out-of-state offender sent to Florida under the ICAOS on probation violations.]
5-2006 [45 calendar days is the maximum time the receiving state has under the rules to respond to a sending state's request for transfer]
3-2008 [Guidance Concerning Out-of-State Travel for Sex Offenders]

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 14, 2016, effective June 1, 2017.**

## Rule 4.102

### Duration of supervision in the receiving state

A receiving state shall supervise an offender transferred under the interstate compact for a length of time determined by the sending state.

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 4.103

Conditions of supervision

(a) At the time of acceptance or during the term of supervision, the receiving state may impose a condition on an offender if that condition would have been imposed on an offender sentenced in the receiving state.

(b) A receiving state shall notify a sending state that it intends to impose, or has imposed, a condition on the offender.

(c) A sending state shall inform the receiving state of any conditions to which the offender is subject at the time the request for transfer is made or at any time thereafter.

(d) A receiving state that is unable to enforce a condition imposed in the sending state shall notify the sending state of its inability to enforce a condition at the time of request for transfer of supervision is made.

*References:*
*ICAOS Advisory Opinions*
2-2005 [In seeking a compact transfer of supervision, the offender accepts that a sending state can retake them at any time and that formal extradition hearings would not be required and that he or she is subject to the same type of supervision afforded to other offenders in the receiving state… The receiving state can even add additional requirements on an offender as a condition of transfer]
5-2006 [Special conditions may be imposed by the receiving state after an offender has transferred]
1-2008 [Rule 4.103 concerning special conditions does not authorize a receiving state to deny a mandatory transfer of an offender under the compact who meets the requirements of such a transfer under Rule 3.101]

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 13, 2005, effective January 1, 2006; amended September 14, 2016, effective June 1, 2017.**

Rule 4.103-1

Force and effect of conditions imposed by a receiving state

The sending state shall give the same force and effect to conditions imposed by a receiving state as if those conditions had been imposed by the sending state.

**History: Adopted October 26, 2004, effective January 1, 2005; amended October 4, 2006, effective January 1, 2007; amended September 14, 2016, effective June 1, 2017.**

Rule 4.104

Offender registration or DNA testing in receiving or sending state

A receiving state shall require that an offender transferred under the interstate compact comply with any offender registration and DNA testing requirements in accordance with the laws or policies of the receiving state and shall assist the sending state to ensure DNA testing requirements and offender registration requirements of a sending state are fulfilled.

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 26, 2007, effective January 1, 2008**

Rule 4.105

Arrival and departure notifications; withdrawal of reporting instructions

(a) *Departure notifications*—At the time of an offender's departure from any state pursuant to a transfer of supervision or the granting of reporting instructions, the state from which the offender departs shall notify the intended receiving state, and, if applicable, the sending state, through the electronic information system of the date and time of the offender's intended departure and the date by which the offender has been instructed to arrive.

(b) *Arrival notifications*—At the time of an offender's arrival in any state pursuant to a transfer of supervision or the granting of reporting instructions, or upon the failure of an offender to arrive as instructed, the intended receiving state shall immediately notify the state from which the offender departed, and, if applicable, the sending state, through the electronic information system of the offender's arrival or failure to arrive.

(c) A receiving state may withdraw its reporting instructions if the offender does not report to the receiving state as directed.

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 13, 2005, effective June 1, 2009.**

## Rule 4.106

### Progress reports on offender compliance and non–compliance

(a) A receiving state shall submit a progress report to the sending state within 30 calendar days of receiving a request.

(b) A receiving state may initiate a progress report to document offender compliant or noncompliant behavior that does not require retaking as well as incentives, corrective actions or graduated responses imposed. The receiving state shall provide: date(s), description(s) and documentation regarding the use of incentives, corrective actions, including graduated responses or other supervision techniques to address the behavior in the receiving state, and the offender's response to such actions.

(c) A progress report shall include–

1. offender's name;
2. offender's current residence address;
3. offender's current telephone number and current electronic mail address;
4. name and address of offender's current employer;
5. supervising officer's summary of offender's conduct, progress and attitude, and compliance with conditions of supervision;
6. programs of treatment attempted and completed by the offender;
7. information about any sanctions that have been imposed on the offender since the previous progress report;
8. supervising officer's recommendation;
9. any other information requested by the sending state that is available in the receiving state.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended November 4, 2009, effective March 1, 2010; amended September 14, 2016, effective June 1, 2017; amended October 9, 2019, effective April 2020.**

## Rule 4.107

## Fees

(a) *Application fee*—A sending state may impose a fee for each transfer application prepared for an offender.

(b) *Supervision fee*—

1. A receiving state may impose a reasonable supervision fee on an offender whom the state accepts for supervision, which shall not be greater than the fee charged to the state’s own offenders.
2. A sending state shall not impose a supervision fee on an offender whose supervision has been transferred to a receiving state.

*References:*
*ICAOS Advisory Opinions*
14-2006 [A fee imposed by a sending state for purposes of defraying costs for sex offender registration and victim notification, not appearing to fit criteria of a "supervision fee," may be collected on Compact offenders at a sending state's responsibility]

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 4.108

Collection of restitution, fines and other costs

(a) A sending state is responsible for collecting all fines, family support, restitution, court costs, or other financial obligations imposed by the sending state on the offender.

(b) Upon notice by the sending state that the offender is not complying with family support and restitution obligations, and financial obligations as set forth in subsection (a), the receiving state shall notify the offender that the offender is in violation of the conditions of supervision and must comply. The receiving state shall inform the offender of the address to which payments are to be sent.

*References:*
*ICAOS Advisory Opinions*
14-2006 [A fee imposed by a sending state for purposes of defraying costs for sex offender registration and victim notification, not appearing to fit criteria of a "supervision fee," may be collected on Compact offenders at a sending state's responsibility. A receiving state would be obligated for notifying the offender to comply with such financial responsibility under Rule 4.108 (b)]

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 4.109

Violation report(s) requiring retaking

(a) A receiving state shall notify a sending state of an act or pattern of behavior requiring retaking within 30 calendar days of discovery or determination by submitting a violation report.

(b) A violation report shall contain–

1. offender’s name and location;
2. offender’s state-issued identifying numbers;
3. date(s) and description of the behavior requiring retaking;
4. date(s), description(s) and documentation regarding the use of incentives, corrective actions, including graduated responses or other supervision techniques to address the behavior requiring retaking in the receiving state, and the offender’s response to such actions;
5. date(s), description(s) and documentation regarding the status and disposition, if any, of offense(s) or behavior requiring retaking;
6. date(s), description(s) and documentation of previous non-compliance, to include a description of the use of corrective actions, graduated responses or other supervision techniques;
7. name and title of the officer making the report;
8. if the offender has absconded, the offender’s last known address and telephone number, name and address of the offender’s employer, and the date of the offender’s last personal contact with the supervising officer and details regarding how the supervising officer determined the offender to be an absconder.
9. supporting documentation regarding the violation.

(c)

1. The sending state shall respond to a report of a violation made by the receiving state no later than 10 business days following transmission by the receiving state.
2. The response by the sending state shall include action to be taken by the sending state and the date by which that action will begin and its estimated completion date.

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 26, 2007, effective January 1, 2008; amended October 13, 2010, effective March 1, 2011; amended August 28, 2013, effective March 1, 2014; amended September 14, 2016, effective June 1, 2017.**

Rule 4.109-1

Authority to arrest and detain

An offender in violation of the conditions of supervision may be taken into custody or continued in custody by the receiving state.

**History: Adopted October 4, 2006, effective January 1, 2007; amended September 14, 2016, effective June 1, 2017.**

## Rule 4.109-2

## Absconding Violation

(a) If there is reasonable suspicion that an offender has absconded, the receiving state shall attempt to locate the offender. Such activities shall include, but are not limited to:

1. Documenting communication attempts directly to the offender, including dates of each attempt;
2. Conducting a field contact at the last known place of residence;
3. Contacting the last known place of employment, if applicable;
4. Contacting known family members and collateral contacts, which shall include contacts identified in original transfer request.

(b) If the offender is not located, the receiving state shall submit a violation report pursuant to Rule 4.109(b)(8).

**History: Adopted October 13, 2010, effective March 1, 2011; amended October 9, 2019, effective April 1, 2020.**

Rule 4.110

Transfer to a subsequent receiving state

(a) At the request of an offender for transfer to a subsequent receiving state, and with the approval of the sending state, the sending state shall prepare and transmit a request for transfer to the subsequent state in the same manner as an initial request for transfer is made.

(b) The receiving state shall assist the sending state in acquiring the offender's signature on the "Application for Interstate Compact Transfer" and any other forms that may be required under Rule 3.107, and shall transmit these forms to the sending state.

(c) The receiving state shall submit a statement to the sending state summarizing the offender's progress under supervision.

(d) The receiving state shall issue a travel permit to the offender when the sending state informs the receiving state that the offender's transfer to the subsequent receiving state has been approved.

(e) Notification of offender's departure and arrival shall be made as required under Rule 4.105.

(f) Acceptance of the offender's transfer of supervision by a subsequent state and issuance of reporting instructions to the offender terminate the receiving state's supervisory obligations for the offender.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended September 13, 2005 (to be effective upon the implementation of electronic system; date to be determined by Executive Committee) amended September 26, 2007, effective January 1, 2008.**

## Rule 4.111

### Offenders returning to the sending state

(a) For an offender returning to the sending state, the receiving state shall request reporting instructions, unless the offender is under active criminal investigation or is charged with a subsequent felony or violent crime in the receiving state. The receiving state shall provide the sending state with the reason(s) for the offender's return. The offender shall remain in the receiving state until receipt of reporting instructions.

(b) If the receiving state rejects the transfer request for an offender who has arrived in the receiving state with approved reporting instructions under Rules 3.101-1, 3.101-3, 3.103 or 3.106, the receiving state shall, upon submitting notice of rejection, submit a request for return reporting instructions within 7 business days, unless Rule 3.104 (b) or (c) applies or if the location of the offender is unknown, conduct activities pursuant to Rule 4.109-2.

(c) The sending state shall grant the request no later than 2 business days following receipt of the request for reporting instructions from the receiving state. The instructions shall direct the offender to return to the sending state within 15 business days from the date the request was received.

(d) The receiving state shall provide the offender reporting instructions and determine the offender's intended departure date. If unable to locate the offender to provide the reporting instructions, the receiving state shall conduct activities pursuant to Rule 4.109-2.

(e) The receiving state retains authority to supervise the offender until the offender's directed departure date or issuance of the sending state's warrant. Upon departing, the receiving state shall notify the sending state as required in Rule 4.105 (a) and submit a case closure as required by Rule 4.112 (a)(5). The sending state shall notify the receiving state of the offender's arrival or failure to arrive as required by Rule 4.105 (b) prior to validating the case closure notice.

(f) If the offender does not return to the sending state as ordered, the sending state shall issue a warrant no later than 15 business days following the offender's failure to appear in the sending state.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective day January 1, 2005; amended September 26, 2007, effective January 1, 2008; amended September 14, 2011, effective March 1, 2012; amended October 7, 2015, effective March 1, 2016; amended October 11, 2017, effective March 1, 2018; amended October 9, 2019, effective April 1, 2020; amended September 29, 2021, effective April 1, 2022**

## Rule 4.112

### Closing of supervision by the receiving state

(a) The receiving state may close its supervision of an offender and cease supervision upon–

1. The date of discharge indicated for the offender at the time of application for supervision unless informed of an earlier or later date by the sending state;
2. Notification to the sending state of the absconding of the offender from supervision in the receiving state;
3. Notification to the sending state that the offender has been sentenced to incarceration for 180 calendar days or longer, including judgment and sentencing documents and information about the offender's location;
4. Notification of death; or
5. Return to sending state.

(b) A receiving state shall not terminate its supervision of an offender while the sending state is in the process of retaking the offender.

(c) At the time a receiving state closes supervision, a case closure notice shall be provided to the sending state which shall include last known address and employment. The receiving state shall transmit a case closure notice within 10 business days after the maximum expiration date.

(d) The sending state shall submit the case closure notice reply to the receiving state within 10 business days of receipt.

*References:*
*ICAOS Advisory Opinions*
11-2006 [A receiving state closing supervision interest, does not preclude the jurisdiction of the Compact except for cases where the original term of supervision has expired]
2-2010 [If a sending state modifies a sentencing order so that the offender no longer meets the definition of "supervision," no further jurisdiction exists to supervise the offender under the compact and qualifies as a discharge requiring a receiving state to close supervision.]
1-2019 [Except in those excluded cases where the offender is discharged from supervision under the original application for supervision, absconders who are subsequently apprehended are subject to the compact and Rules 4.112 (b) and 5.107.]

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended September 26, 2007, effective January 1, 2008; amended September 14, 2011, effective March 1, 2012; amended August 28, 2013, effective March 1, 2014.**

***Rules governing retaking an offender under the compact of the Interstate Commission for Adult Offender Supervision***

Rule 5.101

Discretionary retaking by the sending state

(a) Except as required in Rules 5.101-1, 5.102, 5.103 and 5.103-1 at its sole discretion, a sending state may order the return of an offender. The sending state must notify the receiving state within 15 business days of their issuance of the directive to the offender to return. The receiving state shall request return reporting instructions under Rule 4.111. If the offender does not return to the sending state as ordered, then the sending state shall issue a warrant no later than 15 business days following the offender's failure to appear in the sending state.

(b) Except as required in Rules 5.101-1, 5.102, 5.103 and 5.103-1 at its sole discretion, a sending state may retake an offender via warrant. The sending state must notify the receiving state within 15 business days of the issuance of their warrant. The receiving state shall assist with the apprehension of the offender and shall notify the sending state once the offender is in custody on the sending state's warrant.

*References:*
*ICAOS Advisory Opinions*
13-2006 [Retaking of an undocumented immigrant is at the sole discretion of the sending state unless the offender comes within the exceptions provided in Rule 5.102]

**History: Adopted November 4, 2003, effective August 1, 2004; amended September 26, 2007, effective January 1, 2008; amended October 13, 2010, effective March 1, 2011; amended August 28, 2013, effective March 1, 2014; amended October 9, 2019, effective April 1, 2020; amended September 29, 2021, effective April 1, 2022**

Rule 5.101-1

Pending felony or violent crime charges

Notwithstanding any other rule, if an offender is charged with a subsequent felony or violent crime, the offender shall not be retaken or ordered to return until criminal charges have been dismissed, sentence has been satisfied, or the offender has been released to supervision for the subsequent offense, unless the sending and receiving states mutually agree to the retaking or return.

*References:*
*ICAOS Advisory Opinions*
1-2019 [The language of Rule 5.101-1 anticipates the exercise of discretion by prosecutors and other state authorities in the determination of whether an offender or absconder should be held subject to retaking bonds or to be detained on bonds set in connection with a new offense.]

**History: Adopted August 28, 2013, effective March 1, 2014.**

## Rule 5.101-2

### Discretionary process for disposition of violation in the sending state for a new crime conviction

Notwithstanding any other rule, a sentence imposing a period of incarceration on an offender convicted of a new crime which occurred outside the sending state during the compact period may satisfy or partially satisfy the sentence imposed by the sending state for the violation committed. This requires the approval of the sentencing or releasing authority in the sending state and consent of the offender.

(a) Unless waived by the offender, the sending state shall conduct, at its own expense, an electronic or in-person violation hearing.

(b) The sending state shall send the violation hearing results to the receiving state within 10 business days.

(c) If the offender's sentence to incarceration for the new crime fully satisfies the sentence for the violation imposed by the sending state for the new crime, the sending state is no longer required to retake if Rules 5.102 and 5.103 apply.

(d) If the offender's sentence to incarceration for the new crime only partially satisfies the sentence for the violation imposed by the sending state for the new crime, the sending state is required to retake if Rules 5.102 and 5.103 apply.

(e) The receiving state may close the case under Rule 4.112 (a)(3).

**History: Adopted October 7, 2015, effective March 1, 2016.**

## Rule 5.102

### Mandatory retaking for a new felony or new violent crime conviction

(a) Upon a request from the receiving state, a sending state shall retake an offender from the receiving state or a subsequent receiving state after the offender's conviction for a new felony offense or new violent crime and:

1. completion of a term of incarceration for that conviction; or
2. placement under supervision for that felony or violent crime offense.

(b) When a sending state is required to retake an offender, the sending state shall issue a warrant no later than 15 business days and, upon apprehension of the offender, file a detainer with the holding facility where the offender is in custody.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 26, 2004, effective January 1, 2005; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; amended October 13, 2010, effective March 1, 2011; amended August 28, 2013, effective March 1, 2014; amended September 29, 2021, effective April 1, 2022**

Rule 5.103

Offender behavior requiring retaking

(a) Upon a request by the receiving state and documentation that the offender's behavior requires retaking, a sending state shall issue a warrant to retake or order the return of an offender from the receiving state or a subsequent receiving state within 15 business days of the receipt of the violation report.

(b) If the offender is ordered to return in lieu of retaking, the receiving state shall request reporting instructions per Rule 4.111 within 7 business days following the receipt of the violation report response.

(c) The receiving state retains authority to supervise until the offender's directed departure date. If the offender does not return to the sending state as ordered, then the sending state shall issue a warrant, no later than 15 business days following the offender's failure to appear in the sending state.

(d) If the sending state issues a warrant under subsection (c) of this rule, the receiving state shall attempt to apprehend the offender on the sending state's warrant and provide notification to the sending state. If the receiving state is unable to locate the offender to affect the apprehension, the receiving state shall follow Rule 4.109-2 (a) and (b).

*References:*
*ICAOS Advisory Opinions*
2-2005 [An out of state offender may be arrested and detained by a receiving state who are subject to retaking based on violations of supervision, See Rule 4.109-1]

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; amended August 28, 2013, effective March 1, 2014; amended October 7, 2015, effective March 1, 2016; amended September 14, 2016, effective June 1, 2017; amended September 29 , 2021, effective April1, 2022**

Rule 5.103-1

Mandatory retaking for offenders who abscond

(a) Within 15 business days of receipt of an absconder violation report and case closure, the sending state shall issue a warrant and, upon apprehension of the offender, file a detainer with the holding facility where the offender is in custody.

(b) If an offender who has absconded is apprehended on a sending state's warrant within the jurisdiction of the receiving state that issued the violation report and case closure, the receiving state shall, upon request by the sending state, conduct a probable cause hearing as provided in Rule 5.108 (d) and (e) unless waived as provided in Rule 5.108 (b).

(c) Upon a finding of probable cause the sending state shall retake the offender from the receiving state.

(d) If probable cause is not established, the receiving state shall resume supervision upon the request of the sending state.

(e) The sending state shall keep its warrant and detainer in place until the offender is retaken pursuant to paragraph (c) or supervision is resumed pursuant to paragraph (d).

**History: Adopted October 13, 2010, effective March 1, 2011, amended September 29, 2021, effective April 1, 2022**

Rule 5.103-2

Mandatory retaking for violent offenders and violent crimes [Repealed]

*REPEALED effective March 1, 2014*

**History: Adopted October 13, 2010, effective March 1, 2011; repealed August 28, 2013, effective March 1, 2014.**

Rule 5.104

Cost of retaking an offender

A sending state shall be responsible for the cost of retaking the offender.

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 5.105

Time allowed for retaking an offender

A sending state shall retake an offender within 30 calendar days after the offender has been taken into custody on the sending state's warrant and the offender is being held solely on the sending state's warrant.

**History: Adopted November 4, 2003, effective August 1, 2004; amended August 28, 2013, effective March 1, 2014.**

## Rule 5.106

### Cost of incarceration in receiving state

A receiving state shall be responsible for the cost of detaining the offender in the receiving state pending the offender's retaking by the sending state.

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 5.107

Officers retaking an offender

(a) Officers authorized under the law of a sending state may enter a state where the offender is found and apprehend and retake the offender, subject to this compact, its rules, and due process requirements.

(b) The sending state shall be required to establish the authority of the officer and the identity of the offender to be retaken.

*References:*
*ICAOS Advisory Opinions*
11-2006 [Officers of a sending state are specifically authorized to enter a state where the offender is found and apprehend and retake the offender notwithstanding case closure]

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 5.108

Probable cause hearing in receiving state

(a) An offender subject to retaking that may result in a revocation shall be afforded the opportunity for a probable cause hearing before a neutral and detached hearing officer in or reasonably near the place where the alleged violation occurred.

(b) No waiver of a probable cause hearing shall be accepted unless accompanied by an admission by the offender to 1 or more violations of the conditions of supervision that would result in the pursuance of revocation of supervision in the receiving state and require retaking.

(c) A copy of a judgment of conviction regarding the conviction of a new criminal offense by the offender shall be deemed conclusive proof that an offender may be retaken by a sending state without the need for further proceedings.

(d) The offender shall be entitled to the following rights at the probable cause hearing:

1. Written notice of the alleged violation(s);
2. Disclosure of non–privileged or non–confidential evidence regarding the alleged violation(s);
3. The opportunity to be heard in person and to present witnesses and documentary evidence relevant to the alleged violation(s);
4. The opportunity to confront and cross–examine adverse witnesses, unless the hearing officer determines that a risk of harm to a witness exists.

(e) The receiving state shall prepare and submit to the sending state a written report within 10 business days of the hearing that identifies the time, date and location of the hearing; lists the parties present at the hearing; and includes a clear and concise summary of the testimony taken and the evidence relied upon in rendering the decision. Any evidence or record generated during a probable cause hearing shall be forwarded to the sending state.

(f) If the hearing officer determines that there is probable cause to believe that the offender has committed the alleged violations of conditions of supervision that would result in the pursuance of revocation of supervision, the receiving state shall hold the offender in custody, and the sending state shall, within 15 business days of receipt of the hearing officer's report, notify the receiving state of the decision to retake or other action to be taken.

(g) If probable cause is not established, the receiving state shall:

1. Continue supervision if the offender is not in custody.
2. Notify the sending state to vacate the warrant, and continue supervision upon release if the offender is in custody on the sending state's warrant.
3. Vacate the receiving state's warrant and release the offender back to supervision within 24 hours of the hearing if the offender is in custody.

*References:*
*ICAOS Advisory Opinions*
2-2005 [Although Rule 5.108 requires that a probable cause hearing take place for an offender subject to retaking for violations of conditions that may result in revocation as outlined in subsection (a), allegations of due process violations in the actual revocation of probation or parole are matters addressed during proceedings in the sending state after the offender's return]

*Case Law*
Gagnon v. Scarpelli, 411 U.S. 778 (1973)
*Ogden v. Klundt*, 550 P.2d 36, 39 (Wash. Ct. App. 1976)
*See, People ex rel. Crawford v. State*, 329 N.Y.S.2d 739 (N.Y. 1972)
*State ex rel. Nagy v. Alvis*, 90 N.E.2d 582 (Ohio 1950)
*State ex rel. Reddin v. Meekma*, 306 N.W.2d 664 (Wis. 1981)
*Bills v. Shulsen*, 700 P.2d 317 (Utah 1985)
*California v. Crump*, 433 A.2d 791 (N.J. Super. Ct. App. Div. 1981)
*California v. Crump*, 433 A.2d at 794, *Fisher v. Crist*, 594 P.2d 1140 (Mont. 1979)
*State v. Maglio*, 459 A.2d 1209 (N.J. Super. Ct. 1979)
*In re Hayes*, 468 N.E.2d 1083 (Mass. Ct. App. 1984)
Morrissey v. Brewer, 408 U.S. 471 (1972)
In *State v. Hill*, 334 N.W.2d 746 (Iowa 1983)
*See e.g., State ex rel. Ohio Adult Parole Authority v. Coniglio*, 610 N.E.2d 1196, 1198 (Ohio Ct. App. 1993

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008; amended August 28, 2013, effective March 1, 2014; amended September 14, 2016, effective June 1, 2017; amended September 29, 2021, effective April 1, 2022**

Rule 5.109

Transport of offenders

States that are party to this compact shall allow officers authorized by the law of the sending or receiving state to transport offenders through the state without interference.

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 5.110

Retaking offenders from local, state or federal correctional facilities

(a) Officers authorized by the law of a sending state may take custody of an offender from a local, state or federal correctional facility at the expiration of the sentence or the offender's release from that facility provided that–

1. No detainer has been placed against the offender by the state in which the correctional facility lies; and
2. No extradition proceedings have been initiated against the offender by a third–party state.

**History: Adopted November 4, 2003, effective August 1, 2004.**

## Rule 5.111

### Denial of bail or other release conditions to certain offenders

An offender against whom retaking procedures have been instituted by a sending or receiving state shall not be admitted to bail or other release conditions in any state.

**History: Adopted November 4, 2003, effective August 1, 2004; amended October 4, 2006, effective January 1, 2007; amended September 26, 2007, effective January 1, 2008.**

## ***Rules governing dispute resolution and interpretation of rules under the compact of the Interstate Commission for Adult Offender Supervision***

### Rule 6.101

### Informal communication to resolve disputes or controversies and obtain interpretation of the rules

(a) Through the office of a state's compact administrator, states shall attempt to resolve disputes or controversies by communicating with each other by telephone, telefax, or electronic mail.

(b) *Failure to resolve dispute or controversy—*

1. Following an unsuccessful attempt to resolve controversies or disputes arising under this compact, its by–laws or its rules as required under Rule 6.101 (a), states shall pursue 1 or more of the informal dispute resolution processes set forth in Rule 6.101 (b)(2) prior to resorting to formal dispute resolution alternatives.
2. Parties shall submit a written request to the executive director for assistance in resolving the controversy or dispute. The executive director shall provide a written response to the parties within 10 business days and may, at the executive director's discretion, seek the assistance of legal counsel or the executive committee in resolving the dispute. The executive committee may authorize its standing committees or the executive director to assist in resolving the dispute or controversy.

(c) *Interpretation of the rules*—Any state may submit an informal written request to the executive director for assistance in interpreting the rules of this compact. The executive director may seek the assistance of legal counsel, the executive committee, or both, in interpreting the rules. The executive committee may authorize its standing committees to assist in interpreting the rules. Interpretations of the rules shall be issued in writing by the executive director or the executive committee and shall be circulated to all of the states.

**History: Adopted November 4, 2003, effective August 1, 2004.**

## Rule 6.102

### Formal resolution of disputes and controversies

(a) *Alternative dispute resolution*—Any controversy or dispute between or among parties that arises from or relates to this compact that is not resolved under Rule 6.101 may be resolved by alternative dispute resolution processes. These shall consist of mediation and arbitration.

(b) *Mediation and arbitration*

1. Mediation
   (A) A state that is party to a dispute may request, or the executive committee may require, the submission of a matter in controversy to mediation.
   (B) Mediation shall be conducted by a mediator appointed by the executive committee from a list of mediators approved by the national organization responsible for setting standards for mediators, and pursuant to procedures customarily used in mediation proceedings.
2. Arbitration
   (A) Arbitration may be recommended by the executive committee in any dispute regardless of the parties' previous submission of the dispute to mediation.
   (B) Arbitration shall be administered by at least 1 neutral arbitrator or a panel of arbitrators not to exceed 3 members. These arbitrators shall be selected from a list of arbitrators maintained by the commission staff.
   (C) The arbitration may be administered pursuant to procedures customarily used in arbitration proceedings and at the direction of the arbitrator.
   (D) Upon the demand of any party to a dispute arising under the compact, the dispute shall be referred to the American Arbitration Association and shall be administered pursuant to its commercial arbitration rules.
   (E)
      (i) The arbitrator in all cases shall assess all costs of arbitration, including fees of the arbitrator and reasonable attorney fees of the prevailing party, against the party that did not prevail.
      (ii) The arbitrator shall have the power to impose any sanction permitted by this compact and other laws of the state or the federal district in which the commission has its principal offices.
   (F) Judgment on any award may be entered in any court having jurisdiction.

**History: Adopted November 4, 2003, effective August 1, 2004.**

Rule 6.103

Enforcement actions against a defaulting state

(a) If the Interstate Commission determines that any state has at any time defaulted ("defaulting state") in the performance of any of its obligations or responsibilities under this Compact, the by–laws or any duly promulgated rules the Interstate Commission may impose any or all of the following penalties–

1. Fines, fees and costs in such amounts as are deemed to be reasonable as fixed by the Interstate Commission;
2. Remedial training and technical assistance as directed by the Interstate Commission;
3. Suspension and termination of membership in the compact. Suspension shall be imposed only after all other reasonable means of securing compliance under the by–laws and rules have been exhausted. Immediate notice of suspension shall be given by the Interstate Commission to the governor, the chief justice or chief judicial officer of the state; the majority and minority leaders of the defaulting state's legislature, and the state council.

(b) The grounds for default include, but are not limited to, failure of a Compacting State to perform such obligations or responsibilities imposed upon it by this compact, Interstate Commission by–laws, or duly promulgated rules. The Interstate Commission shall immediately notify the defaulting state in writing of the potential penalties that may be imposed by the Interstate Commission on the defaulting state pending a cure of the default. The Interstate Commission shall stipulate the conditions and the time period within which the defaulting state must cure its default. If the defaulting state fails to cure the default within the time period specified by the Interstate Commission, in addition to any other penalties imposed herein, the defaulting state may be terminated from the Compact upon an affirmative vote of a majority of the compacting states and all rights, privileges and benefits conferred by this Compact shall be terminated from the effective date of suspension.

(c) Within 60 calendar days of the effective date of termination of a defaulting state, the Interstate Commission shall notify the governor, the chief justice or chief judicial officer and the majority and minority leaders of the defaulting state's legislature and the state council of such termination.

(d) The defaulting state is responsible for all assessments, obligations, and liabilities incurred through the effective date of termination including any obligations, the performance of which extends beyond the effective date of termination.

(e) The Interstate Commission shall not bear any costs relating to the defaulting state unless otherwise mutually agreed upon between the Interstate Commission and the defaulting state.

(f) Reinstatement following termination of any compacting state requires both a reenactment of the Compact by the defaulting state and the approval of the Interstate Commission pursuant to the rules.

**History: Adopted November 4, 2003, effective August 1, 2004; amended August 28, 2013, effective March 1, 2014.**

Rule 6.104

Judicial Enforcement

The Interstate Commission may, by majority vote of the members, initiate legal action in the United States District Court for the District of Columbia or, at the discretion of the Interstate Commission, in the federal district where the Interstate Commission has its offices to enforce compliance with the provisions of the Compact, its duly promulgated rules and by–laws, against any compacting state in default. In the event judicial enforcement is necessary the prevailing party shall be awarded all costs of such litigation including reasonable attorneys' fees.

**History: Adopted November 4, 2003, effective August 1, 2004.**

Interstate Commission for Adult Offender Supervision

Ensuring Public Safety for the 21st Century

# ICAOS Bench Book for Judges

## and Court Personnel

2022 Edition
Version 13.0



## *Mission Statement*

The Interstate Commission for Adult Offender Supervision will guide the transfer of offenders in a manner that promotes effective& supervision strategies consistent with public safety, offender accountability, and victims' rights.

## *Acknowledgements*

The Commission would like to acknowledge the assistance of all the individuals involved in drafting this book and, more specifically, to the authors and reviewers that took part in the review process. Our sincere gratitude goes to the chapter's authors who contributed their time and expertise to this resource.

We also wish to acknowledge the valuable contributions of the reviewers regarding the improvement of quality, coherence, and content presentation. We are fortunate that the nation's leading legal experts on interstate compact law dedicated their considerable knowledge and skills to this work. Many thanks to:

- **Michael L. Buenger**, Executive Vice President and Chief of Operations for the National Center for State Courts
- **Richard L. (Rick) Masters**, Legal Counsel for the Interstate Commission for Adult Offender Supervision
- **Jeffrey Litwak**, Legal Counsel for the Columbia River Gorge Commission
- **James Markham**, Associate Professor of Public Law and Government for the University of North Carolina Chapel Hill School of Government
- **Jeremy Mussman**, Deputy Director, Maricopa County Public Defender
- **Mark Hodgson**, Maricopa County Public Defender Law Clerk

**INTERSTATE COMPACT LAW - A HISTORICAL PERSPECTIVE** ........ 7
**Chapter 1 - General Law of Interstate Compacts** ........ 8
***Bench Book - 1.1 Who Must Comply with an Interstate Compact?*** ........ 8
***Bench Book - 1.2 Nature of Interstate Compacts*** ........ 9
Bench Book - 1.2.1 Interstate Compacts are Formal Agreements Between States ........ 9
Bench Book - 1.2.2 Compacts Are Not Uniform Laws ........ 10
Bench Book - 1.2.3 Compacts Are Not Administrative Agreements ........ 10
***Bench Book - 1.3 Delegation of State Authority to an Interstate Commission*** ........ 10
***Bench Book - 1.4 Congressional Consent Requirement*** ........ 11
Bench Book - 1.4.1 When Consent is Required ........ 11
Bench Book - 1.4.2 Withdrawal and Modification of Congressional Consent ........ 12
Bench Book - 1.4.3 Implications of Congressional Consent ........ 12
***Bench Book - 1.5 Interpretation of Interstate Compacts*** ........ 14
***Bench Book - 1.6 Application of State Law that Conflicts with an Interstate Compact*** ........ 15
***Bench Book - 1.7 Special Considerations for Litigation Involving Interstate Commissions*** ........ 16
Bench Book - 1.7.1 Relief Must Be Consistent with the Compact ........ 16
Bench Book - 1.7.2 Eleventh Amendment Issues for Interstate Commissions ........ 17
***Bench Book - 1.8 Party State, Interstate Commission, and Third-Party Enforcement Compacts*** ........ 18
***Bench Book - 1.9 Recommended Sources of Compact Law and Information*** ........ 19
**Chapter 2 - Interstate Commission for Adult Offender Supervision (ICAOS)** ........ 20
***Bench Book - 2.1 History of the Interstate Compact for Probation and Parole (ICPP)*** ........ 20
***Bench Book - 2.2 Why the Interstate Compact for Adult Offender Supervision?*** ........ 20
***Bench Book - 2.3 General Principles Affecting Interstate Movement of Offenders*** ........ 21
***Bench Book - 2.4 Historical Development of the ICAOS*** ........ 22
***Bench Book - 2.5 Purpose of the ICAOS*** ........ 23
***Bench Book - 2.6 Effect of the ICAOS on the States*** ........ 23
***Bench Book - 2.7 Adoption and Withdrawal*** ........ 24
***Bench Book - 2.8 Effect of Withdrawal*** ........ 25
***Bench Book - 2.9 Key Features of the ICAOS*** ........ 25
***Bench Book - 2.10 Key Definitions in the ICAOS (Art II)*** ........ 26
***Bench Book - 2.11 Interstate Commission*** ........ 26
Bench Book - 2.11.1 Primary Powers of the Commission ........ 26
Bench Book - 2.11.2 Rulemaking Powers ........ 27
***Bench Book - 2.12 Enforcement of the Compact and its Rules (Art. IX & Art. XII)*** ........ 27
Bench Book - 2.12.1 General Principles of Enforcement ........ 28
Bench Book - 2.12.2 Judicial Enforcement ........ 28
**Chapter 3 - The ICAOS Implications for the Courts** ........ 30
***Bench Book - 3.1 Key Definitions in the Rules*** ........ 30
***Bench Book - 3.2 Judicial Considerations*** ........ 31
Bench Book - 3.2.1 Offender Eligibility Criteria ........ 31
Bench Book - 3.2.1.1 Offenders Covered by the ICAOS ........ 32
Bench Book - 3.2.1.2 Eligibility of Offenders, Residency Requirements - General Overview ........ 33
Bench Book - 3.2.1.3 Special Rules for Military Personnel and Their Families ........ 34
Bench Book - 3.2.1.4 Employment Transfers of Offenders and Their Families ........ 35
Bench Book - 3.2.1.5 Persons Not Covered by the ICAOS ........ 35
Bench Book - 3.2.1.6 Sentencing Considerations ........ 36
Bench Book - 3.2.1.6.1 Deferred Sentencing ........ 36
Bench Book - 3.2.1.6.2 Deferred Prosecution ........ 37
Bench Book - 3.2.1.6.3 What Constitutes Second and Subsequent Conviction of Driving While Impaired? ........ 38
Bench Book - 3.2.2 Special Considerations ........ 38
Bench Book - 3.2.2.1 Out-of-state Treatment ........ 38
***Bench Book - 3.3 Initiating the Transfer Process*** ........ 39
Bench Book - 3.3.1 Time of Transfer ........ 39
Bench Book - 3.3.1.1 Expedited Transfers ........ 40
Bench Book - 3.3.1.2 Reporting Instructions for Probationers Living in the Receiving State at the Time of Sentencing or After Disposition of a Violation or Revocation Proceeding ........ 40
Bench Book - 3.3.2 Pre-Acceptance Testing ........ 41
Bench Book - 3.3.3 Post-Acceptance Testing ........ 41
Bench Book - 3.3.4 Transfer of Supervision of Sex Offenders ........ 41
***Bench Book - 3.4 Supervision in the Receiving State*** ........ 42
Bench Book - 3.4.1 Duration of Supervision ........ 42
Bench Book - 3.4.2 Type of Supervision in Receiving State ........ 43
Bench Book - 3.4.2.1 Disabled Offenders ........ 43
Bench Book - 3.4.2.2 Continuing Jurisdiction over Offenders Between the Sending & Receiving States ........ 44
***Bench Book - 3.5 Other Considerations*** ........ 44
Bench Book - 3.5.1 Post-Transfer Change of the Underlying Circumstances ........ 44
Bench Book - 3.5.2 Temporary Travel Permits ........ 45
Bench Book - 3.5.3 Victims' Rights ........ 45
***Bench Book - 3.6 Conditions*** ........ 45
Bench Book - 3.6.1 General Conditions ........ 45
Bench Book - 3.6.2 Authority to Impose Conditions ........ 46
Bench Book - 3.6.3 Limitations on Conditions ........ 47

***Bench Book - 3.7 Sex Offender Registration*** ..... 48
***Bench Book - 3.8 Financial Obligations*** ..... 49
Bench Book - 3.8.1 Restitution ..... 49
Bench Book - 3.8.2 Fees ..... 49
***Bench Book - 3.9 Implications, Health Insurance Portability and Accountability Act of 1996 (HIPAA)*** ..... 50
**Chapter 4 - Returning Offenders to the Sending State** ..... 51
***Bench Book - 4.1 Status of Offenders Subject to ICAOS*** ..... 51
***Bench Book - 4.2 Waiver of Formal Extradition Proceedings*** ..... 53
Bench Book - 4.2.1 Waiver of Extradition under the ICAOS ..... 53
Bench Book - 4.2.2 Uniform Extradition Act Considerations ..... 54
***Bench Book - 4.3 Retaking*** ..... 55
Bench Book - 4.3.1 Violation Reports Requiring Retaking ..... 55
Bench Book - 4.3.2 Offenders Convicted of a Violent Crime ..... 56
***Bench Book - 4.4 Arrest and Detention of Offenders in the Receiving State*** ..... 56
***Bench Book - 4.5 Discretionary Disposition of Violation*** ..... 58
***Bench Book - 4.6 Arrest of Absconders*** ..... 58
Bench Book - 4.6.1 Arrest of Absconders Who Fail to Return to Return to Sending State as Ordered ..... 58
***Bench Book - 4.7 Post-Transfer Hearing Requirements*** ..... 59
Bench Book - 4.7.1 General Considerations ..... 59
Bench Book - 4.7.2 Right to Counsel ..... 60
Bench Book - 4.7.3 Specific Considerations for Probable Cause Hearings under ICAOS ..... 60
Bench Book - 4.7.3.1 When a Probable Cause Hearing is Not Required ..... 61
Bench Book - 4.7.3.2 Probable Cause Hearings when Violations Occurred in another State ..... 61
Bench Book - 4.7.3.2.1 Offender’s Basic Rights at a Probable Cause Hearing ..... 62
Bench Book - 4.7.3.2.2 Probable Cause Hearing Report ..... 63
Bench Book - 4.7.3.2.3 Post Probable Cause Hearing ..... 64
Bench Book - 4.7.3.3 Probable Cause Hearings Waiver ..... 66
***Bench Book - 4.8 Bail Pending Return*** ..... 67
***Bench Book - 4.9 Revocation or Punitive Action by the Sending State – Conditions*** ..... 67
**Chapter 5 - Liability and Immunity Considerations for Judicial Officers and Employees** ..... 69
***Bench Book - 5.1 Introduction*** ..... 69
***Bench Book - 5.2 Liability*** ..... 69
Bench Book - 5.2.1 Liability under 42 U.S.C. § 1983 ..... 69
Bench Book - 5.2.1.1 No Statutory Right under ICAOS Itself ..... 69
Bench Book - 5.2.1.2 Constitutional Violations Related to ICAOS ..... 70
Bench Book - 5.2.1.3 No Supervisor Liability under Section 1983 ..... 71
Bench Book - 5.2.1.4 No Substitute for Appeal or Habeas Corpus ..... 71
Bench Book - 5.2.1.5 Official Capacity versus Individual Capacity ..... 71
Bench Book - 5.2.1.6 Persons Acting under Color of Law ..... 72
Bench Book - 5.2.2 State Tort Claims ..... 72
Bench Book - 5.2.2.1 Tort Claims by Offenders ..... 72
Bench Book - 5.2.2.2 Tort Claims by Others ..... 73
Bench Book - 5.2.3 Claims under the Compact Itself ..... 74
***Bench Book - 5.3 Immunity and Related Defenses*** ..... 74
Bench Book - 5.3.1 Eleventh Amendment Immunity ..... 74
Bench Book - 5.3.1.1 Official Capacity versus Individual Capacity ..... 75
Bench Book - 5.3.1.2 No Protection for Local Governments ..... 75
Bench Book - 5.3.1.3 Waiver of Eleventh Amendment Immunity ..... 76
Bench Book - 5.3.2 State Sovereign Immunity ..... 76
Bench Book - 5.3.3 Immunity in Another State's Courts ..... 77
Bench Book - 5.3.4 Judicial Immunity ..... 77
Bench Book - 5.3.5 Prosecutorial Immunity ..... 78
Bench Book - 5.3.6 Qualified Immunity ..... 78
Bench Book - 5.3.7 The Public Duty Doctrine ..... 79
Bench Book - 5.3.8 Personal Jurisdiction ..... 79

References available at www.interstatecompact.org

Rules of the Interstate Commission for Adult Offender Supervision
Model Act, Interstate Compact for Adult Offender Supervision
Bylaws for the Interstate Commission for Adult Offender Supervision
Advisory Opinions of the Interstate Commission for Adult Offender Supervision
Disclosures Permitted under HIPPA (45 C.F.R. 164.512)

INTERSTATE COMPACT LAW

A HISTORICAL PERSPECTIVE

Interstate Compacts are not new legal instruments. Compacts derive from the nation’s colonial past where states utilized agreements, similar to modern Compacts, to resolve intercolonial disputes, particularly boundary disputes.

The colonies and crown employed a process to negotiate and submit colonial disputes to the crown through the Privy Council for final resolution. This created a long tradition of resolving state disputes through negotiation followed by submission of the proposed resolution to a central authority for its concurrence. The modern “Compact process” formalized under the Articles of Confederation. Article VI provided: “No two or more states shall enter into any treaty, confederation or alliance whatever without the consent of the United States in Congress assembled, specifying accurately the purposes for which the same is to be entered into, and how long it shall continue.”

Concerned with managing interstate relations and the creation of powerful political and regional allegiances, the Founders barred states from entering into “any treaty, confederation or alliance whatever” without the approval of Congress. They also constructed an elaborate scheme for resolving interstate disputes. Under Articles of Confederation, Article IX, Congress was to “be the last resort on appeal in all disputes and differences now subsisting or that hereafter may arise between two or more States concerning boundary, jurisdiction or any other causes [.]” Later, the concern over unregulated interstate cooperation continued during the drafting of the U.S. Constitution, resulting in the adoption of the “Compact Clause,” Article I, sect. 10, cl. 3.

The Compact Clause provides that, “No state shall, without the consent of Congress…enter into any agreement or Compact with another state, or with a foreign power[.]” This wording is important because the Constitution does not so much authorize states to enter into Compacts as it bars states from entering into Compacts without congressional consent. Unlike the Articles of Confederation, however, in which interstate disputes concluded by appeal to Congress, the Constitution vests ultimate resolution of interstate disputes in the Supreme Court either under its original jurisdiction or through the appellate process. For a thorough discussion on the history of interstate Compacts from their origins to the present, *see generally*, Michael L. Buenger & Richard L. Masters, *The Interstate Compact on Adult Offender Supervision: Using Old Tools to Solve New Problems*, 9 ROGER WILLIAMS U. L. REV. 71 (2003); Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution – A Study in Interstate Adjustments*, 34 YALE L.J. 685 (1925); MICHAEL L. BUENGER, JEFFREY B. LITWAK, MICHAEL H. MCCABE & RICHARD L. MASTERS, THE EVOLVING LAW AND USE OF INTERSTATE COMPACTS 2d ed. (ABA Publ’g 2016).

Chapter 1

General Law of Interstate Compacts

# Overview

The legal environment for Compacts involves an amalgamation of Compact texts and case law from federal and state courts throughout the country. Because there are relatively few court decisions establishing legal principles in any particular court or for any particular Compact, courts frequently consider other federal and state court decisions for their interpretation and application of a Compact. Courts also use the texts of other Compacts and corresponding case law for generally applicable principles of Compact law. Given complexity of the legal underpinnings and the pervasive and appropriate use of Compacts today, it is important for judges and court personnel to understand the law of interstate Compacts.

As noted in the introduction and explained in this chapter, interstate Compacts are not mere agreements between the states subject to parochial interpretations or selective application. On their face, they are statutory contracts that bind member states including respective agencies, officials, and citizens to an agreed set of principles and understandings. They are not a series of recommended procedures or easily disregarded discretionary proposals of convenience. Moreover, they are not uniform, model, or suggested state laws, nor are they administrative agreements between agencies or executive officials. Understanding the unique significance of interstate Compacts in the American legal system is an important predicate to correct application of Compact terms and conditions that may prevent legal jeopardy vis-à-vis fulfilling its contractual obligations.

Bench Book

1.1 Who Must Comply with an Interstate Compact?

Interstate Compacts are binding on signatory states, meaning once a state legislature adopts a Compact, it binds all agencies, state officials and citizens to the terms of that Compact. Since the very first Compact case, the U.S. Supreme Court has consistently held that a Compact is an enforceable agreement governing the subject matter of the Compact. *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 89 (1823); *see also Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 108 (1938); *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951); *Alabama v. North Carolina*, 560 U.S. 330, 334 (2010) (applying contract law principles to Compact interpretation).

In the case of the Interstate Commission for Adult Offender Supervision (ICAOS), member states agree to a binding Compact governing the movement of offenders across state lines. The ICAOS is not discretionary; rather, it binds the member states, state officials (including judges, court personnel, and probation/parole authorities), and citizens to the Compact requirements that determine the circumstances, procedures, and supervision applicable to interstate transfers. *See, e.g., M.F. v. State Exec. Dep't*, 640 F.3d 491, 497 (2d Cir. 2011) (stating, "The Compact is an agreement among sovereign states."). *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95105-106 (3d 6 Cir. 2008) (stating, "Once New Jersey granted permission for Doe to return to Pennsylvania, Pennsylvania was required to assume supervision over Doe and to treat him as in-state offenders. The Commission has not done so and in treating Doe and other out-of-state parolees differently, it violates its own agreement failing to do precisely what it promised . . . ."). Failure to comply with the Compact can have significant consequences for a non-complying state, including enjoinder from taking actions in contravention of the Compact. *See, e.g., Interstate Comm'n for Adult Offender Supervision v. Tenn. Bd. of Prob. & Parole*, No. 04-526-KSF (E.D. Ky. June 13, 2005) (order granting permanent injunction) (stating "[T]he defendants, their respective officers, agents, representatives, employees and successors, and all other persons in active concert and participation with them, are hereby permanently restrained and enjoined

from denying interstate transfers . . . ."). In short, the ICAOS and its rules do not create a recommended process but rather a compulsory and binding process for applicable cases.

Bench Book

## 1.2 Nature of Interstate Compacts

Beginning with the Articles of Confederation, states used Compacts to settle boundary disputes. In 1918, Oregon and Washington enacted the first Compact solely devoted to joint supervision of an interstate resource (fishing on the Columbia River). Three years later, New York and New Jersey enacted the first Compact to create an interstate commission (now known as the Port Authority of New York and New Jersey).

Today, more than 200 interstate Compacts directly regulate or guide policy for a range of matters as diverse as use and allocation of water, land, and natural resources. There are Compacts for environmental protection, transportation systems, regional economic development, professional licensing, education, crime control and corrections, and child welfare. The U.S. Supreme Court has a history of encouraging states to resolve disputes through Compacts rather than litigation. *E.g., Vermont v. New York*, 417 U.S. 270, 277–78 (1974). A seminal law review article notes, "The combined legislative powers of Congress and of the states permit a wide range of permutations and combinations of power necessary for governmental action." Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 YALE L.J. 685, 688 (1925).

Like the 1937 Parole and Probation Compact, the ICAOS is part of a long history and recently accelerating use of interstate Compacts. Similar to its predecessor, it addresses multilateral state issues beyond state boundaries.

Bench Book

### 1.2.1 Interstate Compacts are Formal Agreements Between States

Understanding the legal nature of an interstate Compact begins with this basic point: interstate Compacts are *formal agreements between states* that exist simultaneously as both (1) statutory law, and (2) contracts between states. The contractual nature stems from the reciprocal enactment and adoption of substantially and substantively similar laws by sovereign state legislatures. There is (1) an offer (the presentation of a reciprocal law to two or more state legislatures), (2) acceptance (the actual enactment of the law by two or more state legislatures), and (3) consideration (the settlement of a dispute or creation of a joint regulatory scheme). *See* MICHAEL L. BUENGER, JEFFREY B. LITWAK, MICHAEL H. MCCABE & RICHARD L. MASTERS,, THE EVOLVING LAW AND USE OF INTERSTATE COMPACTS 2d ed. 42–48 (ABA Publ'g 2016). However, if a unilateral alteration clause exists within Compact language, the agreement generally may not rise to the level of a Compact enforceable as a contract between the states. *Ne. Bancorp v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 175 (1985).

Interstate Compacts, federal statutes, and regulatory law are the only binding means of resolving interstate policy issues. Of those methods of resolution, an interstate Compact is the only formal mechanism that allows individual states to reach beyond their borders and collectively regulate the conduct of multiple states and their citizens. Compacts are also one of the only exceptions to the general rule that a sitting state legislature cannot irrevocably bind future state legislatures. BUENGER, ET AL., *supra*, at 48. Compacts regulate matters aptly described as subfederal, supra-state in nature. *Id.* at xxi. The binding nature of interstate Compacts comes from their contractual character and judicial recognition that Compacts must supersede conflicting state laws in order to be effective under applicable Constitutional law.

## 1.2.2 Compacts Are Not Uniform Laws

An interstate Compact is not a "uniform law" as typically construed and applied. Unlike interstate Compacts, uniform laws are not contracts; a state adopting an interstate Compact may not select provisions of an interstate Compact to adopt; and, a state may not adapt the provisions of an interstate Compact to address solely intra-state concerns. Unlike uniform laws, once adopted, a state may not unilaterally amend or repeal an interstate Compact unless the language of the agreement authorizes such an act; and, even then, states may only amend or repeal the Compact in accordance with the terms of the Compact. *See, e.g., West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951).

Bench Book

## 1.2.3 Compacts Are Not Administrative Agreements

Compacts differ from administrative agreements in two principal ways. First, states, as sovereigns, have inherent authority to enact Compacts. *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 725 (1838). Thus, states do not need any express authority to enact a Compact. In contrast, states must authorize agencies and executive officials to enact administrative agreements both intra and interstate. All states have such express authority in their constitutions, in generally applicable statutes, or in statutes that expressly authorize administrative agreements for specific purposes. These authorities commonly refer to administrative agreements as inter-local, intergovernmental, inter-municipal, or interagency agreements.

The second way that Compacts differ from administrative agreements is that state legislatures enact Compacts, whereas the executive branch enacts administrative agreements. However, the executive branch may enact Compacts if a Compact expressly authorizes executive enactment (See article VII(b)(1) of the Nonresident Violator Compact that specifically authorizes, "Entry into the Compact shall be made by a Resolution of Ratification executed by the authorized officials of the applying jurisdiction . . . ."). As well, Courts do not enforce improperly enacted Compacts. *E.g., Sullivan v. Pa. Dep't of Transp.*, 708 A.2d 481, 485 (Pa. 1998) (Driver License Compact called for legislature to enact reciprocal statutes; power to enact laws cannot be delegated to executive agency and thus the Compact was not "enacted" in Pennsylvania under an administrative agreement executed by state Department of Transportation even though authorized by statute to do so). In addition, administrative agreements enacted by the executive branches of state government may bind the executive entities but those agreements do not have the same force and effect to bind a state legislature as statutorily enacted Compacts. *See, e.g., Gen. Expressways, Inc. v. Iowa Reciprocity Bd.*, 163 N.W.2d 413, 419 (Iowa 1968) ("We conclude the uniform Compact herein was more than a mere administrative agreement and did constitute a valid and binding contract of the State of Iowa.").

Bench Book

## 1.3 Delegation of State Authority to an Interstate Commission

One of the axioms of modern government is a state legislature's ability to delegate rulemaking power to an administrative body. This delegation of authority extends to the creation of an interstate commission through an interstate Compact. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994); *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951) (obligations imposed by an interstate

commission pursuant to an interstate Compact are enforceable on the member states). An interstate Compact may also provide that its interstate commission may determine when member states breach obligations allowing for the imposition of sanctions on non-compliant states. *See, e.g., Alabama v. North Carolina*, 560 U.S. 300, 342–44 (2010) (interstate commission had such power but was not the sole arbiter of disputes regarding a state's compliance with the Compact).

Bench Book

## 1.4 Congressional Consent Requirement

The ICAOS operates under Congress' consent in the Crime Control Act of 1934, 4 U.S.C. § 112 (2012).

Bench Book

### 1.4.1 When Consent is Required

The Compact Clause of the U.S. Constitution states, "No State shall, without the consent of Congress, . . . enter into any agreement or Compact with another State . . . ." U.S. CONST. art. I, § 10, cl. 3. Though a strict reading of the Compact Clause might appear to require congressional consent for every Compact, the Supreme Court has determined that "any agreement or Compact" does not mean every agreement or Compact. The Compact Clause triggers only by those agreements that would alter the balance of political power between the states and federal government, intrude on a power reserved to Congress, or alter the balance of political power between the Compacting states and non-Compacting states. *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893) (agreements "which may tend to increase and build up the political influence of the contracting States, so as to encroach upon or impair the supremacy of the United States . . . ."); *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 495–96 (1978) (non-Compact states placed at competitive disadvantage by the Multistate Tax Compact); *Ne. Bancorp v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 176 (1985) (statute in question neither enhances the political power of the New England states at the expense of other states or impacts the federal structure of government).

Where an interstate agreement facilitates only what states could accomplish unilaterally, the Compact does not intrude on federal interests requiring congressional consent. *See U.S. Steel Corp.*, 434 U.S. at 472–78. The lack of requisite congressional consent, however, does not affect the contractual nature of the agreement between states.

Congress does not pass upon a Compact in the same manner as a court decides a question of law. Congressional consent is an act of political judgment about the Compact's potential impact on national interests, not a legal judgment as to the correctness of the form and substance of the agreement. See Detroit Int'l Bridge Co. v. Gov't of Canada, 883 F.3d 895, 899 (D.C. Cir. 2018). Implied consent may exist when actions by the states and federal government indicate that Congress has granted its consent even in the absence of a specific legislative act. *See Virginia v. Tennessee*, 148 U.S. at 521–22.

Alternatively, Congress may attach conditions to its consent. Conditions can be proscriptive involving the duration of the agreement. Other congressional conditions may be compulsory, requiring member states to act in a certain manner before activation of the Compact. On the other hand, conditions authored by Congress can be substantive, altering the purposes or procedures mandated by a Compact. The only limitation imposed on congressional conditions is that they must be Constitutional. *New York v. United States*, 505 U.S. 144 (1992). Courts deem that states that adopt an interstate Compact to which Congress attaches conditions have accepted those conditions as a part of the Compact. *Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275, 277-78 (1959) (mandated provisions regarding suability of bridge commission as binding on states because Congress possessed the authority to impose conditions as part of its consent, and the states accepted those conditions by enacting the Compact).

When states amend a Compact with consent, Congress must assent to the amendment. However, there is no requirement for additional consent if the amendment is consistent with Congress' existing authority. *See, e.g.*, Joint resolution granting consent to amendments to the Compact between Missouri and Illinois, Pub. L. No. 112-71, 125 Stat. 775 (2011); *Int'l Union of Operating Eng'rs, Local 542 v. Delaware River Joint Toll Bridge Comm'n*, 311 F.3d 273, 280 n.7 (3d Cir. 2002) (where a Compact contains no provision for amendment, congressional consent to any modification would be necessary).

> **PRACTICE NOTE:** Article XI of the Interstate Compact for the Supervision of Adult Offenders authorizes the Interstate Commission to propose amendments to the Compact for the states to adopt; however, all Compacting states must enact the amendment before it becomes effective. Congressional consent to an amendment would not be necessary unless the amendment conflicts with a condition of Congress' consent under the Crime Control Act or any actions that support Congress' implied consent.



### 1.4.2 Withdrawal and Modification of Congressional Consent

Once Congress grants its consent to a Compact, the general view is that it may not be withdrawn. Although the matter has not been resolved by the U.S. Supreme Court, two federal circuit courts of appeal have held that congressional consent, once given, is likely not subject to alteration. *Tobin v. United States*, 306 F.2d 270, 273 (D.C. Cir. 1962) ("such a holding would stir up an air of uncertainty in those areas of our national life presently affected by the existence of these Compacts. No doubt the suspicion of even potential impermanency would be damaging to the very concept of interstate Compacts."); *Mineo v. Port Auth. of N.Y. & N.J.*, 779 F.2d 939 (3d Cir. 1985) (following Tobin).

Notwithstanding *Tobin* and *Mineo*, Congress specifically reserves the right to alter, amend, or repeal its consent as a condition of approval in several Compacts. *See, e.g.*, Congress' consent to the Tahoe Regional Planning Compact, Pub. L. No. 96-551 § 7, 94 Stat. 3233, 3253 (1980). Embodiment of the reservation of congressional authority exists in Congress' consent to low-level radioactive waste disposal Compacts states that reads, "Each Compact shall provide that every 5 years after the Compact has taken effect that Congress may by law withdraw its consent." 42 U.S.C. § 2021d(d). Express reservations provide prior notice to the states, but no court decision has addressed whether these reservations are proper or raise the concerns expressed in *Tobin* and *Mineo*.

Notwithstanding the courts' concerns in *Tobin* and *Mineo*, Congress may legislate within the subject matter of a Compact to which it has granted previous consent, which could have the effect of changing the landscape in which a Compact operates or making a Compact obsolete. BUENGER, ET AL., *supra*, at 89; *Arizona v. California*, 373 U.S. 546, 565 (1963) (Congress is within its authority to create a comprehensive scheme for managing the Colorado River, notwithstanding its consent to the Colorado River Compact). There is one exception to this general rule regarding Congress' retained authority. Article IV of the U.S. Constitution guarantees the territorial integrity of the states; thus, once Congress consents to a state boundary Compact, it may not subsequently adopt legislation undoing the states' agreement.

If Congress modifies a condition of its consent, the states would need to enact that modification into their Compact. BUENGER, ET AL., *supra*, at 89. There is no case law on this issue, but a Compact requiring consent cannot be valid if it conflicts with Congress' conditions of consent.

1.4.3 Implications of Congressional Consent

Congressional consent can significantly change the nature of an interstate Compact. "[W]here Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause." *Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Although most clearly articulated in *Cuyler v. Adams*, the rule that congressional consent transforms the states' agreement into federal law has been recognized since 1852. *See id.* at 438 n.7.

As federal law, disputes involving the application or interpretation of an interstate Compact with congressional consent may be brought in federal court under 28 U.S.C. § 1331 (federal question jurisdiction), except where a Compact specifically authorizes suit only in state court. Federal court jurisdiction is not exclusive; under the Supremacy Clause of the U.S. Constitution, state courts, similar to federal counterparts, have the same obligation to give force and effect to the provisions of a congressionally approved Compact. The U.S. Supreme Court retains the final word on the interpretation and application of congressionally approved Compacts no matter whether the case arises in federal or state court. *Delaware River Joint Toll Bridge Comm'n v. Colburn*, 310 U.S. 419, 427 (1940) ("[T]he construction of such a [bi-state] Compact sanctioned by Congress by virtue of Article I, § 10, Clause 3 of the Constitution, involves a federal 'title, right, privilege or immunity,' which when 'specially set up and claimed' in a state court may be reviewed here on certiorari under § 237(b) of the Judicial Code.").

**PRACTICE NOTE:** Because the ICAOS regulates the supervision of persons under the jurisdiction of state courts, most of the case law involving the ICAOS is state rather than federal.

Courts apply the Supremacy Clause in situations where there is a conflict between an interstate Compact with consent and state law or state constitutions. *See, e.g., Hinderlider v. La Plata River & Cherry Ditch Co.*, 304 U.S. 92, 108 (1938) (holding that states may, with congressional consent, enact Compacts even if those Compacts would conflict with rights granted under a state constitution); *Wash. Metro. Area Transit Auth. v. One Parcel of Land*, 706 F.2d 1312 (4th Cir. 1983) (Maryland may confer on an interstate agency federal quick-take condemnation powers not available to state agencies under Maryland's constitution); *Jacobson v. Tahoe Reg'l Planning Agency*, 566 F.2d 1353, 1358 (9th Cir. 1977) (holding that "causes of action based on state constitutional provisions must fail because the Compact, as federal law, preempts state law."); *Frontier Ditch Co. v. Se. Colo. Water Cons. Dist.*, 761 P.2d 1117, 1124 (Colo. 1998) (concluding, "Thus, to the extent that there might be some arguable conflict between [the Compact's] Article VI B's grant of exclusive jurisdiction to Kansas and the Colorado water court's jurisdiction [granted in that state's constitution], Article VI B is the supreme law of the land and governs the rights of the parties in this case.").

**PRACTICE NOTE:** Article XIV of the Interstate Compact for Adult Offender Supervision specifies, "All Compacting States' laws conflicting with this Compact are superseded to the extent of the conflict." This provision applies to conflicts between the ICAOS and state legislation, regulations, guidance documents, and other material as discussed below in section 1.6.

Courts also construe Compacts with consent under federal law, use federal law methods for interpreting the Compact and reviewing interstate commission interpretations and applications of the Compact. *See,*

*e.g., Carchman v. Nash*, 473 U.S. 716, 719 (1985); *League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 507 F.2d 517, 521-25 (9th Cir. 1974) ("[A] congressionally sanctioned interstate Compact within the Compact Clause is a federal law subject to federal construction"); *Friends of the Columbia Gorge v. Columbia River Gorge Comm'n*, 213 P.3d 1164, 1170–74, 1189 (Or. 2009) (applying the federal *Chevron* method for reviewing the interstate Commission's interpretation of federal law granting consent to the Compact, and the federal *Auer* method for reviewing the interstate Commission's interpretation of its own administrative rules).

Consent can also make federal remedies available for violations of a Compact. For example, the Interstate Agreement on Detainers (to which the United States is also a signatory) is considered a law of the United States; a violation of which is grounds for habeas corpus relief under *28 U.S.C. § 2254. See, e.g., Bush v. Muncy*, 659 F.2d 402, 407 (4th Cir. 1981), *cert. denied*, 455 U.S. 910 (1982).

Finally, unrelated to the federal law character of a Compact with consent, Congress can use the consent process to alter substantively the application of federal law in Compact situations. *See, e.g., McKenna v. Wash. Metro. Area Transit Auth.*, 829 F.2d 186, 188–89 (D.C. Cir. 1987) (Congress' consent to Title III of the Washington Metropolitan Area Transit Regulation Compact effectively altered the application of the Federal Employers' Liability Act to the Washington Metropolitan Area Transit Authority and exempted it from liability under that act).

Bench Book

## 1.5 Interpretation of Interstate Compacts

Because Compacts are statutes and contracts, courts interpret interstate Compacts in the same manner as interpreting ordinary statutes and by applying contract law principles.

> **PRACTICE NOTE:** No court has explained when to apply statutory construction principles versus contract law principles when interpreting an interstate Compact.

When determining whether a state or Compact agency applied the Compact in a permissible manner, courts generally apply a statutory construction approach. *See, e.g., Friends of the Columbia Gorge v. Columbia River Gorge Comm'n*, 213 P.3d 1164, 1170–74 (Or. 2009) As noted in section 1.4.2 above, for Compacts with consent, courts apply federal law, including federal decisional law unless the consent statute or Compact specifically makes state statutory, regulatory, or decisional law applicable. For Compacts that do not have consent, courts apply state law.

When interpreting a Compact to determine whether a party state is in breach of the Compact, courts typically apply principles governing interpretation of contracts. Where there is an ambiguity, courts apply contract interpretation principles such as negotiating history (*Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991)); course of performance (*Alabama v. North Carolina*, 560 U.S. 330, 346 (2010)); and usage of trade (Id. at 341–42 (considering Compacts that received contemporaneous consent); *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 633 (2013) (considering Compacts of the same subject matter, but not receiving consent contemporaneously)). In applying contract law principles, courts recognize that a Compact represents a political compromise between "constituent elements of the Union" in contrast with a commercial transaction. For example, the Eighth Circuit states in one case:

> *While a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate Compact may directly impact the population, the*

> *economy, and the physical environment in the whole of the Compact area. A suit alleging that a state has breached an obligation owed to its sister states under a congressionally approved interstate Compact also raises delicate questions bearing upon the relationship among separate sovereign polities with respect to matters of both regional and national import.*

*Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528, 541–42 (8th Cir. 2004). Consequently, the right to sue for breach of the Compact differs from a right to sue for breach of a commercial contract; it arises from the Compact, not state common law.

Courts generally strive to interpret and apply a Compact uniformly throughout the states where the Compact is effective. *See, e.g., In re C.B.*, 116 Cal. Rptr. 3d. 294, 295 (2010) (stating, "One of the key elements of any interstate Compact is uniformity in interpretation."). To achieve a uniform interpretation, courts commonly look to other courts decisions; however, there is often no uniformity. E.g., id. at 294–95 (looking at a dozen other state and federal court decisions and finding no uniformity); *State v. Springer*, 406 S.W.3d 526 (Tenn. 2013) (same).

**PRACTICE NOTE:** Courts help ensure a uniform interpretation of Compacts by citing interstate commissions' statements about and interpretations of their Compacts. Interstate commissions prepare these statements and interpretations to avoid disputes and to help the states implement the Compact uniformly. Courts commonly cite ICAOS advisory opinions and the ICAOS Bench Book. *See, e.g., State v. Brown*, 140 A.3d 768, 776, 777 n.5 (R.I. 2016); *Voerding v. Mahoney*, No. CV 09-73-H-DWM-RKS, 2010 U.S. Dist. LEXIS 32059 (D. Mont. Apr. 1, 2010); *In re Paul*, No. A-3905-08T2, 2010 N.J. Super. Unpub. LEXIS 1729 (N.J. Super. Ct. App. Div. Apr. 10, 2010).

Bench Book

1.6 Application of State Law that Conflicts with an Interstate Compact

Where state law and a Compact conflict, courts are required under the Supremacy Clause (for Compacts with consent) and as a matter of contract law to apply the terms and conditions of the Compact to a given case. The fact that a judge may not like the effect of a Compact or believes that other state laws can produce a more desirable outcome is irrelevant. The Compact controls over individual state law and must be given full force and effect by the courts. For a full discussion of giving Compacts effect over conflicting state law, see BUENGER, ET AL., supra, at 54–66.

Many Compacts are silent about how states may apply their own state law. In cases involving such Compacts, courts use different analyses that generally reach the same holding. For example, the Ninth Circuit held that states may not apply state law unless the specific state law to be applied is specifically preserved in the Compact. Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conserv. Planning Council, 786 F.2d 1359, 1364 (9th Cir. 1986). Similarly, states do not have the unilateral right to exercise a veto over actions of an interstate commission created by a Compact:

> *[W]hen enacted, a Compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the Compact absent the concurrence of the other signatories. C. T. Hellmuth & Assocs., Inc. v. Washington Metro. Area Transit Auth., 414 F. Supp. 408, 409 (D. Md. 1976).*

Some Compacts with just two or a few member states specifically allow states to apply new state law to a Compact provided that the other member states concur with applying that law. Most courts reason that the concurrence of other member states occurs when all of the states enact substantively identical law and express an intent that the law applies to a specific Compact. E.g., Int'l Union of Operating Eng'rs, Local 542 v. Delaware River Joint Toll Bridge Comm'n, 311 F.3d 273 (3d Cir. 2002) (citing cases and also noting New Jersey state courts use a less demanding analysis).

Occasionally, courts invoke the Contracts Clause of the U.S. Constitution in analyzing whether a state may apply its own law to a Compact. See, e.g., U.S. Trust Co. v. New Jersey, 431 U.S. 1, 32 (1977). Some courts use a contractual analysis without reference to the Contracts Clause of the federal or any state constitution. E.g., McComb v. Wambaugh, 934 F.2d 474, 479 (3d Cir. 1991). ("Having entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states.").

By entering into a Compact, the member states contractually agree that the terms and conditions of the Compact supersede parochial state considerations. In effect, Compacts create collective governing tools to address multilateral issues and, as such, they govern the multilateral contingent on the collective will of the member states, not the will of any single member state. This point is critically important to the success and uniform application of the ICAOS. Compacts are ultimately more successful when states enact statutes and regulations to support them.

**PRACTICE NOTE:** Most Compacts expressly preserve some state law or state authority, and states frequently enact statutes and regulations that support and complement their administration of a Compact.

Bench Book

1.7 Special Considerations for Litigation Involving Interstate Commissions

Special Considerations for Litigation Involving Interstate Commissions

Bench Book

1.7.1 Relief Must Be Consistent with the Compact

In *Texas v. New Mexico*, the Supreme Court sustained exceptions to a Special Master's recommendation to enlarge the Pecos River Compact Commission, holding that one consequence of a Compact becoming "a law of the United States" is that "no court may order relief inconsistent with its express terms." 462 U.S. 554, 564 (1983). The Court emphasized this principle in *New Jersey v. New York*, stating, "Unless the Compact . . . is somehow unconstitutional, no court may order relief inconsistent with its express terms, no matter what the equities of the circumstances might otherwise invite." 523 U.S. 767, 769 (1998). Although these cases were original jurisdiction cases in the U.S. Supreme Court, other courts applied this principle to consider appropriate relief in cases involving interstate commissions and states' application of Compacts. *E.g., New York State Dairy Foods v. Northeast. Dairy Compact Comm'n*, 26 F. Supp. 2d 249, 260 (D. Mass. 1998), *aff'd*, 198 F.3d 1 (1st Cir. 1999), *cert. denied*, 529 U.S. 1098 (2000); *HIP Heightened Independence & Progress, Inc. v. Port Auth. of N.Y. & N.J.*, 693 F.3d 345, 357 (3d Cir. 2012).

Where the Compact does not articulate the terms of enforcement, courts have wide latitude to fashion

remedies that are consistent with the purpose of the Compact. In a later *Texas v. New Mexico* 482 U.S. 124, 128 (1987) proceeding, the Supreme Court has opined, "By ratifying the Constitution, the States gave this Court complete judicial power to adjudicate disputes among them . . . and this power includes the capacity to provide one State a remedy for the breach of another." The Court further notes, "That there may be difficulties in enforcing judgments against States counsels caution but does not undermine our authority to enter judgments against defendant States in cases over which the Court has undoubted jurisdiction, authority that is attested to by the fact that almost invariably the 'States against which judgments were rendered, conformably to their duty under the Constitution, voluntarily respected and gave effect to the same.'" *Id.* at 130–31; *see also Kansas v. Nebraska*, 135 S. Ct. 1042, 1052–53, 1057 (2015) (stating that within the limits of *Texas v. New Mexico*, "the Court may exercise its full authority to remedy violations of and promote compliance with the agreement, so as to give complete effect to public law" and allowing a disgorgement remedy not specified in the Compact).



### 1.7.2 Eleventh Amendment Issues for Interstate Commissions

The Eleventh Amendment guarantees state sovereign immunity from suit in federal court. The Eleventh Amendment ensures that states retain certain attributes of sovereignty, including sovereign immunity. *Hans v. Louisiana*, 134 U.S. 1, 13 (1890). Over the years, the U.S. Supreme Court has established a clear approach to determining whether an interstate commission is a "state" or political subdivision thereof such that it enjoys immunity under the Eleventh Amendment; or, if through participation in a Compact, states waived immunity. Now, however, the application of the Eleventh Amendment immunity to interstate commissions is well established. In *Petty v. Tennessee-Missouri Bridge Commission*, *supra* at 277-78, the Supreme Court has opined that the text of the Compact stating that the Bridge Commission should have the power "to contract, to sue and be sued in its own name," and Congress' grant of consent to the Compact, stating "that nothing herein contained shall be construed to affect, impair, or diminish any right, power, or jurisdiction of the United States or of any court, department, board, bureau, officer, or official of the United States, over or in regard to any navigable waters . . . " effectively abrogates the states' Eleventh Amendment immunity by reserving the jurisdiction of the federal courts. 359 U.S. 275, 277 (1959).

In *Hess v. Port Authority Trans-Hudson Corp* 513 U.S. 30, 52 (1994), the Supreme Court has determined that when the *Lake Country Estates* factors point in different directions, the Eleventh Amendment's "twin reasons for being"—(1) respect for the dignity of the states as sovereigns, and (2) the "prevention of federal-court judgments that must be paid out of a State's treasury" should be the court's prime guide. 513 U.S. 30, 47-48 (1994).

There are many different actors involved with administering the ICAOS—the Interstate Commission, state agencies and officials, and local agencies and officials. Local agencies and officials do not enjoy Eleventh Amendment Immunity and suit may be brought against them in federal court. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). However, the Eleventh Amendment may apply to the Interstate Commission and state agencies and actors. The "sue and be sued" provisions in Articles III and IV of the ICAOS may constitute a state waiver of immunity from suits against the Interstate Commission in state courts, but it does not necessarily constitute a waiver of Eleventh Amendment immunity against suits in federal courts. *See, e.g., Fla. Dep't of Health and Rehab. Servs v. Fla. Nursing Home Assoc.*, 450 U.S. 147, 150 (1981); *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39-40 (2d Cir. 1977). Arguably, the ICAOS evidences intent by the states to be financially and administratively responsible for the actions of the commission, which may provide Eleventh Amendment immunity under the test articulated in Hess 513 U.S. at 47-48. The ICAOS provides that the Commission "shall defend the Commissioner of a Compacting State, or his or her representatives or employees, or the Commission's representatives or employees, in any civil action seeking to impose liability, arising out of any actual or alleged act, error or omission that occurred within the scope of Interstate Commission employment, duties or responsibilities[.]" The ICAOS requires the Commission to indemnify

and hold harmless a Commissioner, appointed designee or employees, or the Commission's representatives or employees in the amount of any settlement or judgment arising out of actual or alleged errors, acts or omissions that are within the scope of the Commission's duties or responsibilities.

Even if the Eleventh Amendment does not offer protection, the commission may be immune from suit governed by non-Eleventh Amendment considerations. For example, in *Morris v. Washington Metropolitan Area Transit Authority*, the court has determined that a bare "sue and be sued" clause extends only as far as other more specific partial waivers in the Compact, not to any and all suits. 781 F.2d 218, 221 n.3 (D.C. Cir. 1986). (*For a broader discussion of immunity issues associated with the application of the ICAOS, see Chapter 5.*)

Article VII of the ICAOS requires that judicial review of the Interstate Commission's rulemaking actions be brought in federal court for the District of Columbia or the federal district where the Commission has its principal offices. Additionally, Article XII.C specifies that the Interstate Commission may seek to enforce the ICAOS in the same federal courts. These two provisions specifying suit in federal court are specific to the types of suits described. Not all types of disputes involving the Interstate Commission may be brought in federal court.

> **PRACTICE NOTE:** Currently the principal offices of the Commission are located in Lexington, Kentucky. Any challenge to an Interstate Commission's rulemaking action brought in state court would be subject to removal to federal court.

Bench Book

1.8 Party State, Interstate Commission, and Third-Party Enforcement Compacts

Some Compacts authorize the interstate commission to seek judicial action to enforce the Compact against a party state. Article XII.C of the ICAOS is a good example. *See Interstate Comm'n for Adult Offender Supervision v. Tennessee Bd. of Prob. & Parole*, No. 04-526-KSF (E.D. Ky. June 13, 2005) (permanent injunction). In general, however, claims for breach of a Compact typically involve one party state filing an action against another party state in the U.S. Supreme Court under the Court's original jurisdiction in Article III, Section 2 of the U.S. Constitution and 28 U.S.C. § 1251(a). *See, e.g., Texas v. New Mexico*, 462 U.S. 554, 564 (1983). However, an interstate commission may join a party state as a plaintiff in an original jurisdiction action provided that it makes the same claims and seeks the same relief or its claims are wholly derivative of the plaintiff states' claims. *Alabama v. North Carolina*, 560 U.S. 330, 352–57 (2010).

Many cases involve third parties seeking to enforce a Compact, but the issue whether a third party may enforce a Compact arises only occasionally. *E.g., Medieros v. Vincent*, 431 F.3d 25 (1st Cir. 2005) (commercial fisherman sought to enforce the Atlantic States Marine Fisheries Compact against a state). In some cases, courts expressly conclude that third parties may enforce the Compact. *E.g., Borough of Morrisville v. Del. River Basin Comm'n*, 399 F. Supp. 469, 472 n.3 (E.D. Pa. 1975) (allowing several municipalities to challenge a DRBC resolution that imposed a charge for consumptive use of water, reasoning, "to hold that the Compact is an agreement between political signatories imputing only to those signatories standing to challenge actions pursuant to it would be unduly narrow in view of the direct impact on plaintiffs and other taxpayers.").

Two U.S. Courts of Appeals have held that there is no indication from the text and structure of the ICAOS that the Compact intended to create new individual rights. In addition, there is no basis for a private suit, whether under section 1983 or under an implied right of action to enforce the Compact. *See, e.g., Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 103 (3d Cir. 2008); *M.F. v. N.Y. Exec. Dep't Div.*

*of Parole*, 640 F.3d 491, 495 (2d Cir. 2011).

> **PRACTICE NOTE:** Courts do not always analyze Compacts for implied enforcement by third parties, which suggests that parties and courts generally recognize third parties' actions, unless there is good reason to believe that third parties may not bring actions. However, recent case law clarifies that absent language showing an intent to create individual rights such rights will not be implied.

Bench Book

1.9 Recommended Sources of Compact Law and Information

For additional information on interstate Compact law and interstate Compacts generally, see MICHAEL L. BUENGER, JEFFREY B. LITWAK, MICHAEL H. MCCABE & RICHARD L. MASTERS,, THE EVOLVING LAW AND USE OF INTERSTATE COMPACTS 2d ed. (ABA Publ'g 2016) and JEFFREY B. LITWAK, INTERSTATE COMPACT LAW: CASES AND MATERIALS 3d ed. (Semaphore Press 2018)

For historical context on interstate Compacts, see Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 YALE L.J. 685 (1925).

For historical context on Compacts and as applicable to transfer of supervision of individuals on probation and parole under the ICAOS, see Michael L. Buenger & Richard L. Masters, *The Interstate Compact on Adult Offender Supervision: Using Old Tools to Solve New Problems*, 9 ROGER WILLIAMS U. L. REV. 71 (2003).

See also the legal analysis concerning the contractual nature of ICAOS as interpreted and applied in *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 105 n.7 (3d Cir. 2008) (analyzing the contractual nature of ICAOS and citing the foregoing article); James G. Gentry, *The Interstate Compact for Adult Offender Supervision: Parole and Probation Supervision Enters the Twenty-First Century*, 32 MCGEORGE L. REV. 533 (2001).

For a report on interstate Compact agencies and good governance, see U.S. Gov't Accountability Office, No. GAO-07-519, *Interstate Compacts: An Overview of the Structure and Governance of Environment and Natural Resource Compacts* (2007).

Chapter 2

Interstate Commission for Adult Offender Supervision (ICAOS)

Bench Book

## 2.1 History of the Interstate Compact for Probation and Parole (ICPP)

In 1934, Congress authorized the creation of interstate Compacts on crime control, which led to the 1937 Interstate Compact for the Supervision of Parolees and Probationers. Also referred to as the Interstate Compact for Probation and Parole or the Uniform Law on the Supervision of Probationers and Parolees (hereafter "ICPP"). Pursuant to 4 U.S.C. 112 (2004), Congress granted the following consent:

> *(a) The consent of Congress is hereby given to any two or more States to enter into agreements or Compacts for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such agreements and Compacts.*

> *(b) For the purpose of this section, the term "States" means the several States and Alaska, Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and the District of Columbia.*

This consent, given to the states in advance of any Compact actually being in place, was the basis of not only the ICPP, but also serves as consent to other agreements such as the Interstate Juvenile Compact and the Interstate Compact for Adult Offender Supervision. *See Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 99 (fnl) (3d Cir. 2008). Prior to the adoption of the ICPP, there was no formal means for controlling the interstate movement of probationers and parolees. In many circumstances, courts and paroling authorities exercised discretion regarding an offender's permission to engage in interstate travel or relocation. Often, a receiving state obtained little or no notice of an offender's relocation. The ICPP served as the primary means for controlling the interstate movement of offenders until its replacement by the ICAOS.

Bench Book

## 2.2 Why the Interstate Compact for Adult Offender Supervision?

The intent of the ICAOS is not to dictate judicial sentencing or place restrictions on the court's discretion relative to sentencing. *See Scott v. Virginia*, 676 S.E.2d 343, 347 (Va. App. 2009). The ICAOS contains no provisions directing judges on sentencing in particular cases; and, it does not alter individual state sentencing laws, although the ICAOS may alter how those laws affect transfer decisions under the Compact. *See, e.g.*, ICAOS *Advisory Opinion 6-2005* (deferred sentencing) & *Advisory Opinion 7-2006* (second offense DUI). The ICAOS only comes into play when an offender seeks to transfer their supervision to another state.

If part of complying with a judge's sentence would require or permit travel or relocation to another state, the rules of the ICAOS may apply. When applicable, those rules would be binding on state officials in both the sending and receiving state.

Similar to its application relative to the courts, the ICAOS does not control the underlying decisions of a parole board except to the extent that the decision to parole requires or permits travel or relocation to another state. If the parole board permits such travel or relocation, the rules of the ICAOS apply and direct related actions of state officials in both states. The transfer of incarcerated offenders to serve their term of confinement in another state is not controlled by the ICAOS but may be controlled by the Interstate Corrections Compact.

**PRACTICE NOTICE:** The ICAOS is not an instrument imposing restrictions upon the discretion of courts or parole authorities in the sending state as to the nature of the sentence or conditions to impose on an offender. Limits on sentencing or parole conditions are generally a function of state law. The ICAOS becomes relevant to courts and parole authorities when an offender travels or relocates to a state other than the state that imposed the sentence or conditions.



2.3 General Principles Affecting Interstate Movement of Offenders

As a general proposition, convicted persons enjoy no right to interstate travel or a constitutionally protected interest to supervision in another state. *See Jones v. Helms*, 452 U.S. 412, 418-20 (1981); *Griffin v. Wisconsi*n, 483 U.S. 868, 874 (1987); *U.S. v. Knights*, 534 U.S. 112, 119 (2001)("Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."); *See Virgin Islands v. Miller*, (2010 WL 1790213 (V.I. Super., May 4, 2010)("This language (of the Compact) clearly reflects that the determination of whether to allow a probationer to reside in another jurisdiction and be supervised under the authority of the receiving state is an exercise of discretion and not a matter of right."), *also O'Neal v. Coleman*, No. 06-C-243-C, 2006 WL 1706426, at *7 (W.D. Wis. June 16, 2006) (Simply put, individuals on probation do not have a constitutional right to have supervision of their probation transferred from one jurisdiction to another.) *See also, United States v. Warren*, 186 F.3d 358, 366 (3d Cir. 1999), *Bagley v. Harvey*, 718 F.2d 921, 924 (9th Cir. 1988); *Alonzo v. Rozanski*, 808 F.2d 637, 638 (7th Cir. 1986) and, *Wilkinson v. Austin*, 545 U.S. 209, 228-30 (2005) (inmates may have protected due process interests, but state's interests in public safety and management of scarce resources are dominant considerations owed great deference). A parolee cannot be regarded as free as they have already lost their freedom by due process of law. While paroled, the parolee is a convicted person who is being "field tested" towards rehabilitation. Therefore, one cannot compare the parolee's rights in this posture with rights before conviction. *Hyser v. Reed*, 318 F.2d 225, 239 (D.C. Cir.) (en banc), *cert denied*, 375 U.S. 957 (1963). A parolee's right to travel is essentially the same as an inmate's and, thus, not in need of any specific constitutional protection. *See Paulus v. Fenton*, 443 F. Supp. 473, 476 (M.D. Pa. 1977), *also Berrigan v. Sigler*, 499 F.2d 514, 522 (D.C. Cir. 1974). Likewise, restricting the movement of individuals on probation is appropriate in some cases to facilitate proper supervision and to punish the probationer for unlawful conduct. *United States v. Scheer*, 30 F.Supp. 2d 351, 353 (E.D.N.Y. 1998); *O'Neal v. Coleman*, No. 06-C-243-C,2006 WL I 706426, at *7 (W.D. Wis. June 16, 2006). A categorical denial of the right to travel applicable to offenders does not presumptively violate due process rights as such rights were extinguished, or greatly diminished, by a conviction. *See e.g., Pelland v. Rhode Island*, 317 F. Supp. 2d 86, 93 (R.I. 2004) (for probationers, the right of interstate travel may exist, if at all, but in a restricted and weakened condition; thus, a higher degree of deference (or a lower degree of scrutiny) is necessary with respect to the government's restrictions if the distinction between the convicted and the law-abiding is to mean anything). Convicted persons have no right to control where they live in the United States; the right to travel is extinguished for the entire balance of their sentences. *See, e.g., Williams v. Wisconsin*, 336 F.3d 576, 581 (7th Cir. 2003). *See also, Jones v. Helms*, 452 U.S. 412, 419-20 (1981) (a person who has committed an offense

punishable by imprisonment does not have an unqualified right to leave the jurisdiction prior to arrest or conviction). *See also United States v. Pugliese*, 960 F.2d 913, 916-16 (10th Cir. 1992). ('No due process challenge may be made unless the challenger has been or is threatened with being deprived of life, liberty, or property.') *See Cevilla v. Gonzales*, 446 F.3d 658, 662 (7th Cir. 2006).

The absence of rights to interstate travel has important implications on the return of offenders. Because offenders possess no presumptive right to travel, in addition to public safety considerations and the management of corrections resources, states have discretion in managing both the sending and return of offenders. The ICAOS is the primary tool for managing the interstate movement of offenders subject to conditional release and/or community supervision. The Compact, therefore, controls such movement as well as the return of offenders. The level of process owed offenders in transferring supervision to another state is therefore purely discretionary and involves little if any due process considerations by a sending state. However, the ICAOS may implicate due process considerations in one of two circumstances. First, in some circumstances the ICAOS imposes an obligation on a receiving state to accept certain offenders for supervision. The improper refusal by the receiving state to accept transfer of an otherwise eligible offender may present due process issues. Second, due process considerations may also arise by actions in the receiving state that may lead the sending state to revoke conditional release. *See*, discussion *infra* at § 4.4.2.3. There are no due process implications *per se* to the decision to transfer supervision or retake an offender unless one of these two circumstances is present. The Compact imposes no obligation on sending states to transfer supervision and therefore appears to present no due process concerns in this context. An offender does not have a right to transfer and a sending state has no affirmative obligation to grant a transfer.

**PRACTICE NOTE:** Offenders have no constitutional right to relocate. Sending states have no obligation to allow an offender to travel to or relocate in another state. Except as provided in the ICAOS and its rules, member states do not have an obligation to assume jurisdiction and supervision over offenders from other states. The ability of an individual offender to relocate and the obligations of states to either approve relocation or accept relocation are defined by federal law or interstate agreements such as the ICAOS.



## 2.4 Historical Development of the ICAOS

The ICAOS was written to address problems and complaints with the ICPP. Chief among the problems and complaints were:

- Lack of state compliance with the terms and conditions of the ICPP;
- Enforceability of its rules given there was no enforcement mechanism provided in the ICPP. Thus, the enforcement tools provided for in the rules of the Parole and Probation Compact Administrators' Association (PPCAA) were limited and problematic;
- Questions as to whether the PPCAA could legitimately be construed as "like officials" conferring authority to promulgate rules under the terms of the ICPP;
- The increasing tendency of state legislatures to adopt statutes that conflicted with the terms, conditions, and purposes of the ICPP due to notorious failures in Compact management. For example, Colorado adopted legislation prohibiting "the travel of a supervised person who is a nonresident of this state . . . without written notification from the administrator of the interstate Compact of acceptance of the supervised person into a private treatment program." *Colo. Rev. Stat.* § 17-27.1-101(3) (b) (2002). The Colorado legislature specifically found that "The general assembly further finds that although Colorado is a signatory to the interstate Compact for parolee

supervision, more information concerning out-of-state offenders is necessary for the protection of the citizens of Colorado, and it may be necessary to further regulate programs that provide treatment and services to such persons." *See, Doe v. Ward*, 124 F. Supp. 2d 900, 916 (W.D. Pa. 2000) (Pennsylvania's attempt to impose higher restrictions on out-of-state sex offenders than it imposed on instate sex offenders violated the terms of the ICPP and rules adopted pursuant to that Compact); and,

- Questions regarding what offenders were covered by the Compact, particularly given the increasing use of alternative sentencing practices such as suspended imposition of sentence and diversion programs that did not readily fit the terms and definitions of the ICPP.

Bench Book

## 2.5 Purpose of the ICAOS

Against this backdrop, concerned parties proposed a new Compact to the states. Defined in Article I, the purpose of the Compact provided:

> *[T]he framework for the promotion of public safety and protect the rights of victims through the control and regulation of the interstate movement of offenders in the community; to provide for the effective tracking, supervision, and rehabilitation of these offenders by the sending and receiving state; and to equitably distribute the costs, benefits, and obligations of the Compact among the Compacting states.*

Bench Book

## 2.6 Effect of the ICAOS on the States

As previously discussed, the ICAOS received advanced congressional consent pursuant to 4 U.S.C. § 112 (2004). Accordingly, the agreement created a Compact that must be construed as federal law enforceable on member states through the Supremacy Clause and the Compacts Clause of the U.S. Constitution.

Given the contractual nature of Compacts, member states may not act unilaterally to alter the terms and conditions of the agreement. Any state law that would conflict with or attempt to supersede the ICAOS would be unenforceable to the extent of any conflict. Additionally, state executive bodies and courts are required to give full force and effect to the agreement by the explicit terms of the ICAOS and its standing as (1) a valid Compact, (2) which is contractual in nature, and (3) must be construed as federal law. For example, a state parole board may not impose terms and conditions on parolees from other states that exceed or attempt to override the requirements set by the Commission.

> **PRACTICE NOTE:** An additional feature of the ICAOS that is unique among Compacts is the effect rules adopted by the Interstate Commission have on state law. The ICAOS specifically vests in the Interstate Commission the authority to adopt rules to meet the purpose of the agreement. By the terms of the Compact, rules adopted by the Interstate Commission have standing as statutory law and are binding on the Compacting states. *Scott v. Virginia*, 676 S.E.2d 343, 346 (Va. App. 2009). A state law, court rule, or regulation that contradicts or attempts to contravene the rules of the Interstate Commission may be invalid to the extent of the conflict. Art. V, Powers & Duties of the Interstate Commission.

## 2.7 Adoption and Withdrawal

Like any other interstate Compact, the ICAOS inaugurated when state legislatures passed similar statutes enacting the provisions of the agreement. In the case of the ICAOS, the threshold requirement for activation of the Compact was adoption of the Compact by thirty-five states. Unlike some Compacts adopted through Executive Order or by delegation of authority to a state official, ICAOS originated by enacting a substantially similar statute that contained all pertinent provisions of the draft Compact. The following states adopted the ICAOS:

| | |
|---|---|
| Alabama | Ala. Code § 15-22-1-1 (2004) |
| Alaska | ALASKA STAT. §33-36-3 (2004) |
| Arizona | ARIZ. REV. STAT. § 31-467 (2004) |
| Arkansas | A.C.A. § 12-51-101 (2004) |
| California | CAL. PENAL CODE § 11180 (2004) |
| Colorado | COLO. REV. STAT. §§ 24-60-2802 (2004) |
| Connecticut | CONN. GEN. STAT. § 54-133 (2004) |
| Delaware | DEL. CODE ANN. tit. 11, §§ 4358 & 4359 (2004) |
| Florida | FLA. STAT. ANN. 949-07 (2004) |
| Georgia | GA. CODE ANN. § 42-9-81 (2004) |
| Hawaii | HAW. REV. STAT. § 353B-1 (2004) |
| Idaho | IDAHO CODE § 20-301 (2004) |
| Illinois | 45 ILL. COMP. STAT. 170 (2004) |
| Indiana | IND. CODE 11-13-4.5 (2004) |
| Iowa | IOWA CODE § 907B-2 (2004) |
| Kansas | KAN. STAT. ANN.§ 22-4110 (2004) |
| Kentucky | KY. REV. STAT. ANN. § 439-561 (2004) |
| Louisiana | LA. REV. STAT. ANN. § 15-574-31 (2004) |
| Maine | ME. REV. STAT. ANN. tit. 34-A, § 9871, et seq. (2004) |
| Maryland | MD. CODE ANN. CORRECT. SERV. § 6-201, et seq. (2004) |
| Massachusetts | MA GEN L CH 127 SECTION 151a-n (2005) |
| Michigan | MICH. CONS. LAWS. § 3-1012 (2004) |
| Minnesota | MINN. STAT. ANN. § 243.1605 (2004) |
| Mississippi | MISS. CODE ANN. § 47-7-81 (2004) |
| Missouri | MO. REV. STAT. § 589.500 (2004) |
| Montana | MONT. CODE ANN. § 46-23-1115 (2004) |
| Nebraska | NEB. REV. STAT. § 29-2254 (2004) |
| Nevada | NEV. REV. STAT. § 213-215 (2004) |
| New Hampshire | N.H. REV. STAT. ANN. § 651-A:29 (2004) |
| New Jersey | N.J. STAT. ANN. § 2A:168-26 (2004) |
| New Mexico | N.M. STAT. ANN. § 31-5-20 (2004) |
| New York | N.Y. EXEC. LAW § 259-mm (2004) |
| North Carolina | N.C. GEN. STAT. § 148-4B (2004) |
| North Dakota | N.D. CENT. CODE § 12-65-01 (2004) |
| Ohio | OHIO REV. CODE §5149-21 (2004) |
| Oklahoma | OKLA. STAT. tit. 22 § 1091, et seq. (2004) |
| Oregon | OR. REV. STAT. §144-600 (2004) |
| Pennsylvania | 61 PA. CONS. STAT. § 324.1 (2004) |
| Puerto Rico | (P. del S. 2141), 2004, ley 208 |
| Rhode Island | R.I. GEN. LAWS § 13-9.1-1 (2004) |
| South Carolina | S.C. CODE ANN. § 24-21-1100 (2003) |
| South Dakota | S.D. CODIFIED LAWS § 24-24-16A (2004) |
| Tennessee | TCA § 40-28-401 (2004) |
| Texas | TEXAS GOV'T CODE ANN. § 510.00, et seq. (2004) |
| Utah | UTAH CODE ANN. § 77-28C-103 (2004) |
| Vermont | VT. STAT. ANN. tit. 22 § 1351 (2004) |
| Virginia | VA. CODE ANN. §§ 53.1-172 & 53.1-174 (2004) |
| Virgin Islands | Act No. 6730, Bill No. 26-0003 |
| Washington | WASH. REV. CODE § 9-94A-745 (2004) |
| West Virginia | W. VA. CODE § 28-7-1, et seq. (2004) |
| Wisconsin | WIS. STAT. § 304-16 (2004) |
| Wyoming | WYO. STAT. ANN. § 7-13-423 (2004) |
| District of Columbia | D.C. CODE § 24-133 (2004) |
| United States | Pub. L. No. 73-293, 48 Stat. 909, 4 U.S.C. § 112(A) (2004) |

Withdrawal from the Compact is permitted pursuant to Article XII, § A of the agreement. A state may withdraw by enacting a statute specifically repealing the agreement. The effective date of withdrawal is the effective date of the repeal, provided that repealing the agreement does not relieve a state of any pending financial obligations it may have to the Commission. Therefore, a state could not avoid paying assessments, obligations or other liabilities, including any financial penalties imposed by the Commission or a court simply by repealing the agreement. Such obligations would extend beyond the date of any repeal and would be subject to judicial enforcement even after a state has withdrawn from the ICAOS.

Bench Book

## 2.8 Effect of Withdrawal

As discussed, offenders have no constitutional travel rights and states have no constitutional obligations to open their doors to offenders from other states. Thus, ICAOS is the only mechanism by which states can regulate the interstate movement of adult offenders subject to community supervision. A state that repeals the ICAOS forfeits being a part of a formal mechanism that regulates the movement of offenders to and from other states. Therefore, at least theoretically, any state could order an offender to relocate to a non-member state without abiding by the most basic considerations, such as prior notice of relocation, the opportunity to review a proposed supervision plan, and the opportunity to investigate whether resources are available to meet the goals of the supervision plan. In short, non-member states place themselves in serious jeopardy of both “dumping” as well as being a “dumping ground” for all other states’ offenders. Additionally, offenders of states that are not members of the ICAOS may be subject to a wide array of state laws and regulations that may actually seek to prohibit relocation. *See, e.g., COLO. REV. STAT. § 17-27.1-101(3) (b) (2002)*. For example, a state statute requiring only that all out-of-state felony offenders submit to psychological testing and registration may not be enforceable against felons from states that are members of the ICAOS, cf., *Doe v. Ward*, 124 F. Supp.2d 900, 916 (W.D. Pa. 2000), but may be enforceable against felons from states that are not members of the Compact. Stated differently, participation in the ICAOS ensures not only the controlled movement of offenders under community supervision, but also that out-of-state offenders will be given the same resources and supervision provided to similar in-state offenders including the use of incentives, corrective actions, graduated responses and other supervision techniques. Non-participation or withdrawal from the Compact could allow for different treatment of out-of-state offenders, within the bounds of due process and equal protection, than their in-state counterparts. The differences could include requirements imposed on non-member state offenders that effectively prevent transfers to the state.

Bench Book

## 2.9 Key Features of the ICAOS

The following are key features of the ICAOS:

- The creation of a formal Interstate Commission comprised of Commissioners representing each of the member states and vested with full voting rights, the exercise of which is binding on the respective state. The Commission also allows for a number of non-voting ex-officio members representing various interest groups such as the Conference of Chief Justices, crime victim advocates, and others;
- Broad rulemaking authority;
- Extensive enforcement authority, including requirements for remedial training, imposition of fines, and suspension of non-compliant states; and,
- A mandate that each member state create a State Council with representatives from all three

branches of government to assist in managing intrastate Compact affairs and intervene as necessary to prevent disputes between states. The State Council is a forum where intrastate management issues can be resolved short of intervention by the Commission.

Bench Book

## 2.10 Key Definitions in the ICAOS (Art II)

The following definitions should be of particular interest to judicial authorities:

- **Adult** – means both individuals legally classified as adults and juveniles treated as adults by court order, statute, or operation of law.
- **Compact Administrator** – means the individual in each Compacting state appointed pursuant to the terms of this Compact who is responsible for the administration and management of the state's supervision and transfer of offenders subject to the terms of this Compact, the rules adopted by the Interstate Commission and the policies adopted by the State Council.
- **Commissioner** – means the voting representative of each Compacting state appointed pursuant to Article II of this Compact.
- **Offender** – means an adult placed under, or subject to, supervision as the result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections, or other criminal justice agencies.
- **Rules** – means acts of the Interstate Commission, duly promulgated pursuant to Article VIII of this Compact, and substantially affecting interested parties in addition to the Interstate Commission, which shall have the force and effect of law in the Compacting states.

Bench Book

## 2.11 Interstate Commission

The ICAOS creates an Interstate Commission to oversee the operations of the Compact nationally, enforce its provisions on the member states, and resolve any disputes that may arise between the states. The Commission is comprised of one voting representative of each member state to the Compact. In addition, the Compact allows for ex officio members representing national organizations. The Commission is a corporate public body of the states that is engaged in public policy making on behalf of the member states. This characterization as a "corporate public body" of the member states may have important liability consideration regarding the actions of the Commission.

Bench Book

### 2.11.1 Primary Powers of the Commission

The powers of the Commission appear in Article V of the ICAOS. Among its primary powers, the Commission:

- Promulgates rules, which are binding on the states and have the force and effect of statutory law within each member state;
- Oversees, supervises, and coordinates the interstate movement of offenders subject to the Compact;
- Enforces compliance with all the Compact rules and terms;
- Creating mechanisms for resolving disputes between states;
- Coordinates the Commission's education, training, and awareness relative to offender's interstate

movement;
- Establishes uniform standards for reporting, collecting, and exchanging data; and,
- Performs other functions as necessary to achieve the purposes of the Compact.



### 2.11.2 Rulemaking Powers

Of the powers of the Commission, none is more unique and all encompassing than its rulemaking authority. The rules promulgated by the Commission have the force and effect of statutory law within member states and therefore must be given full effect by all state agencies and courts. *See Art. IX § A. See Scott v. Commonwealth of Virginia*, 676 S.E.2d 343, 346 (Va. App. 2009) ("The Interstate Commission for Supervision of Adult Offenders, 'the Commission or 'ICAOS' was established by the Compact and has promulgated rules governing the transfer of supervision from a sending state to a receiving state as well as the return to or retaking by a sending state. The ICAOS Rules are binding in the Compacting states and have the force and effect of law in Virginia and Ohio.") *Id.* at 346. *See also Johnson v. State*, 957 N.E.2d 660, 663 (Ind. App. 2011). As the ICAOS has congressional consent, both the Compact and its rules have the force and effect of federal law and are arguably binding on the states under both a Supremacy Clause analysis and a Contract Clause analysis, no state being able to impair the obligations of contracts including those entered into by the state itself. *See Doe v. Pennsylvania Board of Probation and Parole*, 513 F.3d 95, 103 (2008)("[A]pplying the factors set forth in *Cuyler v. Adams*, 449 U.S. 433, 442 (1981)" the Court held that the Compact, "as a congressionally-sanctioned interstate Compact is federal law.") Id. at 103; *See also, ICAOS v. Tennessee Bd. of Probation and Parole*, No. 04-526 KSF (E.D. Ky. 2005). In adopting rules, the Commission is required to substantially comply with the "Government in Sunshine Act," 5 U.S.C. § 552(b). However, the Commission's rulemaking process must only *substantially comply* with the noted provision and is not bound by the specific terms and conditions of 5 U.S.C. § 552(b), et seq. The Commission's rulemaking authority is also limited by Article VIII, which provides that, if a *majority* of state legislatures rejects a Commission rule by enacting a statute to that effect, the rule has no force or effect in *any* member state. A single state may not unilaterally reject a rule even if it adopts legislation to that effect. In addition, insofar as a provision of the Compact (not the rules promulgated by the Commission) exceeds the constitutional limits imposed on a state legislature, the obligations, duties, powers or jurisdiction conferred on the Commission shall be ineffective and such obligations, duties, powers or jurisdiction shall remain in the Compacting state.

The ICAOS specifically provides a mechanism by which a rule adopted by the Commission can be challenged. Under Article VIII, no later than sixty days after the promulgation of a rule, any interested party may file a petition in the United States District Court for the District of Columbia or the United States District Court in which the Commission has its principal offices (currently the United States District Court for the Eastern District of Kentucky) challenging the rule. The court can set aside a Commission rule if it is not supported by substantial evidence in the rulemaking record as defined by the Administrative Procedures Act, 5 U.S.C. § 551, et seq. (2004).

**PRACTICE NOTE:** In promulgating a rule, the Interstate Commission is only required substantially to comply with the requirements of the Administrative Procedures Act. The rule would only be set aside upon failing substantially to comply with the Act. Failure to fully comply with all aspects of the Administrative Procedures Act does not justify setting aside a duly promulgated rule of the Interstate Commission.

## 2.12 Enforcement of the Compact and its Rules (Art. IX & Art. XII)

One of the key features of ICAOS is the Commission's enforcement tools to promote state compliance with the Compact. The tools provided to the Commission are not directed at compelling offender compliance; such compliance is a matter for the member states' courts, paroling authorities and corrections officials. The tools provided for in the ICAOS are exclusively designed to compel member states to fulfill their contractual obligations by complying with the terms and conditions of the Compact and any rules promulgated by the Commission.

Bench Book

### 2.12.1 General Principles of Enforcement

The Commission possesses significant enforcement authority against states deemed in default of their obligations under the Compact. The decision to impose a penalty for noncompliance rests with the Commission as a whole or its executive committee acting on the Commission's behalf. The enforcement tools available to the Commission include:

- Requiring remedial training;
- Mandating mediation or binding arbitration;
- Providing technical assistance;
- Imposing financial penalties on a non-compliant state;
- Suspending a non-compliant state;
- Termination from the Compact; and
- Initiating litigation to enforce the terms of the Compact, monetary penalties ordered by the Commission, or obtaining injunctive relief.

Grounds for default include but are not limited to a state's failure to fulfill such obligations as are imposed by the terms of the Compact, its by-laws, or any duly promulgated rule.

Bench Book

### 2.12.2 Judicial Enforcement

The Commission can initiate judicial enforcement by filing a complaint or petition in the appropriate U.S. district court. A member state that loses in any such litigation is required to reimburse the Commission for the costs incurred in prosecuting or defending a suit, including reasonable attorney's fees. *See*, Art. XII § C; Rule 6.104 (prevailing party shall be awarded all costs associated with the enforcement action, including reasonable attorneys' fees).

All courts and executive agencies in each member state must enforce the Compact and take all necessary actions to achieve its purposes. *See Art. IX, § A. See Scott v. Virginia*, 676 S.E.2d 343, 346 (Va. App. 2009); *Johnson v. State*, 957 N.E.2d 660, 663 (Ind. App. 2011) ("All of the rules and bylaws adopted by the commission established by the interstate Compact are binding upon the Compacting states") For a discussion of the application of a similar provision in Interstate Compact on Juveniles, *see, In re O.M.*, 565 A.2d 573, 581 (D.C.C.A 1989) holding that provisions in the Compact requiring rendition of a juvenile to another member state is required by the terms of the Compact which the courts and executive agencies of the District of Columbia must enforce. The Court of Appeals has concluded that, "The courts of the District of Columbia have no power to consider whether rendition of a juvenile under the Interstate Compact on Juveniles is in the juvenile's best interests." *Id.* at 581. In the context of a Compact, courts cannot ignore the use of the word "shall," which creates a duty, not an option. *Id. See*

*also A Juvenile*, 484 N.E.2d 995, 997-998 (Mass. 1985).

The Commission is entitled to all service of process in any judicial or administrative proceeding in a member state pertaining to the subject of the Compact where the proceedings may affect the powers, responsibilities or actions of the Commission. *See Art. IX, § A*. It is not clear what influence the failure to provide service to the Commission would have on the enforceability of a judgment vis-à-vis the Commission.

Chapter 3

## The ICAOS Implications for the Courts

States are bound to the Commission's rules under the terms of the Compact. The rules adopted by the Commission have the force and effect of statutory law and all courts and executive agencies shall take all necessary measures to enforce their application. *See Art. V. See also Scott v. Virginia*, 676 S.E.2d 343, 346 (Va. App. 2009). Failure of state judicial or executive branch officials to comply with the terms of the Compact and its rules would result in the state defaulting on its contractual obligations under the Compact and could lead the Commission to take corrective or punitive action, including suit in federal court for injunctive relief. *See Art. XII § C*. All state laws that conflict with the Compact are superseded to the extent of any such conflict. *See Art. VIX § A*. Given the Compact's broad definitions, the Commission is not limited to certain classifications of offenders, unless it decides to be so limited. As an interstate Compact approved by Congress, the Compact has the force and effect of federal law in accordance with the Supremacy Clause.

**PRACTICE NOTE:** No court can order relief that is inconsistent with the terms and conditions of the Compact; a principle that extends also to the Commission's rules. This principle would extend to state court enforcement of the Compact as federal law under the Supremacy Clause.

Bench Book

## 3.1 Key Definitions in the Rules

The following key terms and their definitions supplement terms defined by the Compact. They should be of special interests to judicial authorities:

- **Abscond** means to be absent from the offender's approved place of residence and employment; and failing to comply with reporting requirements;
- **Arrival** means to report to the location and officials designated in reporting instructions given to an offender at the time of the offender's departure from a sending state under an interstate Compact transfer of supervision;
- **Behavior Requiring Retaking** means an act or pattern of non-compliance with conditions of supervision that could not be successfully addressed through the use of documented corrective action or graduated responses and would result in a request for revocation of supervision in the receiving state;
- **Compliance** means that an offender is abiding by all terms and conditions of supervision, including payment of restitution, family support, fines, court costs or other financial obligations imposed by the sending state;
- **Deferred Sentence** means a sentence the imposition of which is postponed pending the successful completion by the offender of the terms and conditions of supervision ordered by the court;
- **Offender** means an adult placed under, or made subject to, supervision as the result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections, or other criminal justice agencies, and who is required to request transfer of supervision under the provisions of the Interstate Compact for Adult Offender Supervision;
- **Plan of Supervision** means the terms under which an offender will be supervised, including proposed residence, proposed employment or viable means of support and the terms and

conditions of supervision;

- **Probable Cause Hearing** means a hearing in compliance with the decisions of the U.S. Supreme Court, conducted on behalf of an offender accused of violating the terms or conditions of the offender's parole or probation;
- **Relocate** means to remain in another state for more than 45 consecutive days in any 12-month period; Sex Offender means an adult placed under, or made subject to, supervision as the result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections, or other criminal justice agencies, and, who is required to register as a sex offender either in the sending or receiving state; and, who is required to request transfer of supervision under the provisions of the Interstate Compact for Adult Offender Supervision;
- **Substantial Compliance** means that an offender is sufficiently in compliance with the terms and conditions of his or her supervision so as not to result in initiation of revocation of supervision proceedings by the sending state;
- **Supervision** means the oversight exercised by authorities of a sending or receiving state over an offender for a period of time determined by a court or releasing authority, during which time the offender is required to report to or be monitored by supervising authorities, and to comply with regulations and conditions, other than monetary conditions, imposed on the offender at the time of the offender's release to the community or during the period of supervision in the community;
- **Violent Crime** means any crime involving the unlawful exertion of physical force with the intent to cause injury or physical harm to a person; or an offense in which a person has incurred direct or threatened physical or psychological harm as defined by the criminal code in which the crime occurred; or the use of a deadly weapon in the commission of a crime; or any sex offense requiring registration;
- **Waiver** means the voluntary relinquishment, in writing, of a known constitutional right or other right, claim or privilege by an offender;
- **Warrant** means a written order of the court or authorities of a sending or receiving state or other body of competent jurisdiction which is made on behalf of the state, or United States, issued pursuant to statute and/or rule and which commands law enforcement to arrest an offender. The warrant shall be entered in the National Crime Information Center (NCIC) Wanted Person File using a nationwide pick-up radius with no bond amount set.

Bench Book

## 3.2 Judicial Considerations

Judicial Considerations

Bench Book

### 3.2.1 Offender Eligibility Criteria

Determining offender eligibility under the Compact requires a multi-prong analysis beginning with the broad definition of offender. An "offender" means "an adult placed under, or made subject to, supervision as a result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections or other criminal justice agencies, and who is required to request transfer of supervision under the terms and conditions of supervision." *See Art. II; Rule 1.101*. If an offender is an "offender" for purposes of the Compact, qualification for transfer of supervision is determined by the nature of the offense and the nature of the supervision.

In interpreting the definition of "offender," the Commission affirms that the type of supervision to be carried out in a receiving state is not a factor in determining whether an offender is eligible for transfer.

See *Advisory Opinion 9-2004*: Additionally, because of the broad definition of offender, the Compact covers those under the supervision of probation and parole officials, departments of corrections, courts, related agencies, and private firms acting on behalf of the courts and corrections authorities.

> **PRACTICE NOTE:** If an offender does not meet any of the eligibility criteria, the offender is not subject to the ICAOS. These factors may include failure to meet the definition of an offender, failure to commit an offense covered by the Compact, or not being subject to some form of community supervision. Offenders not subject to the ICAOS may, depending on the terms and conditions of their adjudication, be free to move across state lines without prior approval from the receiving state.

Bench Book

3.2.1.1 Offenders Covered by the ICAOS

According the Commission's definition of "offender," the Commission can regulate the full range of adult offenders. An adult offender does not have to be on a traditionally applied formal "probation" or "parole" status to qualify for transfer and supervision under the ICAOS. To *initially* qualify for transfer of supervision under the ICAOS, the offender must (1) be subject to some form of community supervision, including supervision by a court, paroling authority, probation authority, treatment authority or anyone person or agency acting in such a capacity or under contract to provide supervision services, and (2) have committed a covered offense as defined by the rules.

Offenders ELIGIBLE FOR TRANSFER of supervision under the ICAOS and its rules include:

- Those subject to traditional parole or probation, *e.g.*, offenders found guilty and sentenced;
- Those subject to deferred sentencing such as suspended imposition of sentences if some form of community supervision and/or reporting is a condition of the court's order;
- Those subject to deferred execution of sentence if some form of community supervision and/or reporting is a condition of the court's order;
- Those subject to other "non-standard" forms of disposition as determined by the Commission if some form of community supervision and/or reporting is a condition of the court's order;
- A juvenile offender treated as an adult by court order, statute, or operation of law;
- A misdemeanant provided they are subject to one year or more supervision and were convicted of one of the following offenses:
  - An offense resulting in direct physical or psychological harm to another person (*See ICAOS* *Advisory Opinion 16-2006* for clarification);
  - An offense involving the possession or use of a firearm; (*See ICAOS* *Advisory Opinion 1-2011* for clarification);
  - A second or subsequent conviction of driving while impaired by drugs or alcohol; or (*See ICAOS* *Advisory Opinion 7-2006* for clarification);
  - A sex offense requiring the offender to register as a sex offender under the laws of the sending state. (*See Rule 2.105*); and,
- Those subject to deferred prosecution programs, to the extent that participation in such programs requires the offender to make material admissions of fact and waive all or some of their constitutional rights. *See ICAOS* *Advisory Opinion 6-2005*.

**PRACTICE NOTE:** Pursuant to Rule 2.110, with limited exception, no state may allow a person covered by the Compact to relocate to another state except as provided by the Compact and its rules. Therefore, a court cannot order or direct an eligible offender to leave a state and relocate to another state unless such relocation occurs in accordance with the Compact and its rules.

Those *NOT ELIGIBLE FOR TRANSFER* of supervision under the ICAOS and its rules include:

- Offenders on furlough or work release (Rule 2.107);
- Misdemeanants not subject to the qualifications contained in Rule 2.105;
- Non-criminals such as those convicted of infractions or subject to a civil penalty system, *See Com. of Virginia v. Amerson*, 706 S.E.2d 879, 884-85 (2011) (offenders convicted under Sexually Violent Predators Act (SVPA) ineligible for transfer under ICAOS because the act is civil not criminal); and
- Juvenile offenders who are not deemed "adults" for purposes of prosecution.

Bench Book

3.2.1.2 Eligibility of Offenders, Residency Requirements

General Overview

Transfers fall into one of two categories, (1) mandatory acceptance and (2) discretionary acceptance. The authority to place an offender outside the state rests exclusively with the sending state. *See Rule 3.101*. The offender has no constitutional right to transfer their supervision to another state, even if the offender is otherwise eligible. Therefore, Rule 3.101 should not be interpreted as creating any constitutionally protected interest to relocate on behalf of an offender. Rather, Rule 3.101 creates an obligation on a receiving state to accept an offender for supervision *once the sending state has made a determination to transfer supervision*. The sending state's denial of the transfer of supervision appears absolute and is entitled to deference by courts. *See Com. v. Mowry*, 921 N.E.2d 565 (Mass. App. 2010); *also Strong v. Kansas Parole Bd.*, 115 P.3d 794 (Kan. Ct. App. 2005).

If a sending state decides to transfer supervision, and the offender has three months or more or an indefinite period of supervision remaining, the receiving state must accept the transfer if the offender:

- Is in substantial compliance with a valid plan of supervision; and,
- Is a resident of the receiving state; or,
- Has resident family in the receiving state who has indicated (1) a willingness to assist in satisfying the plan of supervision, *and* (2) the offender can obtain employment or has a means of support.

The sending state is responsible for verifying that the offender has a valid plan of supervision, means of support and is in substantial compliance with their supervision. If these obligations are not met, the sending state may refuse to allow an offender to transfer even if they meet the residency requirements.

The intent of adding "substantial compliance" to the eligibility criteria was to prevent the transfer offenders who are not in compliance with the terms and conditions of their supervision in the sending state. However, pending charges in the receiving state are irrelevant to the transfer decision when the issuing authority takes no action. Accordingly, if the sending state does not take any action on these warrants or determines that the pending charges are not a basis for revocation proceedings, the transfer application should not be rejected on this basis alone. Rejecting transfers solely on this basis

unjustifiably prohibits offenders, who are residents of the receiving state, from transferring supervision. *See* ICAOS *Advisory Opinion 7-2004*.

A receiving state can accept supervision of an offender who does not meet the mandatory acceptance criteria. However, acceptance of supervision is discretionary with the receiving state under circumstances other than those listed above. For example, an offender who is ineligible for mandatory transfer due to the nature of the offense or the offender's failure to meet residency and employment requirements may be transferred under the discretionary provisions of the rules. *See* ICAOS *Advisory Opinion 4-2005*. Under such circumstances, transfer may be warranted when *in the opinion of both the sending and receiving states* such a transfer is in the interests of justice and rehabilitation. It must be emphasized, however, that a discretionary transfer requires the consent of both the sending and receiving states. The failure to obtain such consent prohibits the transfer of supervision.

**PRACTICE NOTE:** Acceptance of offenders on grounds other than those mandated in Rules 3.101 & 3.101-1 lies within the discretion of the receiving state under Rule 3.101-2.

The sending state must submit a transfer request along with all relevant information necessary for the receiving state to investigate and accept the transfer. Rule 3.107 sets out the information that must be provided to a receiving state prior to the offender's transfer.

With limited exceptions, a sending state *shall not allow* an offender to relocate without a receiving state's explicit acceptance. *See Rule 2.110*. Allowing the offender to relocate prior to acceptance may trigger two events:

*(1) the sending state shall order the offender to return to the sending state, and*

*(2) the receiving state can reject the placement, requiring a new transfer request.*

*See* ICAOS *Advisory Opinion 9-2006*. Practically, this means that no court or paroling authority may authorize an offender to relocate before acceptance by the receiving state, unless the transfer of supervision is accomplished pursuant to expedited reporting instructions under Rule 3.106 or Rules 3.101-1 and 3.103. *See discussion infra* § 3.3.1.1.



### 3.2.1.3 Special Rules for Military Personnel and Their Families

Rule 3.101-1 addresses three categories of military individuals: (1) military personnel, (2) family members living with military personnel; and (3) veterans for medical or mental health services. Military Personnel are eligible for reporting instructions and transfer through the ICAOS when they are under orders by the military to another state.

If an offender lives with a family member who is in the military, that offender's supervision is subject to transfer through the ICAOS if they:

1. have three months or more supervision remaining;
2. are in substantial compliance with the terms and conditions of their supervision;

3. have a valid plan of supervision;
4. can obtain employment in the receiving state or have a means of support;
5. are moving to another state with a family member who is under orders by the military; and,
6. will be living with the family member who is subject to military orders.

Veterans referred for medical and/or mental health services in a receiving state by the Veterans Health Administration are eligible transfer supervision if they:

1. have three months or more supervision remaining;
2. are in substantial compliance with the terms and conditions of their supervision;
3. have a valid plan of supervision; and
4. the sending state provides referral or acceptance documentation and is approved for care at the receiving state Veterans Health Administration.

Bench Book

3.2.1.4 Employment Transfers of Offenders and Their Families

The other circumstances in which a receiving state is mandated to accept supervision include the employment transfer of an offender and the employment transfer of a family member with whom the offender resides with to another state. Rule 3.101-1(a)(3) and (a)(4) covers such instances. An offender is eligible to have supervision transferred to another state if they:

1. have three months or more of supervision remaining;
2. are in substantial compliance with the terms and conditions of their supervision;
3. have a valid plan of supervision; and,
4. are directed to transfer by either the offender's or offender's family member's full-time employer as a condition of maintaining employment.

Bench Book

3.2.1.5 Persons Not Covered by the ICAOS

An offender not subject to the ICAOS is not eligible to have their supervision transferred to another state, but neither are they restricted in their travel, except as otherwise ordered by the sentencing court. *See Sanchez v. N.J. State Parole Bd.*, 845 A.2d 687, 692 (N.J. Super. Ct. App. Div. 2004) ("New York cannot have it both ways. If CSL defendants do not fall within the purview of ICAOS, then New Jersey has no obligation to prevent them from moving to New York. If New York is willing to permit the change of residency, assuming the other criteria of ICAOS are met, we expect that New Jersey will cooperate fully to the extent and in the manner allowed by the laws of this state and the rules of ICAOS.")

Offenders with three months or less of supervision and offenders not subject to some form of community supervision are generally free to travel. This is in large measure because the duration of supervision does not warrant further consideration in the receiving state or because the nature of the offense is such that a court did not see continuing supervision a necessary element of the sentence. For example, the Compact does not cover individuals convicted of low-level misdemeanor offenses and subject only to "bench probation" with no reporting requirements or conditions other than monetary conditions, the only requirement of which is to "go and commit no further offense." However, a court should not attempt to circumvent the Compact by placing offenders on "unsupervised" status, particularly offenders who pose a public safety risk. Such an action would not comport with the purpose of the Compact, and may act to encourage other states to take similar actions thereby compromising the underlying principles of the Compact. Placing an offender on "bench probation" as a means of

circumventing the ICAOS carries with it the high probability of additional harm to the community especially if the offender is high risk.

The ICAOS contains no provision authorizing "side agreements" between member states, thus the Compact is the only means for transfer of supervision.

Bench Book

### 3.2.1.6 Sentencing Considerations

The ICAOS applies to all offenders meeting the eligibility requirements and who are subject to some form of community supervision or corrections. By design, the term "offender" provides greater scope and flexibility in the management of offender populations as sentencing practices change. Therefore, whether an offender is "sentenced" and subject to formal "probation" or "parole" is a largely irrelevant inquiry. From the judiciary's perspective the relevant inquiry in determining whether ICAOS is a factor centers on two considerations: (1) what did the court do, and (2) was the end consequence of the court's action community supervision. In this way, the ICAOS applies in a broad range of cases and dispositions beyond traditional conviction followed by probation or parole.

The Commission does not consider provisions such as "bench" probation to be eligible for transfer under the ICAOS, since these provisions are more in line with "go and commit no further offenses." The supervision intended by the Commission is more formal, with elements similar to traditional notions of regular reporting and supervision requirements. A sentence that essentially states "go and commit no other offense" and that does not include supervision and reporting requirements does not create a "supervision" relationship between the offender and the court sufficient to trigger the ICAOS. However, to the extent that reporting requirements may be imposed on an offender, even if only to the court, that offender may be subject to the ICAOS if all other eligibility requirements are met. This is a particularly important consideration when courts sentence offenders to probation with only a treatment element and reporting requirements. Such offenders may be subject to the ICAOS. *See discussion, infra* at 3.2.2.1.

Bench Book

### 3.2.1.6.1 Deferred Sentencing

In addition to traditional cases where an offender is formally adjudicated and placed on supervision, the ICAOS also applies in so-called "suspended sentencing," "suspended adjudication," and "deferred sentencing" contexts. Rule 2.106 provides that "Offenders subject to deferred sentences are eligible to transfer supervision under the same eligibility requirements, terms and conditions applicable to all offenders under this Compact. Persons subject to supervision pursuant to a pre-trial intervention program, bail, or similar program are not eligible for transfer under the terms and conditions of this Compact." In interpreting this rule, the Commission has issued an opinion advising as follows:

> *In the case of a "deferred sentence," Rule 2.106 would apply if the court lawfully entered a conviction on its records even if it suspended the imposition of a final sentence and subjected the offender to a program of conditional release. The rule would also apply if the defendant entered a plea of guilt or no contest to the charge(s) and the court accepted the plea but suspended entry of a final judgment of conviction in lieu of placing the offender in a program of conditional release, the successful completion of which may result in the sealing or expungement of any criminal record. Finally, the rule would apply if the court entered a conviction on the record and sentenced the offender but suspended execution of the sentence in lieu of a program of conditional release.*

*The operative consideration for purposes of Rule 2.106 is whether the court, as a condition precedent, made some finding that the offender did indeed commit the offense charged. This finding, by a court of competent jurisdiction, whether technically classified as a "conviction" under the terms of an individual state's law, makes an individual an offender for purposes of the Compact. The offender is no longer in a pretrial, presumed-innocent status, but found to have committed the charged offense notwithstanding the decision of the court to withhold punitive sentencing in favor of an alternative program of corrections, such as deferment, probation in lieu of sentencing, suspended imposition of sentence, or suspended execution of sentence. (Emphasis added).*

*It must be emphasized, given the overall purposes of the Compact, and the status of the Compact as federal law, that an individual state's statutory scheme can vary from state to state and is of limited benefit in determining whether an offender is subject to the Compact. Individual states can use terms that are significantly different from other states to describe the same legal action. In determining the eligibility of an offender and the application of the ICAOS, one must not look at the legal definitions, but rather the legal action taken by a court of competent jurisdiction or the paroling authorities. To find otherwise would lead to disruptions in the smooth movement of offenders, the equitable application of the ICAOS to the states, and the uniform application of the rules. See ICAOS Advisory Opinion 4-2004.*

In addition to the nature of the adjudication, eligibility also turns on the nature of the supervision ordered. The Commission defines the term "supervision" as follows:

*"Supervision" means the oversight exercised by authorities of a sending or receiving state over an offender for a period of time determined by a court or releasing authority, during which time the offender is required to report to or be monitored by supervising authorities, and to comply with regulations and conditions, other than monetary conditions, imposed on the offender at the time of the offender's release to the community or during the period of supervision in the community. See Rule 1.101.*



3.2.1.6.2 Deferred Prosecution

Some states may use a "sentencing" option referred to as deferred prosecution. Such sentences, which are generally authorized by a state's statutes, allow the offender to admit under oath or stipulate to the facts of the criminal conduct, but defer prosecution conditioned upon the offender completing some type of treatment program or meeting other conditions. Generally, if the offender successfully complies with the court's order, the case is dismissed and no criminal judgment is entered. If the offender fails to comply with the court's order, the court may enter a judgment of conviction and proceed to criminal sentencing.

The question in deferred prosecutions is whether the offender is covered by the ICAOS because there is no conviction, since the offender is in a "pretrial" status. However, the Commission has interpreted its rules to apply to such offenders. *See ICAOS Advisory Opinion 6-2005*. In concluding that the Compact covers such offenders, the Commission opined that there is little functional difference between a "deferred prosecution" and a "deferred sentence." In both cases, the offender is generally required to stipulate to the facts of the underlying criminal conduct. While in the deferred prosecution context, the

court does not enter a judgment of conviction and then suspend sentencing (as is the case in deferred sentencing), the court nevertheless accepts the offender's admission to certain facts and places the offender on a probationary-type status. Unlike a pretrial offender, whose guilt has not been established by trial or admission, the deferred prosecution offender has admitted to the essential facts of their conduct and no longer enjoys the status of "innocent until proven guilty." As the Commission has noted, "In determining that Rule 2.106 applies here [to deferred prosecutions], we are considering the action actually taken by the offender and the court, rather than the label used by the legislature." Considerations in determining whether the Compact would cover an offender subject to a deferred prosecution program include, but are not limited to:

- Is the offender required to make material and binding factual admissions before a court concerning the circumstances of the case such that practically there is no question that an offense has been committed?
- Upon violation of the terms and condition of the deferred prosecution program, is the offender returned to court and in jeopardy of having a conviction entered without trial?
- Is the offender, as a condition of participation in a deferred prosecution program, required to waive material rights concerning future court proceedings, such as the right to contest the facts, confront witnesses and offer exculpatory evidence?

An offender in a deferred prosecution program that includes some of these elements, particularly those regarding admissions of material fact and waiver of rights, would be subject to the Compact. By contrast, an offender in a deferred prosecution program that is run exclusively as a prosecutorial diversion program and does not involve the courts or require an offender to waive fundamental rights in future proceedings is likely not covered by the Compact.

Bench Book

### 3.2.1.6.3 What Constitutes Second and Subsequent Conviction of Driving While Impaired?

Particular attention should be paid to offenders convicted of a second or subsequent offense of driving while impaired (DUI and DWI offenses). Because various states' laws differ widely on what constitutes a second or subsequent conviction, the Commission has issued ICAOS Advisory Opinions to clarify the application of the ICAOS to such offenders. Thus, even if the sentencing court deems a second or subsequent conviction to be a "first conviction" for sentencing purposes, the Commission considers the actual number of convictions not the manner in which the conviction may be treated for sentencing purposes by individual state laws. An offender convicted of a second or subsequent offense but sentenced as a first-time offender is nevertheless an offender subject to the ICAOS. *See ICAOS Advisory Opinion 7-2006*.

Bench Book

### 3.2.2 Special Considerations

Special Considerations

Bench Book

### 3.2.2.1 Out-of-state Treatment

One area for potential confusion centers on the issue of treatment in lieu of supervision or treatment as supervision. In such cases, courts may be inclined to defer sentence and require enrollment in a

community based or in-house treatment program in another state. Successful completion of the treatment program is commonly a condition of the supervision program. Such treatment programs may include drug treatment, mental health treatment, or sex offender treatment, to name a few. The difficulties with these programs arise when an offender in one state is required to enroll in a treatment program only available in another state and whether such situations constitute circumstances that would trigger the ICAOS.

Offenders placed in an out-of-state treatment program may trigger the requirements of the Compact even if the offender is not subject to supervision by corrections officials. Imposing a treatment component as a condition of release with corresponding requirements for progress reports to be submitted to the court, together with the potential for probation revocation upon failure to comply, is sufficient to trigger the Compact and its rules.

Enrollment in out-of-state treatment programs is typically a “discretionary” transfer unless the offender meets the residency or family ties with means of support criteria of Rule 3.101. Consequently, courts should be cautious in sentencing offenders, particularly high-risk offenders, to treatment programs in other states, even if the treatment may be intended to be short-term (less than 30 days.) Such sentencing practices could create an impossible situation for the offender who is required to participate in a program, but unable to transfer to that program or continue treatment (should the short-term treatment be extended to 45 days or more) if the receiving state declines to accept the case.

Bench Book

## 3.3 Initiating the Transfer Process

Initiating the Transfer Process

Bench Book

### 3.3.1 Time of Transfer

The rules of the Commission can have significant impact on the time between final disposition of a case and when the offender can actually move to another state. To the extent that an offender is eligible for transfer under the Compact, a court ***does not*** have the authority to order the offender to the receiving state prior to acceptance. Therefore, it is possible that the offender, even if a resident of the receiving state, will have to remain within the custody of the sending state until such time that the transfer is approved and reporting instructions are issued by the receiving state.

Rule 3.102 requires the sending state to send a transfer application and all pertinent information ***prior to allowing the offender to relocate*** to the receiving state. Under Rule 3.104, a receiving state has up to 45 days to investigate and respond to a sending state’s transfer request. There are provisions for emergency transfers to expedite reporting instructions. *See Rule 3.106*. As noted, Rule 3.103 provides a limited probation exception to restrictions on transfer prior to acceptance. In general, however, a probationer or parolee is not allowed to travel to a receiving state (unless for employment or medical purposes previously established prior to the transfer request) until the receiving state has investigated, accepted transfer of the offender, and issued reporting instructions. *See Rule 3.102*.

In the event the sending state fails to provide all needed information as required by Rule 3.107, the receiving state shall reject the request and provide specific reason(s) for rejection. *See Rule 3.104(b)*. Therefore, failure to transmit all necessary information when requesting transfer may substantially delay the processing of the transfer request and such insufficiencies may result in a denial of a transfer by the receiving state.

With regard to incarcerated offenders applying for transfer of supervision upon release, under Rule 3.105, a sending state shall submit a completed request for transfer no earlier than 120 days prior to the offender's planned release from a correctional facility. This rule has been interpreted to mean that "the process for transferring parole to a sister state cannot be commenced until the inmate is given a release date." *In re Sauers*, (No H034179, 2010 WL 290584 at *9 fn 6 (Cal. Ct. App. Jan 26, 2010).

In addition, within one business day of receiving reporting instructions or acceptance of transfer by a receiving state, the sending state must notify crime victims, pursuant to applicable state law, that a transfer will occur. *See Rule 3.108*. The rules also set out guidelines by which victims can request the opportunity to be heard on the offender's transfer or return request. *See Rule 3.108-1*.

An offender applying for interstate transfer must agree to waive extradition from any state to which the offender may abscond while under supervision in the receiving state. States party to the Compact waive all legal requirements to extradition of offenders who are fugitives from justice. *See Rule 3.109*.

Bench Book

3.3.1.1 Expedited Transfers

Through its rules, the Commission allows an "expedited" option, which effectively allows the offender to transfer supervision on a "pending acceptance" basis. To qualify for expedited reporting instructions, the sending and receiving state must agree that an emergency exists justifying such a transfer. *See Rule 3.106*. The receiving state must provide a response to a request for expedited reporting instructions no more than two (2) business days after receiving the sending state's request. (*Rule 3.101-3 applicable to sex offenders extends the receiving state's response to five (5) business days.*) After which, the sending state, upon obtaining the offender's signature on all necessary forms, must issue a departure notice at the time the offender leaves the state. The granting of expedited instructions does not limit the authority of the receiving state to eventually reject the transfer of supervision upon a full investigation. In such event, the offender is required to return to the sending state. If the offender fails to return to the sending state, retaking procedures must be initiated to obtain custody and return the offender. Retaking in this context would not appear to trigger the probable cause hearing requirements in Rule 5.108 unless revocation of conditional release is contemplated by the sending state based on violations committed in the receiving state while the transfer is pending.

Bench Book

3.3.1.2 Reporting Instructions for Probationers Living in the Receiving State at the Time of Sentencing

or After Disposition of a Violation or Revocation Proceeding

The Commission adopted Rule 3.103 to address those offenders subject to probation who need to relocate to a state prior to acceptance and receiving reporting instructions. This rule allows an offender who is living in the receiving state at the time of initial sentencing, or after disposition of a violation or revocation proceeding, to receive reporting instructions, allowing the offender to reside in the receiving state pending the reply for transfer of supervision. The rule only applies to offenders who are living in the receiving state *at the time of initial sentencing or after disposition of a violation or revocation proceeding*. Therefore, the rule does not apply to every probationer.

The sending state may grant a seven-day travel permit to an offender subject to Rule 3.103; and, the receiving state must issue reporting instructions no later than two days after receiving the sending state's request. *See Rule 3.103*. (*Rule 3.101-3 applicable to sex offenders extends the receiving state's response to five (5) business days and travel permits for 'sex offenders' shall not be provided until reporting instructions are issued*). While an offender living in the receiving state would meet the

eligibility requirements for reporting instructions under Rule 3.103, the receiving state may deny the transfer if the investigation reveals the offender does not satisfy the prerequisites of Rule 3.101, including not meeting the definition of resident as defined by the Compact rules. In the event of such a denial, the provisions of Rule 3.103(e) clearly require the offender to return to the sending state or be retaken upon issuance of a warrant. *See* ICAOS *Advisory Opinion 3-2007*.

Bench Book

3.3.2 Pre-Acceptance Testing

An offender who is otherwise eligible for transfer under Rule 3.101 may not be required to submit to psychological testing by the receiving state as a condition of acceptance of the transfer. Such "pre-acceptance" requirements imposed on otherwise eligible offenders constitute additional requirements not authorized by the Compact or commission rules. Imposing additional requirements on offenders not contemplated by the Compact or its rules constitutes an impermissible and unilateral attempt to amend the Compact. Although certain testing requirements may be applied equally to in-state and out-of-state offenders, such requirements cannot operate to foreclose offenders from transferring their supervision. *See also* ICAOS *Advisory Opinion 5-2006* (requiring sending state to establish sex offender risk level is inappropriate where similar requirement is not imposed on offenders in receiving state).

Bench Book

3.3.3 Post-Acceptance Testing

Although receiving states may not impose pre-acceptance requirements on offenders that would violate a state's obligations under the Compact, the Compact and its rules would not prevent the receiving state from imposing post-acceptance testing requirements on an offender. An offender otherwise eligible for transfer under Rule 3.101 must be accepted by the receiving state without obstacle. Once accepted, the receiving state may impose additional requirements on the offender provided the additional requirements apply equally to in state and out-of-state offenders. An offender's failure to meet the additional requirements, *e.g. sex* offender registration or psychological testing, could be grounds for retaking. The same rule would apply to discretionary transfers under Rule 3.101-2. *See Critelli v. Florida*, 962 So.2d 341 342-44 (Fl. Dist. Ct. App. 2007).

Bench Book

3.3.4 Transfer of Supervision of Sex Offenders

The Commission recognizes that the transfer of sex offenders is complex due to individual state laws regarding sex offender registries and various residency and employment restrictions. Rule 3.101-3 addresses these challenges in order to promote offender accountability, public safety, and sharing comprehensive information regarding these offenders and their offenses. The process of transferring supervision of this high-risk population is uniform in regulation.

This rule specifically provides exceptions to the procedures for issuing reporting instructions for sex offenders who meet the criteria of Rules 3.101-1, 3.103 and 3.106 as addressed in previous sections. In cases of sex offenders, there is a disallowance for travel permits. Accordingly, a sex offender must remain in the sending state until issuance of reporting instructions. A receiving state has five (5) business days to review an offender's proposed residence and respond to a request for reporting instructions. A denial may result if similar sex offenders sentenced in the receiving state would not be permitted to live at the proposed residence.

In addition to providing these exceptions, this rule also prohibits a sex offender from any travel outside of a sending state pending a request for transfer. The rules re quire a sending state to provide additional information at the time the transfer request is made, if available. This additional information requirement assists the receiving state in determining risk and appropriate supervision levels for sex offenders. *See Rule 3.101-3*. To implement further special considerations and processes for sex offenders, the Commission defines a sex offender as:

> *[A]n adult placed under, or subject to supervision as the result of the commission of a criminal offense and released to the community under the jurisdiction of courts, paroling authorities, corrections, or other criminal justice agencies and who is required to register as a sex offender either in the sending or receiving state and who is required to request transfer of supervision under the provisions of the Interstate Compact for Adult Offender Supervision. See Rule 1.101*.

> **PRACTICE NOTE:** The Commission recognizes that state laws may differ with regard to the criteria which classify a person as a sex offender. Therefore, the definition of sex offender provided in the Compact rules does not impinge on individual state definitions or registration requirements in a receiving state, but rather whether the offender is required to register as a sex offender in the sending state or being supervised as a sex offender.

Bench Book

3.4 Supervision in the Receiving State

Supervision in the Receiving State

Bench Book

3.4.1 Duration of Supervision

In interpreting the ICAOS and its rules, eligibility to transfer supervision is controlled by the nature of the offense, the nature of the sentence and the status of the offender, not the duration of supervision (as distinguished from the amount of supervision remaining under Rule 3.101.) Rule 4.102 states, "A receiving state shall supervise an offender transferred under the interstate Compact for a length of time *determined by the sending state*." (Emphasis added) Therefore, the duration of supervision rests exclusively within the authority of the sending state. Officials in the receiving state have little to no discretion in the matter. The ICAOS rules require a receiving state to supervise an out-of-state offender even if the duration of that supervision would supersede the duration of supervision normally afforded an in-state offender.

Several states operate supervision programs designated as "CSL" programs, or "Community Supervision for Life" in an effort to monitor high-risk offenders, such as sex offenders. These programs generally require that high-risk offenders be subject to continuing community-based supervision for very long periods, including the natural life of the offender. This puts an obligation on the receiving state to provide a level of supervision that its own state laws may not recognize. Additionally, CSL programs can be a significant resource drain adding pressure on receiving states to either reject such cases or prematurely terminate supervision of the offender. (See the example of New York and New

Jersey referenced in ICAOS Advisory Opinion 9-2004).

Bench Book

### 3.4.2 Type of Supervision in Receiving State

While the sending state has sole authority to determine the duration of supervision either by way of the court's sentence of by paroling authorities, the receiving state retains discretion as to the type of supervision it will provide. Rule 4.101 obligates the receiving state to supervise the offender in a manner determined by the receiving state that is consistent with the supervision it provides to other similar offenders. Consequently, there can be qualitative differences between the level of services provided by a sending state versus the services a receiving state provides an offender under its own rules and laws.

The principle of treating compact offenders the same applies to both the quality and quantity of supervision, as well as access to rehabilitative programs. *See Doe v. Pennsylvania Board of Probation & Parole*, 513 F.3d 95, 108 (3rd Cir. 2008) ("By signing the Interstate Compact, Pennsylvania has agreed that, when accepting out-of-state probationers who transfer their parole and their residence to the Commonwealth, it will approximate the same procedure and standards it applies to its own probationers"). A receiving state may impose conditions on an out-of- state offender if they assist in the offender's rehabilitation and promote community safety. *See discussion infra*, at § 3.6.2. It would be a violation of the Compact for a receiving state to create barriers to rehabilitation programs. Similarly, it could be a violation to impose conditions on out-of- state offenders not otherwise imposed on in-state offenders. *See e.g., ICAOS v. Tennessee Bd. of Probation and Parole*, No. 04-526 KSF (E.D. Ky. 2005). Rule 3.101 affirms the sending state's sole discretion and prevents the receiving state from attempting unilaterally to add conditions in order to stifle the transfer of offenders it deems undesirable or shifting a financial obligation related to the offender's supervision to the sending state. *See Doe v. Ward*, 124 F. Supp.2d 900, 915-16 (W.D. Pa. 2000) (interpreting a similar provision in the old ICPP to negate certain provisions of Pennsylvania's "Megan's Law" which treated out-of-state offenders differently from in-state offenders). *See also ICAOS Advisory Opinion 9-2004* ("[I]t is our opinion that CSL offenders are subject to supervision under the Interstate Compact for Adult Offender Supervision and upon proper application and documentation of a valid plan of supervision and verification of residency and employment criteria as required under those rules should be permitted to transfer to other states for supervision under the Compact").

> **PRACTICE NOTE:** Rule 4.101 requires a receiving state to supervise transferred offenders as it would in-state offenders. Receiving states shall subject the offender to any and all supervision techniques and behavior responses imposed on in-state offenders, with the exception of modifying the supervision term or revoking conditional release.

Bench Book

### 3.4.2.1 Disabled Offenders

A receiving state is obligated to continue to supervise offenders "who become mentally ill or exhibit signs of mental illness or who develop a physical disability while supervised in the receiving state." *See Rule 2.108*. Therefore, it would be impermissible for a receiving state to seek to terminate supervision or to demand that a sending state retake an offender purely because the offender has become mentally or physically disabled.

### 3.4.2.2 Continuing Jurisdiction over Offenders Between the Sending & Receiving States

Transferring an offender's supervision pursuant to the Compact does not deprive the sending state of jurisdiction over the offender, unless it is clear from the record that the sending state intended to relinquish jurisdiction. See, e.g., Scott v. Virginia, 676 S.E.2d 343, 347 (Va. App. 2009); State v. Lemoine, 831 P.2d 1345 (Kan. Ct. App. 1992). While the receiving state exercises jurisdiction over the offender for purposes of supervision, the sending state retains jurisdiction over the offender for purposes of probation or parole revocation. *See ICAOS Advisory Opinion 3-2008*.

The Compact does not give the receiving state the authority to revoke the probation or parole imposed by authorities in a sending state, nor can a receiving state decide not to provide supervision once the offender transfers in accordance with the ICAOS rules. See Scott v. Virginia supra. at 347; See also, Peppers v. State, 696 So. 2d 444 (Fla. Dist. Ct. App. 1997). A receiving state may, independent of the sending state, initiate criminal proceedings against offenders who commit crimes while in the receiving state. *See Rule 5.101-1*. However, a receiving state may not revoke the probation or parole imposed on the offender by the sending state as part of the offender's conviction for such crimes. Moreover, whether a sending state continues to exercise jurisdiction over an offender, or has relinquished or forfeited that jurisdiction, is generally a matter that determinable only by the sending state.



## 3.5 Other Considerations

Other Considerations



### 3.5.1 Post-Transfer Change of the Underlying Circumstances

As discussed, the transfer of supervision of an offender is mandatory in some circumstances. Receiving states are required to accept transfer if the offender is eligible under Rules 3.101 and 3.101-1. As discussed in Chapter 4 regarding return of offenders to a sending state, the sending state has sole discretion to retake unless conviction of the offender for a new felony or violent crime or the offender engages in behavior requiring retaking. *See Rule 5.102 and 5.103*. This presents a question: What happens if the offender neither commits a new felony or receives a new conviction for a violent crime and does not demonstrate a pattern of noncompliance, but the original circumstances leading to the transfer significantly change?

Under the ICAOS rules and as a general principle, a change in the underlying circumstances that mandated the transfer of an offender is not, in itself, grounds to require the sending state to retake that offender if the transfer was the result of a mandatory acceptance under Rule 3.101 or Rule 3.101-1. However, a different rule may apply in the context of a discretionary transfer under Rule 3.102. In this latter circumstance, the transfer is purely a voluntary arrangement and the receiving state could demand the retaking of an offender based on a change of circumstances if such a condition was placed on the offender. For example, Rule 4.103 allows the receiving state to impose conditions post-transfer. Conceivably this could include a condition that the offender demonstrate and maintain a means of support, the failure to do so being cause to demand retaking by the sending state. However, any conditions imposed on an offender either at the time of acceptance or during the term of supervision must reasonably be related to the overall purposes of the Compact, which is to promote offender

rehabilitation and public safety. The rule of “reasonableness” applies to mandatory and discretionary transfers without distinction.

Bench Book

### 3.5.2 Temporary Travel Permits

Offenders may be granted travel permits. A travel permit is the “written permission granted to an offender authorizing the offender to travel from one state to another.” *See Rule 1.101*. Rule 3.110 requires a receiving state to provide notification to a sending state prior to issuing a travel permit to travel to the sending state. Exceptions exist when the travel is limited to what is necessary for employment or medical purposes. *See* Rule 3.110.

Bench Book

### 3.5.3 Victims' Rights

The ICAOS specifically creates distinct rights for victims of crime and certain obligations on courts and supervising authorities with respect to those rights. While the Compact statute itself is general on the rights, the commission’s rules spell out specific obligations. Under Rule 3.108-1, victims of crime have a right to notice of an offender’s transfer. The notification requirement is triggered one business day after the issuance of reporting instructions by the receiving state. The sending state initiates notification procedures to related victims in accordance with its own state laws. Additionally, once an offender relocates, the receiving state shall respond to requests for offender information from the sending state within five (5) business days following the receipt of the request .

In addition to the right to various notifications, victims also have a right to appear and be heard and to express their concerns with an offender’s proposal to transfer supervision to another state. See Rule 3.108. The obligation to notify the victim of the right to be heard rests with the victim notification authority in the sending state. However, it would seem only logical that courts and paroling authorities must apprise state victim notification authorities of a pending hearing for this right to have any meaning.

The responsibility for administering the rights given by the ICAOS to victims falls more on a state’s interstate Compact office rather than judicial officers and courts. However, courts should be aware of the various victim protections contained in the ICAOS and the commission’s rules to ensure full compliance by all parties.

Bench Book

### 3.6 Conditions

Conditions

Bench Book

### 3.6.1 General Conditions

Although a state may be required to accept supervision given the offender’s eligibility status, the receiving state may determine that conditions are necessary at the time of acceptance. The receiving

state can only impose conditions that it would impose on similar in-state offenders. *See Rule 4.103(a)*. A receiving state cannot impose conditions on out-of-state offenders as a means of avoiding its general obligations under the Compact, nor may a receiving state preemptively impose conditions prior to acceptance as a means of preventing a transfer. To do so, either in a particular case or as a matter of routine practice, violates the Commission's rules. For example, the receiving state would not violate the ICAOS rules by requiring an out-of-state offender to submit to registration and testing requirements (e.g., DNA testing, sex offender registration, etc.) if mandated by the laws of the receiving state and imposed on in-state offenders. *See Rule 4.104(a)*. However, the timing of imposing conditions is critical to their validity. Under Rule 4.103, imposition of a condition by the receiving state may only occur after acceptance.

Rule 4.103 requires the receiving state to notify the sending state of its intent to impose a condition. A receiving state can place conditions on an offender resulting from any allowable investigation once transfer is accepted. In seeking to transfer, an offender accepts any conditions imposed by the receiving state; that is, by applying for transfer and with acceptance by a receiving state, the offender accepts the condition or risks forfeiting the ability to transfer supervision. A receiving state can impose a condition after acceptance of the offender, but prior to the offender's actual physical relocation to the receiving state. See Warner v. McVey, (2010 WL 3239385 (W.D. Pa., July 9, 2010). An offender accepted for transfer may refuse to comply with a receiving state's conditions, but refusal deprives the offender of physical relocation of supervision.

A sending state may also impose a condition on an offender as a condition of transferring supervision; however, in this context, the receiving state must receive an opportunity to inform the sending state of its inability to meet a condition. This may be of particular concern to judges. A court may impose a condition and require that it be met in the receiving state; yet, the receiving state can refuse to enforce the condition if it is unable to do so. *See ICAOS Advisory Opinion 1-2008*. The receiving state's inability to enforce a condition requires the sending state either to withdraw the condition and allow the offender to relocate to the receiving state, or withdraw the transfer request and continue to supervise the offender in the sending state.

Bench Book

3.6.2 Authority to Impose Conditions

Courts and paroling authorities have wide latitude in imposing conditions. Generally, a condition imposed as a part of probation or parole must be reasonably related to the underlying offense, promote offender rehabilitation, not unreasonably impinge on recognized liberty interests, protect the community and not be so vague as to make compliance difficult. If a statute governs authorization of a condition and/or does not violate any constitutional protections, habeas corpus relief is unavailable to an offender contesting the condition. *See People of the State of New York ex rel. William Stevenson v. Warden*, 806 N.Y.S.2d 185-86 (N.Y. App. Div. 2005). Conditions deemed appropriate include:

- Pursuant to a North Carolina statute applicable to offenders sentenced in North Carolina, it is reasonable to conclude that the imposition of this limited period of incarceration, in lieu of revocation of probation ('Quick Dip'), would 'qualify' as a condition under Rule 4.103. Such condition would require the State of North Carolina to notify the sending state of such condition of supervision 'at the time of acceptance or during the term of supervision' as required under this rule. *See ICAOS Advisory Opinion 1-2015*;
- Condition imposed on an offender convicted of weapons charges that included a ban on operation of a motor vehicle and permitted warrantless searches was reasonable given the underlying offense, the need to protect the public, and the goal of reducing the likelihood of recidivism in view of an extensive criminal activity. *United States v. Kingsley*, 241 F.3d 828, 838 (6th Cir. 2001), cert. denied 534 U.S. 859 (2001);
- Social contact notification imposed on offender with history of domestic violence. *United States v.*

*Brandenburg*, No. 05-1261, 2005 WL 3419999, 157 F. App'x 875, 878 (6th Cir. 2005);
- Supervised release which requires the defendant to remain current on restitution payments from previous criminal convictions is not subject to the limitation that restitution be related to the underlying offense. *United States v. Mitchell*, 429 F.3d 952, 961-62 (10th Cir. 2005);
- Participation in sex offender treatment program and prohibition against contact with minor children upheld because condition against contact allowed an offender to seek and obtain prior approval. *United States v. Heidebur*, 417 F.3d 1002, 1005-06 (8th Cir. 2005);
- Prohibiting offender who pled guilty to possessing child pornography from having contact with his girlfriend and her minor children because the condition of supervised release served a permitted goal of protecting the children from harm and reasonably allowed for contact upon prior approval. *United States v. Roy*, No. 05-2145 (1st Cir., March 1, 2006);
- 'Restitution scheme requiring offender convicted of mail fraud to set up a trust fund for those whom he defrauded was in keeping with the purposes of probation because of establishment of aggrieved parties in civil litigation. *United States v. Barringer*, 712 F.2d 60 (4th Cir. 1983); and,
- Mandatory statutory condition prohibiting offender convicted of sexual misconduct with a minor from living with a child and which did not permit exceptions for offender's own children was a valid probation condition, and did not violate due process. *State v. Strickland*, 609 S.E.2d 253, 256 (2005).

Offenders who transfer supervision under the Compact may be subject to graduated sanctions or short periods of confinement in the receiving state for violating the terms and conditions of supervision. These sanctions intend to modify the offender's behavior in lieu of revoking the offender's supervision and returning them to the sending state. The ICAOS rules require receiving states to "supervise an offender transferred under the interstate Compact in a manner determined by the receiving state and consistent with the supervision of other similar offenders sentenced in the receiving state." *See* Rule 4.101. However, it is reasonable to conclude, that the imposition of limited periods of incarceration, in lieu of revocation, qualifies as a condition under Rule 4.103, requiring the receiving state to notify the sending state of supervision conditions 'at the time of acceptance or during the term of supervision' as required under this rule.

Bench Book

3.6.3 Limitations on Conditions

Notwithstanding the authority of the sending and receiving state to impose conditions on an offender, several courts assert that certain conditions – such as banishment from a geographical area – are not appropriate because they interfere with the purpose of probation and parole, which is essentially rehabilitative in nature. For example, it is an invalid condition to order an offender deported from the United States, as it is beyond the jurisdiction of a court to order anyone deported without due process of the law. *State v. Ahmed*, 278 Mont. 200, 211, 924 P. 2d 679, 685 (1996), *cert. denied*, 519 U.S. 1082 (1997). Similarly, most jurisdictions examining the issue of banishment from a geographical area generally hold that such a condition cannot be broader than necessary to accomplish the goals of rehabilitation and social protection. *Jones v. State*, 727 P.2d 6, 8 (Alaska Ct. App. 1986) (vacating condition prohibiting the defendant from being within a 45- block area since the condition is "unnecessarily severe and restrictive," unlike a condition which prohibits the frequenting of certain types of establishments such as bars where prohibited activity will occur); *State v. Franklin*, 604 N.W.2d 79, 82 (Minn. 2000) (vacating condition excluding defendant from Minneapolis, Minnesota); *State v. Ferre*, 734 P.2d 888, 890 (1987) (determining condition restricting the defendant from the county where the victim lived was broader than necessary and trial court must draw a more limited geographical area); *Johnson v. State*, 672 S.W.2d 621, 623 (Tex. App. 1984). (Determining banishment from county where defendant resides is unreasonable).

Some jurisdictions invalidate banishment conditions as contrary to public policy. *See People v. Baum*,

231 N.W. 95, 96 (Mich. 1930). *See also, Rutherford v. Blankenship*, 468 F. Supp. 1357, 1360 (W.D. Va. 1979) (power to banish, if it exists at all, is vested in the legislature; where such methods of punishment are not authorized by statute, it is impliedly prohibited by public policy); *State v. Charlton*, 846 P.2d 341, 344 (N.M. Ct. App. 1992) (endorsing the public policy rationale stated in *Baum and Rutherford*). By contrast, a limited number of jurisdictions hold that probation conditions restricting a defendant from geographic areas encompassing a county or areas within a city or town reasonably relate to the goals of rehabilitation and the protection of society. *See Oyoghok v. Municipality of Anchorage*, 641 P.2d 1267, 1269 (Alaska Ct. App. 1982) (approving condition restricting offender convicted of soliciting prostitution from being within a two block radius where street prostitution occurs); *People v. Brockelman*, 933 P.2d 1315, 1320 (Colo. 1997) (affirming condition restricting offender convicted of assault from the two towns where the victim lived and worked); *State v. Nolan*, 759 A.2d 721, 724 (Maine 2000) (trial court's special probation condition which prohibited offender from entering towns of Sanford or Wells during five-year probationary term was reasonable as applied and was not an abuse of discretion).

Courts have held other types of conditions invalid because they bear no reasonable relationship to offender rehabilitation, public safety or the underlying offense. For example, a condition requiring sex offender registration is invalid where the trial court imposes the condition not because of the underlying offense (armed bank robbery), nor because of the conduct that leading to revocation, but because of an unrelated 1986 sex-offense conviction. *See United States v. Scott*, 270 F.3d 632, 636 (8th Cir. 2001). In the Scott case, the court opined that the condition has had no reasonable relationship to the nature of the underlying offense and the record has not shown that the condition to be reasonably necessary to deter the offender from repeating a sex crime from 15 years earlier. Likewise, the courts have found that a condition restricting computer use is not reasonably related to present or prior offenses. *See United States v. Peterson*, 248 F.3d 79, 83-4 (2nd Cir. 2001) (computer and internet restriction unreasonable for offender guilty of writing bad checks who also had previous incest charge and probation violations for accessing legal pornography). Thus, a condition that is overly broad, not related to the goals of rehabilitation, and not reasonably related to the protection of a victim or a community is generally unlawful. *State v. Muhammad*, 43 P.3d 318 (Mont. 2002); *Harrell v. State*, 559 S.E.2d 155 (Ga. Ct. App. 2002).

In addition to finding some conditions invalid, some courts upheld the conditions but found their execution invalid as the offender failed to receive sufficient notice of the proscription against certain conduct. In *State v. Boseman*, 863 A.2d 704 (Conn. Ct. App. 2005), the court held that revocation of an offender's probation for violating a no-contact order violated due process because the offender had no prior knowledge that being outside of his girlfriend's house to drop off a child to an intermediary was contemplated within no contact condition. See also Jackson v. State, 902 So.2d 193 (Fla. 5th Dist. Ct. App. 2005) ( condition of probation of paying for drug treatment was not statutorily authorized and was struck since it was not orally pronounced; conditions requiring drug treatment and submission to warrantless searches were authorized). Likewise, a condition requiring an offender to reimburse attorney's fees was not valid where the trial court failed to determine the offender's ability to pay. *State v. Drew*, No. 83563 (Ohio Ct. App. 8th Dist., July 8, 2004).

Bench Book

## 3.7 Sex Offender Registration

Courts have generally upheld sex offender registration requirements for offenders whose supervision transfers under an interstate Compact so long as such registration requirements are not discriminatory. Thus, a receiving state may impose sex offender registration requirements on transferees so long as the requirements are the same as imposed on in-state offenders.

In Doe v. McVey, 381 F. Supp. 2d 443, 451 (E.D. Penn. 2005) aff'd sub nom. *Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F. 3d 95 (3d Cir. 2008), the court struck down the application of Pennsylvania's "Megan's Law" to an out-of-state offender. The court determined that under the law as applied, an in-

state offender was entitled to a civil hearing to determine whether they were a “sexually violent predator” before required registration. An out-of-state offender seeking transfer of supervision was subject to the requirement of automatic registration without the corresponding hearing available to an in-state offender. The court found that, although protecting citizens from sex offenses was a legitimate state interest, subjecting one group of sex offenders to community notification without the same procedural safeguards accorded to other sex offenders, based solely on where the predicate offense was committed, was not rationally related to consistent protection from sex offenses. Thus, according to the court, Pennsylvania's Megan's Law violated the Equal Protection Clause.

Bench Book

## 3.8 Financial Obligations

Financial Obligations

Bench Book

### 3.8.1 Restitution

As the ICAOS governs the movement of offenders and not the terms and conditions of sentencing, the ICAOS rules are silent on the imposition of restitution. This is therefore a matter governed exclusively by the laws of the sending state and the court imposing sentence. Further, Rule 4.108 clearly relieves the receiving state of the obligation to collect fines, fees, costs or restitution. A sending state retains exclusive authority – and the obligation – to manage the financial portion of an offender’s sentence. The only obligation imposed on the receiving state is to inform the offender of a default and that the offender failed to comply with the conditions of supervision. *See Rule 4.108(b)*. The actual collection and enforcement of the financial obligation rests with the sending state. Failure to meet financial obligations is a breach of the supervision agreement and can result in the sending state retaking the offender and revoking probation or parole. *See, e.g., Gelatt v. County of Broome*, 811 F.Supp. 61 (N.D.N.Y. 1993) (decided on other grounds).

Bench Book

### 3.8.2 Fees

Rule 4.107 authorizes the collection of fees from offenders subject to the Compact. Pursuant to Rule 4.107(a), the sending state may impose a transfer application fee on an offender and according to Rule 4.107(b), the receiving state may impose a supervision fee on an offender. Generally, such fees are authorized by state statutory or state administrative rule. See Holloway v. Cline, 154 P.3d 557 (Kan. App. 2007) (Imposition of a $25.00 per month interstate Compact supervision fee without providing a hearing before assessing such fee does not violate an offender’s Constitutional rights to due process of law). It is important to note that once an offender transfers supervision to a receiving state, the authority of a sending state to collect any type of supervision fee ceases, to the extent such fees are truly supervision fees. Thus, while a sending state may impose a supervision fee for the period in which the offender is actually in that state, the sending state may not continue to impose such a fee on the offender under the guise of continuing to “supervise” the offender’s progress in the receiving state.

A sending state may impose other fees on offenders so long as those fees are not related to supervision. For example, a sending state could impose an annual fee on sex offenders so long as that fee had “no direct relationship to the supervision of such offenders.” *See ICAOS Advisory Opinion 14-2006*.

In the particulars leading to AO 14-2006, a state statute authorized collection of an annual fee from sex offenders for the purposes of maintaining the state's sex offender registry and victim notification systems. The fee was an annual assessment distinguishable from an on-going fee related to the actual supervision of an offender. However, the ICAOS also concluded that the sending state could impose such a fee, but that the sending state alone bore responsibility for collecting the fee and could not transfer collection responsibility to the receiving state.

Bench Book

3.9 Implications, Health Insurance Portability and Accountability Act of 1996 (HIPAA)

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) and rules promulgated pursuant thereto intended to protect certain health care information from disclosure to authorized persons or entities. Generally, prior to disclosure of health care information, the holder of that information must obtain a release from the patient. HIPAA covers the disclosure of both physical and mental health care information. Thus, persons subject to transfer under ICAOS may have a protected privacy interest in certain health care information.

There is a law enforcement exception to the requirement to obtain a written release from an offender prior to disclosure of protected health care information. *See 45 C.F.R. 164.512(f)(1)*. Protected health care information may also be released pursuant to a court order. *See 45 C.F.R. 164.512(f)(1)(ii)*. However, release of protected health care information pursuant to court order is limited to the explicit terms of the orders. *See 45 C.F.R. 164.512(e)(1)(i)*. Additionally, providers may release protected health care information when such release is consistent with law and applicable ethical standards, including disclosure to law enforcement authorities when necessary to protect the public or an individual from serious imminent threat or to aid in the apprehension of an individual at large from lawful custody. *See 45 C.F.R. 164.512(j)(1)(i) & (j)(1)(ii)(B). See also, 45 C.F.R. 164.512(k)(5).*

The release of protected health care information must be genuinely for law enforcement purposes. Thus, it should not be assumed that offenders have no privacy rights in their health care information. To the extent that the disclosure of protected information is a legitimately necessary element in the supervision of an offender, such a release of information would not violate HIPAA. If the disclosure of such information is more general in nature and not directly linked to a legitimately necessary element of supervision, the release could violate HIPAA. Therefore, in deciding whether to release protected health care information to the authorities of another state, it is important to determine whether the release of such information is critical to the offender's supervision or maintaining public safety.

Although HIPAA may arise in the context of an interstate transfer, several courts have concluded that HIPAA does not provide either an explicit or implicit private right of action. One court having addressed HIPAA within the context of transferring medical records in the ICAOS context concluded that "I need not determine whether petitioner's allegations state a possible claim under this statute because the text of the statute does not provide a private right of action and two federal courts have concluded after thorough and persuasive analyses that no implied right of action exists." *O'Neal v. Coleman*, No. 06-C-243-C, 2006 WL 1706426, at *10 (W.D. Wis. June 16, 2006) citing *Johnson v. Quander*, 370 F. Supp. 2d 79, 99-100 (D.D.C. 2005); *Univ. of Colorado Hospital v. Denver Publishing Co.*, 340 F. Supp. 2d 1142, 1144-46 (D. Colo. 2004).

Chapter 4

Returning Offenders to the Sending State

Bench Book

## 4.1 Status of Offenders Subject to ICAOS

One of the principal purposes of the ICAOS is to ensure the effective transfer of offenders to other states and to oversee the return of offenders to the sending state through means other than formal extradition. To this end, the status of an offender as a convicted person substantially affects the process to which they are entitled under the ICAOS and constitutional principles of due process.

The U.S. Supreme Court has held that the granting of probation or parole is a privilege, not a right guaranteed by the Constitution. Probation or parole comes as an "act of grace" to one convicted of a crime and may be coupled with conditions that a state deems appropriate under the circumstances of a given case. *Escoe v. Zerbst*, 295 U.S. 490 (1935); *Burns v. United States*, 287 U.S. 216 (1932). *See also, United States ex rel. Harris v. Ragen*, 177 F.2d 303 (7th Cir. 1949). Many state courts have similarly found that probation or parole is a "revocable privilege," an act of discretion. *See Wray v. State*, 472 So. 2d 1119 (Ala. 1985); *People v. Reyes*, 968 P.2d 445 (Calif. 1998); People v. Ickler, 877 P.2d 863 (Colo. 1994); *Carradine v. United States*, 420 A.2d 1385 (D.C. 1980); *Haiflich v. State*, 285 So. 2d 57 (Fla. Ct. App. 1973); *State v. Edelblute*, 424 P.2d 739 (Idaho 1967); People v. Johns, 795 N.E.2d 433 (Ill. Ct. App. 2003); Johnson v. State, 659 N.E.2d 194 (Ind. Ct. App. 1995); State v. Billings, 39 P.3d 682 (Kan. Ct. App. 2002); *State v. Malone*, 403 So. 2d 1234 (La. 1981); *Wink v. State*, 563 A.2d 414 (Md. 1989); *People v. Moon*, 337 N.W.2d 293 (Mich. Ct. App.1983); *Smith v. State*, 580 So.2d 1221 (Miss. 1991); *State v. Brantley*, 353 S.W.2d 793 (Mo. 1962); *State v. Mendoza*, 579 P.2d 1255 (N.M. 1978). Probation or parole is a statutory privilege that is controlled by the legislature and rests within the sound discretion of a sentencing court or paroling authority. *See, e.g. People v. Main*, 152 Cal. App. 3d 686 (Cal. Ct. App. 1984). An offender has no constitutional right to conditional release or early release. *See Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7 (1979). Because there is no constitutional right, federal courts "recognize due process rights in an inmate only where the state has created a 'legitimate claim of entitlement' to some aspect of parole." *Vann v. Angelone*, 73 F.3d 519, 522 (4th Cir. 1996). *See also Furtick v. South Carolina Dept. of Probation, Parole & Pardon Services*, 576 S.E.2d 146, 149 (2002).

Courts have held that because probation, parole or conditional pardon is not something an offender can demand, but rather extends no further than the conditions imposed, revocation of the privilege generally does not deprive an offender of any legal right. Rather, revocation merely returns the offender to the same status enjoyed before probation, parole or conditional pardon was granted. *See Woodward v. Murdock*, 24 N.E. 1047 (Ind. 1890); *Commonwealth ex rel. Meredith v. Hall*, 126 S.W.2d 1056 (Ky. 1939); *Guy v. Utech*t, 12 NW2d 753 (Minn. 1943). Other courts have held that probation, parole or conditional pardon is in the nature of a contract between the offender and the state, which the offender is free to accept with conditions or to reject and serve the sentence. Having elected to accept probation, parole or conditional pardon, the offender is bound by its terms. *See Gulley v. Apple*, 210 S.W.2d 514 (Ark 1948); *Ex parte Tenner*, 128 P.2d 338 (Calif. 1942); *State ex rel. Rowe v. Connors*, 61 S.W.2d 471 (Tenn. 1933); *Ex parte Calloway*, 238 S.W.2d 765 (Tex. 1951); *Re Paquette*, 27 A.2d 129 (Vt. 1942); *Pierce v. Smith*, 195 P.2d 112 (Wash. 1948), *cert denied* 335 U.S. 834. Regardless of the underlying theory – grace, contract, or both – the general argument is that probation is a privilege so that if the offender refuses to comply with the conditions, a state can deny or revoke it. *People v. Eiland*, 576 N.E.2d 1185 (Ill. Ct. App. 1991). The rights of a person who is actually or constructively in the custody of state corrections officials due to the conviction of a criminal offense differs markedly from citizens in general, or for that matter, citizens under suspicion of criminal conduct. *People v. Gordon*, 672 N.Y.S.2d 631 (N.Y. Sup. Ct. 1998). Importantly, although an offender is not entitled to supervised release, the

offender is entitled to some minimum due process prior to revocation. *See Morrissey v. Brewer*, 408 U.S. 471 (1972); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973).

Over time, courts found that the uniform application of procedures prescribed by the interstate Compact did not constitute a violation of Fourteenth Amendment equal protection. *See People ex rel. Rankin v Ruthazer*, 107 N.E.2d 458 (N.Y. 1952). Similarly, in *Ex parte Tenner*, 128 P2d 338 (Cal. 1942), the court upheld the validity of a uniform statute for out-of-state parolee supervision (ICPP) finding that since the statute applied uniformly to all parolees from states that were members of the Compact, the statute did deprive parolees of the equal protection of the laws. In *People v Mikula*,192 N.E. 546 (Ill. 1934), the court held that no violation of the constitution occurred where an out-of-state offender might be eligible for transfer of parole to another state while an in-state offender was not able to obtain such a parole. The court found that it was within the authority of the legislature to make reasonable classification of prisoners in order to effectuate the purposes of the statute. If the convict was a nonresident and the law would not permit his parole outside of the state, these reasons would become impotent. The court concluded that the statutory distinction between resident and nonresident convicts did not deprive anyone of advantage. *Cf., Williams v. Wisconsin*, 336 F.3d 576 (7th Cir. 2003) (while offenders have a right to marry, a state can impose reasonable travel restrictions, which have the effect of incidental interference with the right to marry; such restrictions did not give rise to a constitutional claim if there was justification for the interference).

Similarly, even warrantless searches of parolees have been held to be permissible, particularly where such searches have been agreed to as a condition of parole. *See Samson v. California*, 547 U.S. 843 (2006) [“Under our general Fourth Amendment approach we examine the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. . . *Id. At 848* (citations omitted)].

In Samson, the Court found that, on the continuum of state-imposed punishments, “parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment.” *Id. At 850*. *See also, United States v. Stewart*, 213 Fed. Appx. 898, 899 (11th Cir. 2007).

A person’s status as an out-of-state offender does not mean that person possesses no constitutional rights. Offenders may have some minimum rights of due process in limited circumstances. For example, in *Browning v Michigan Dept. of Corrections*, 188 N.W.2d 552 (Mich. 1971), the court has determined that equal protection rights would be violated if a “dead time” statute is interpreted in such a way that a person paroled out-of-state is not credited with his original sentence for time served after his parole and while in prison in other states based on subsequent convictions in those other states.

In the Browning case, a parolee, as a result of the imprisonment in Georgia and in Illinois, had accumulated “dead time” totaling nearly 8 years, which was not credited to his Michigan sentence. Noting that the legislature intended that a parole violator should serve sentences concurrently, the court held that, in the event of a parole violation, the time from the date of the parolee’s delinquency to the date of his arrest should not be counted as part of the time to be served. However, the court also concluded that a prisoner who was paroled out of state and subsequently violated parole by committing an offense in another state, did not have his dead time end until declared available by the other state for return to Michigan. The court stated that the “dead time” statute, if interpreted to operate in this manner, not only violated the requirement that consecutive sentences be based upon express statutory provisions, but also invidiously sub-classified an outof- state parolee solely on the basis of geography and constituted a violation of equal protection guaranties.

In *State v. Eldert*, 125 A.3d 139, (Vt. 2015) the sending state’s court found that even though the Vermont probation officer received documents related to the commission of a new crime in the receiving state from the Delaware probation officer, they did not have sufficient indicia of reliability to establish “good cause” to justify denying defendant his right to confront his Delaware probation officer. The documents were unsigned, unsworn and undated and did not contain adequate information or detail

regarding the circumstances of the defendant's admissions to violations, specifically to whom and when they were made, and when the offending behavior took place.

Bench Book

4.2 Waiver of Formal Extradition Proceedings

Waiver of Formal Extradition Proceedings

Bench Book

4.2.1 Waiver of Extradition under the ICAOS

Principal among the provisions of the ICAOS are the waiver of formal extradition requirements for returning offenders who violate the terms and condition of their supervision. The ICAOS specifically provides that:

> *The Compacting states recognize that there is no "right" of any offender to live in another state and that duly accredited officers of a sending state may at all times enter a receiving state and there apprehend and retake any offender under supervision subject to the provisions of this Compact and By-laws and Rules promulgated hereunder.*

*See, Purposes, Art. I*. Additionally, pursuant to Rule 3.109, an offender is required to waive extradition as a condition of transferring supervision. That rule provides:

> *(a) An offender applying for interstate supervision shall execute, at the time of application for transfer, a waiver of extradition from any state to which the offender may abscond while under supervision in the receiving state; and,*

> *(b) States that are parties to this Compact waive all legal requirements to extradition of offenders who are fugitives from justice.*

It is important to note that, subject to certain requirements, a sending state has authority at all times to enter a receiving state and retake an offender. *See discussion, infra*, at §4.4 concerning hearing requirements. The waiver of extradition outlined in Rule 3.109 applies to any member state where the offender might be located. Under Rule 3.109, authorities are not limited in their pursuit of fugitives or in returning a fugitive to the sending state. However, authorities may be required to present evidence that the fugitive is the person sought and that they are acting with lawful authority, e.g., they are lawful agent of the state enforcing a properly issued warrant. *See Ogden v. Klundt*, 550 P.2d 36, 39 (Wash. Ct. App. 1976).

Although neither Article I of the ICAOS or Rule 3.109 have been the subject of judicial interpretation, challenges to the constitutionality of similar waiver provisions contained in past Compacts have not been successful. Courts have held that an interstate Compact authorized by Congress relating to interstate apprehension and retaking of offenders without formalities and without compliance with extradition laws does not violate due process of law. *See Gulley v. Apple*, 210 S.W.2d 514 (Ark. 1948); *Woods v. State*, 87 So.2d 633 (Ala. 1956); *Ex parte Tenner*, 128 P.2d 338 (Cal. 1942); *Louisiana v.*

*Aronson*, 252 A.2d 733 (N.J. Super. Ct. App. Div. 1969); *People ex rel. Rankin v. Ruthazer*, 107 N.E.2d 458 (N.Y.1952); *Pierce v. Smith*, 195 P.2d 112 (Wash. 1948), *cert. denied*, 335 U.S. 834. Even in the absence of a written waiver by the offender, extradition is not available, as the interstate Compact operates to waive any extradition rights. *See People v. Bynul*, 524 N.Y.S.2d 321 (N.Y. Crim. Ct.1987). Habeas corpus is generally unavailable to offenders being held pending return to the sending state under an interstate Compact. *See Stone v. Robinson*, 69 So. 2d 206 (Miss. 1954) (prisoner not in Mississippi as a matter of right but as a matter of grace under the clemency extended by the Louisiana parole board; prisoner subject to being retaken on further action by the parole board); *State ex rel. Niederer v. Cady*, 240 N.W.2d 626 (Wis. 1974) (constitutional rights of an offender with supervision transferred under the Compact are not violated by denial of an extradition hearing, as the offender is not an absconder but is in another state by permission and therefore subject to the retaking provisions of the Compact); *Cook v. Kern*, 330 F.2d 1003 (5th Cir. 1964) (whatever benefits the offender enjoys under the Texas Extradition Statute, he has not been deprived of a federally protected right and therefore a writ of habeas corpus is properly denied; even assuming that involvement of a constitutional right, the parole agreement constitutes a sufficient waiver.) However, a person seeking relief from incarceration imposed as the result of allegedly invalid proceedings under the ICPP may utilize the remedy of habeas corpus to challenge that incarceration. *People v. Velarde*, 739 P.2d 845 (Colo. 1987). Other jurisdictions have also recognized the availability of this remedy, albeit for limited issues, to offenders seeking to challenge the nature and result of proceedings conducted pursuant to provisions equivalent to those of the ICPP. *See, e.g., United States ex rel. Simmons v. Lohman*, 228 F.2d 824 (7th Cir. 1955); *Petition of Mathews*, 247 N.E.2d 791 (Ohio Ct. App. 1969); *Ex Parte Cantrell*, 362 S.W.2d 115 (Tex. 1962). The availability of habeas corpus to a detained offender may also be affected by recent changes to the ICAOS rules imposing time limits on probable cause determinations. *See Rule 5.108(e) & (f)*.

Bench Book

4.2.2 Uniform Extradition Act Considerations

An offender who absconds from a receiving state is a fugitive from justice. The procedures for returning a fugitive to a demanding state can be affected by the Uniform Extradition and Rendition Act (UERA). Under that act, a fugitive may waive all procedural rights incidental to the extradition, for example the issuance of a Governor's warrant, and consent to return to the state demanding the fugitive. To be valid, the waiver must be in writing, in the presence of a judge, and after the judge has informed the fugitive of his rights under the statute. Nothing in the UERA prevents a person from voluntarily returning to a state. Several courts have recognized that an interstate Compact governing supervision of out-of-state offenders provides an alternative procedure by which a person can be returned to the demanding state without complying with the formalities of the UERA. See In re Klock, 133 Cal App 3d 726 (Cal. Ct. App. 1982); People v. Bynul, 524 N.Y.S.2d 321 (N.Y. Crim. Ct. 1987). See also, Todd v. Florida Parole and Probation Commission, 410 So.2d 584 (Fla. 1st DCA 1982) ("[W]hen a person is paroled to another state pursuant to an interstate Compact, all requirements to obtain extradition are waived.") An interstate Compact has been held to displace the UERA as to certain offenders and requires only minimal formalities as to the return of those offenders. Id. Furthermore, the offender's agreement to waive extradition as a condition of relocating waives the need for formal extradition proceedings at the request of the sending state for the offender's return.

**PRACTICE NOTE:** The ICAOS benefits offenders by permitting them to reside and receive supervision in a state where they have family and community ties. In consideration of this privilege, the terms of the ICAOS that includes Rule 3.109 regarding waiver of extradition binds an offender. Therefore, an offender subject to ICAOS is subject to the "alternative procedures" provided in the Compact and its rules, not the provisions of the UERA.

## 4.3 Retaking

As previously noted, Article I of ICAOS authorizes officers of a sending state to enter a receiving state, or a state to which an offender has absconded, for purposes of retaking an offender. With limited exceptions, the decision to retake an offender rests solely in the discretion of the sending state. *See Rule 5.101(a)*. However, if an offender incurs charges for a subsequent offense in the receiving state, the sending state may not retake the offender without prior consent from authorities in the receiving state, until dismissal of the criminal charges, satisfaction of the sentence occurs or the offender obtains release on supervision. *See Rule 5.101-1*.

Several exceptions limit the sending state's discretion for retaking an offender. These exceptions, invoked by a receiving state, require retaking by the sending state when supervision is no longer feasible. First, a sending state must retake an offender upon request of the receiving state or subsequent receiving state and conviction for a felony offense or violent crime. *See Rule 1.101 and Rule 5.102*. The sending state can retake only after dismissal of charges, satisfaction of sentence occurs, the offender obtains a release to supervision for the subsequent offense, or unless the sending and receiving states mutually agree to the retaking. Id. Second, a sending state is required to retake an offender upon request of the receiving state and a showing that the offender has engaged in behavior requiring retaking. *See Rule 1.101 and Rule 5.103*. Furthermore, only the receiving state can invoke Rule 5.103, and the applicability of this rule assumes that the violating behavior occurred in the receiving state. It is important to note that the gravity of the violating act or pattern of non-compliance is measured by the standards of the receiving state. Therefore, a sending state is required to retake an offender even if the violating act or pattern of non-compliant behavior would not result in revocation under the standards of the sending state. So long as the receiving state documents the violation(s) showing the behavior could not be successfully addressed through corrective action or graduated responses, and it meets the revocation standards of the receiving state, the sending state is obligated to retake. This may have significant implications for the need to conduct a retaking or probable cause hearing in the receiving state as required by Rule 5.108.

> **PRACTICE NOTE:** The gravity of a violating act or pattern of non-compliance is measured by the standards of the receiving state. A sending state may be required to retake an offender even if the violation(s) would not have been given the same weight by that state.

Under the Compact, officers of the sending state may enter the receiving state or any other state to which the offender has absconded, in order to retake the offender. As the Compact and Rule 3.109 waive formal extradition proceedings, officers need only establish their authority and the identity of the offender. *See Rule 5.107(a) & (b)*. Due process requirements, such as the requirement for a probable cause hearing, may also apply if the violations are to form the basis for revocation proceedings in the sending state. *See Rule 5.108(a)*. Once sending state officers establish authority and meet due process requirements, authorities in a receiving state may not prevent, interfere with or otherwise hinder the transportation of the offender back to the sending state. *See Rule 5.109*. Interference by court officials would constitute a violation of the ICAOS and its rules.

Bench Book

## 4.3.1 Violation Reports Requiring Retaking

A receiving state is obligated to report to sending state authorities within 30 calendar days of the discovery or determination that an offender has engaged in behavior requiring retaking. "Behavior requiring retaking" is defined in Rule 1.101 as an act or pattern of non-compliance with conditions of supervision that could not be successfully addressed through the use of documented corrective action or graduated responses and would result in a request for revocation of supervision in the receiving state. The definition of "behavior requiring retaking" has not been judicially construed; however, the language of the rule indicates that "behavior requiring retaking" is determined under the facts and laws of the receiving state. Therefore, it is conceivable that revocable acts or patterns of non-compliant behavior may differ from state-to-state. Moreover, a sending state may be required to retake an offender for violating acts or non-compliant behavior that, had they occurred in the sending state, may not have constituted grounds for revocation.

Bench Book

### 4.3.2 Offenders Convicted of a Violent Crime

At the request of a receiving state, Rule 5.102 requires the sending state to retake an offender convicted of a violent crime. A violent crime is qualified by one of the following four criteria: (1) any crime involving the unlawful exertion of physical force with the intent to cause injury or physical harm to a person; (2) or an offense in which a person has incurred direct or threatened physical or psychological harm as defined by the criminal code of the state in which the crime occurred; (3) or the use of a deadly weapon in the commission of a crime; (4) or any sex offense requiring registration.

Bench Book

### 4.4 Arrest and Detention of Offenders in the Receiving State

The courts have defined the relationship between sending state and receiving state officials as an agency relationship. Courts recognize that in supervising out-of-state offenders the receiving state acts on behalf of and as an agent of the sending state. *See State v. Hill*, 334 N.W.2d 746, 748 (Iowa 1983) (trial court committed an error in admitting an out-of-state offender to bail as the status of the offender was not controlled by the domestic law of Iowa, but rather by the Interstate Compact for Probation and Parole and the determinations of sending state authorities); *State ex rel.Ohio Adult Parole Authority v. Coniglio*, 610 N.E.2d 1196, 1198 (Ohio Ct. App. 1993) ("For purposes of determining appellee's status in the present case, we believe that the Ohio authorities should be considered as agents of Pennsylvania, the sending state. As such, the Ohio authorities are bound by the decision of Pennsylvania with respect to whether the apprehended probationer should be considered for release on bond and the courts of Ohio should recognize that fact."); *See also New York v. Orsino*, 27 Misc.3d 1218(A), 2010 WL 1797026 (N.Y.Sup., April 26, 2010)("In several cases both appellate and lower courts have held that the power of the receiving state, in this case Connecticut, to conduct a hearing is delegated to it pursuant to the Compact for Adult Supervision."); *People ex rel Ortiz v. Johnson*, 122 Misc.2d 816, Sup. Ct.1984).

In supervising out-of-state offenders, authorities in a receiving state do not act exclusively as authorities under the domestic law of that state, but also act as agents of the sending state and, to a certain degree, are controlled by the lawful decisions of sending state officials. Under the terms of the Compact, the receiving state "will assume the duties of visitation and supervision over probationers or parolees of any sending state." While the receiving state assumes the obligation to monitor probationers, the sending state does not abdicate its responsibility. *See Johnson v. State*, 957 N.E.2d 660 (Ind. App. 2011); *Keeney v. Caruthers*, 861 N.E.2d 25 (Ind. App. 2007); *Scott v. Virginia*, 676 S.E.2d 343, 348 (Va. App. 2009).

The arrest of an out-of-state offender may occur under one of three broad categories. First, an out-of-state offender is clearly subject to arrest and detention for committing a new offense in the receiving state. Rules 5.101, 5.101-1 and 5.102 recognize that an offender may be held in a receiving state for the

commission of a crime and is not subject to retaking unless the receiving state consents, the term of incarceration on the new crime is completed, or the offender has been placed on probation. The authority to actually incarcerate an offender necessarily carries the implied authority to arrest an offender for committing an offense.

Second, an out-of-state offender is subject to arrest and detention upon request of the sending state based on its intent to retake the offender. Such a retaking can occur based on a demand by the receiving state or because the sending state intends to revoke probation. Under this circumstance, and notification to retake the offender, the sending state must issue a warrant and file a detainer with the holding facility when the offender is in custody. Courts have routinely recognized the right of a receiving state to arrest and detain an offender based on such a request from a sending state. *See e.g., State ex rel. Ohio Adult Parole Authority v. Coniglio*, 610 N.E.2d 1196 (Ohio Ct. App. 1993) (offender cannot be admitted to bail pending retaking); *Crady v. Cranfill*, 371 S.W.2d 640 (Ky. Ct. App. 1963) (detention of offenders is proper as only courts in the sending state can determine the status of their jurisdiction over the offender).

> **PRACTICE NOTE:** An offender arrested and detained for violating the conditions of supervision may have certain due process rights. If the sending state intends to use the offender's violations in the receiving state as the basis for possibly revoking the offender's conditioned release, both U.S. Supreme Court decisions and rules of the Commission require that the sending and receiving states comply with various hearing requirements. See discussion, beginning at Section 4.7.

The third circumstance in which officials in the receiving state can arrest an out-of-state offender is for violations that occur physically in the receiving state. This third circumstance may prove to be the most confusing and difficult, given the offender may or may not face charges for a new offense in the receiving state, and the sending state may or may not initiate retaking proceedings. Nevertheless, courts have recognized that out-of-state offenders are subject to arrest for violations that occur in the receiving state. *See, e.g., Kaczmarek v. Longsworth*, 107 F.3d 870 (Table), 1997 WL 76190 (6th Cir. 1997) (out-of-state probationer could not show that he was entitled to be released from detention under the standards set by Ohio for its own probationers and parolees) (Emphasis added); in accord, *Perry v. Pennsylvania*, 2008 WL 2543119 (W.D. Pa. 2008)

The ICAOS rules clarify the arrest powers of state officials supervising an out-of-state offender. Rule 4.109-1 provides that, "An offender in violation of the conditions of supervision may be taken into custody or continued in custody in the receiving state." This rule acts as statutory authorization in the receiving state notwithstanding domestic laws to the contrary. See, Art. V (Commission to adopt rules that "shall have the effect of statutory law" and are binding on the states). Rule 4.109-1 effectively adopts and codifies the Commission's prior stance on arrest powers as set out in ICAOS Advisory Opinion 2-2005. *See also Perry v. Pennsylvania*, supra. (giving 'deference' to this advisory opinion and holding that the term "supervision" as defined by ICAOS "as a matter of statutory construction . . . included the ability to arrest and to detain Plaintiff.")

> **PRACTICE NOTE:** Notwithstanding Rule 4.109-1, state officials should determine whether their state laws authorize the arrest of a Compact offender who is not already in custody, including the need for a warrant. Rule 4.109-1 gives receiving state officials the right to arrest out-of-state offenders to the extent permitted by the laws of the receiving state.

In addition to specific rule authorization, public policy justifies the arrest of an out-of-state offender,

notwithstanding the domestic law of the receiving state. The purpose of the ICAOS is not simply to regulate the movement of adult offenders for the sake of regulation. Rather, regulating the movement of adult offenders fulfills the critical purposes of promoting public safety and protecting the rights of crime victims. *See INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, ART. I.* All activities of the Commission and the member states endeavor to promote these two overriding purposes. Member states, their courts and criminal justice agencies must take all necessary action to "effectuate the Compact's purposes and intent." *See INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, art. IX, § A.*

Bench Book

## 4.5 Discretionary Disposition of Violation

As previously discussed, Rule 5.102 requires the sending state to retake an offender for a new felony or violent crime conviction *after* the offender's release from incarceration for the new crime. This may result in a considerable amount of time between when the crime occurs when the term of incarceration concludes and when the sending state retakes the offender and has the opportunity to impose its sanction for the violation for a new crime conviction occurring in another state.

Rule 5.101-2 provides a discretionary process for a sending state to timely dispose of a violation for a new crime conviction occurring outside the sending state. This process is limited to offenders incarcerated for the new conviction, and the sentence for the new crime may satisfy or partially satisfy the sentence imposed for the violation. This requires the approval of the sentencing authority or releasing authority and consent of the offender. At its own expense, the sending state is required to establish procedures for conducting the violation hearing electronically or in-person and provide hearing results to the receiving state. If the sentence for the new crime fully satisfies the sentence for the violation imposed, the sending state is no longer required to retake if Rules 5.102 and 5.103 apply. *See Rule 5.101-2.*

Bench Book

## 4.6 Arrest of Absconders

Upon receipt of a violation report for an absconding offender, a sending state must issue a national arrest warrant on notification that the offender has absconded. If the absconding offender is apprehended in the receiving state, the sending state shall file a detainer with the holding facility where the offender is located. *See Rule 5.103-1*. Further, the receiving state shall, upon request by the sending state, conduct a probable cause hearing as provided in Rule 5.108. It is important to note, probable cause hearings should occur if the sending state intends to terminate supervised release and incarcerate the offender.

Bench Book

## 4.6.1 Arrest of Absconders Who Fail to Return to Return to Sending State as Ordered

ICAOS Rules 4.111 and 5.103 also require sending states to issue nationwide arrest warrants for absconders who fail to return to the sending state in no less than fifteen (15) business days. Warrant requirements apply to offenders who fail to return to the sending state when ordered to do so anytime the offender returns from the receiving state while subject to supervision. *See Rules 4.111 & 5.103(c).* The offender's failure to comply and return to the sending state as instructed results in the issuance of a nationwide arrest warrant "effective in all Compact member states, without limitation as to the specific

geographical area." *Id.* Absconders are subject to arrest in all Compact member states, not only the receiving state and sending state. When read in conjunction with Rule 5.111 (Denial of bail to certain offenders), any Compact member state is obligated to arrest and detain absconding offenders. Based upon the provisions of Rule 5.101 (b), Compact offenders who abscond and are subsequently arrested, detained and returned to the sending state have no federal due process rights to compel a state authority to issue a parole violation warrant, file or hear a petition to revoke, or reach a disposition of his parole at a given time.

> **PRACTICE NOTE:** Admission to bail or other release of an absconding offender subject to an arrest warrant issued by the sending state is strictly prohibited *in any state that is a member of the Compact*, regardless of whether that state was the original sending or receiving state. Warrants issued pursuant to any ICAOS rule must be effective in all member states without regard or limitation to a specific geographical area.

Bench Book

4.7 Post-Transfer Hearing Requirements

Post-Transfer Hearing Requirements

Bench Book

4.7.1 General Considerations

Offenders, including those subject to supervision under the ICAOS, have limited rights. Conditional release is a privilege not guaranteed by the Constitution; it is an act of grace, a matter of pure discretion on the part of sentencing or corrections authorities. *See Escoe v. Zerbst*, 295 U.S. 490 (1935); *Burns v. United States*, 287 U.S. 216 (1932); *United States ex rel. Harris v. Ragen*, 177 F.2d 303 (7th Cir. 1949); *Wray v. State*, 472 So. 2d 1119 (Ala. 1985); *People v. Reyes*, 968 P.2d 445 (Calif. 1998); *People v. Ickler*, 877 P.2d 863 (Colo. 1994); *Carradine v. United States*, 420 A.2d 1385 (D.C. 1980); *Haiflich v. State*, 285 So. 2d 57 (Fla. Ct. App. 1973); *State v. Edelblute*, 424 P.2d 739 (Idaho 1967); *People v. Johns*, 795 N.E.2d 433 (Ill. Ct. App. 2003); *Johnson v. State*, 659 N.E.2d 194 (Ind. Ct. App. 1995); *State v. Billings*, 39 P.3d 682 (Kan. Ct. App. 2002); *State v. Malone*, 403 So. 2d 1234 (La. 1981); *Wink v. State*, 563 A.2d 414 (Md. 1989); *People v. Moon*, 337 N.W.2d 293 (Mich. Ct. App.1983); *Smith v. State*, 580 So.2d 1221 (Miss. 1991); *State v. Brantley*, 353 S.W.2d 793 (Mo. 1962); *State v. Mendoza*, 579 P.2d 1255 (N.M. 1978). Some courts have held that revoking probation or parole merely returns the offender to the same status enjoyed before being granted probation, parole or conditional pardon. *See Woodward v. Murdock*, 24 N.E. 1047 (Ind. 1890); *Commonwealth ex rel. Meredith v. Hall*, 126 S.W.2d 1056 (Ky. 1939); *Guy v. Utecht*, 12 NW2d 753 (Minn. 1943).

Offenders enjoy some modicum of due process, particularly with regards to revocation, which impacts the retaking process. In addition to the rules of the Commission, several U.S. Supreme Court cases uphold the process for returning offenders for violating the condition of their supervision. *See e.g., Morrissey v. Brewer*, 408 U.S. 471 (1972) (parolee entitled to revocation hearing); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (probationer entitled to revocation hearing); *Carchman v. Nash*, 473 U.S. 716 (1985) (probation-violation charge results in a probationrevocation hearing to determine if the conditions of probation should be modified or the probationer should be resentenced; probationer entitled to less than the full panoply of due process rights accorded at a criminal trial). The U.S. Supreme Court has recognized that offenders subject to probation or parole have some liberty interests,

but that they need not be afforded the “full panoply of rights” enjoyed by defendants in a pretrial status, because the presumption of innocence has evaporated. Due process requirements apply equally to parole and probation revocation. *See Gagnon, supra*.

Bench Book

4.7.2 Right to Counsel

Under the rules of the Commission, a state is not specifically obligated to provide counsel in circumstances of revocation or retaking. However, particularly with regard to revocation proceedings, a state should provide counsel to an indigent offender if she or he may have difficulty in presenting their version of disputed facts, cross-examining witnesses, or presenting complicated documentary evidence. *See Gagnon, supra* at 788. Presumptively, counsel should be provided if the indigent probationer or parolee, after being informed of his right, requests counsel based on a timely and plausible claim that he or she has not committed the alleged violation or, if the violation is a matter of public record or uncontested, there are substantial reasons in justification or mitigation that make revocation inappropriate. *See generally, Gagnon, supra*. Providing counsel for proceedings in the receiving state may be warranted where the sending state intends to use the offender’s violations as a basis for revoking conditional release. In the revocation context, officials in the receiving state are not only evaluating any alleged violations but are also creating a record for possible use in subsequent proceedings in the sending state. *See Rule 5.108*. The requirement to provide counsel would generally not be required in the context of retaking and the sending state does not intend to revoke conditional release based on violations that occurred in the receiving state. In this latter context, no liberty interest is at stake, because the offender has no right to supervision in another state.

Some courts have read the *Morrissey and Gagnon* decisions governing revocation hearings and the appointment of counsel to apply only after incarceration of the defendant. *See State v Ellefson*, 334 N.W.2d 56 (SD 1983). However, the law in this area is unsettled. At least one case provides insight into the Supreme Court’s evolving jurisprudence with regard to the right to counsel in non-traditional criminal sentencing proceedings. *See, e.g., Alabama v. Shelton*, 535 U.S. 654 (2002) (Sixth Amendment does not permit activation of a suspended sentence upon an indigent defendant’s violation of the terms of his probation where the state did not provide counsel during the prosecution of the offense for which he is imprisoned). In *Shelton*, the Court opines that once a prison term triggers, the incarceration of the defendant is not for the probation violation, but for the underlying offense. The uncounseled conviction at that point results in imprisonment and ends up in the actual deprivation of a person’s liberty. The Court also notes that *Gagnon* does not stand for the broad proposition that sequential proceedings must be analyzed separately for Sixth Amendment purposes, with the right to state-appointed counsel triggered only in circumstances where proceedings result in *immediate* actual imprisonment. The dispositive factor in *Gagnon* and *Nichols v. United States*, 511 U.S. 738 (1994), is not whether incarceration occurred immediately or only after some delay. Rather, the critical point is that the defendant had a recognized right to counsel when adjudicated guilty of the felony for which he was imprisoned. Revocation of probation would trigger a prison sentence for a misdemeanor of which *Shelton* was found guilty without the aid of counsel, not for a felony conviction for which the right to counsel is questioned. Similarly, returning a defendant to a sending state on allegations that he or she violated the terms of their probation and thus are now subject to incarceration *may* give rise to due process concerns. Because *Shelton* is limited to actual trial proceedings – distinguished from post-trial proceedings – its direct application to retaking proceedings may be of limited value; however, the decision does provide insight into the gravity the Supreme Court attaches to the opportunity to be heard and the assistance of counsel if liberty interests are at stake.

Bench Book

### 4.7.3 Specific Considerations for Probable Cause Hearings under ICAOS

The ICAOS recognizes that the transfer of supervision (and hence the relocation of an offender) is a matter of privilege subject to the absolute discretion of the sending state and, to a more limited extent, the discretion of the receiving state. Courts have also recognized that under an interstate compact, conditions can be attached to the transfer of supervision and if violated, can form the basis for the offender's return and ultimate revocation of their conditional release from incarceration. Yet, while numerous courts have held that convicted persons do not have a right to relocate from one state to another, courts have also recognized that once relocation is granted states should not lightly or arbitrarily revoke the relocation.

Bench Book

#### 4.7.3.1 When a Probable Cause Hearing is Not Required

An offender convicted of a new conviction in the receiving state forming the basis for retaking is not entitled to further hearings, the conviction being conclusive as to the status of the offender's violations of supervision and the right of the sending state to retake. In this circumstance, there is no need to conduct a probable cause hearing subsequent to the court proceedings simply to make a new (and virtually identical) record for transmission to the sending state. *See D'Amato v. U.S. Parole Com'n*, 837 F.2d 72, 79 (2d Cir. 1988)

It is important to emphasize the distinction between retaking that may result in revocation and retaking that will not result in revocation. When there is no danger that the sending state will revoke the offender's probation or parole supervision, the offender is not entitled to a probable cause proceeding prior to retaking. As previously discussed, an offender has no right to supervision in another state and the sending state retains the right under the ICAOS to retake an offender for any or no reason. *See Paull v. Park County*, 218 P.3d 1198 (S. Ct. Mt. 2009). For example, a sending state may retake an offender because the offender has failed to comply with a condition. The failure to meet a condition may cause officials in the sending and receiving states to conclude that the offender would be better supervised in the sending state. By contrast, however, if there is any question regarding the intent of the sending state to revoke an offender's conditional release based on violations in the receiving state, the offender should be given a probable cause hearing as provided in Rule 5.108. Failure to do so may bar consideration of those violations in subsequent revocation proceedings in the sending state.

> **PRACTICE NOTE:** An offender convicted of committing a new revocable criminal offense in the receiving state is not entitled to a probable cause hearing, the official judgment of the court is sufficient to trigger retaking by the sending state and subsequent revocation of release.

Bench Book

#### 4.7.3.2 Probable Cause Hearings when Violations Occurred in another State

Where the retaking of an offender may result in revocation of conditional release by the sending state, the offender is entitled to the basic due process considerations that are the foundation of the Supreme Court's decisions in *Morrissey* and *Gagnon*, and the rules of the Commission. Rule 5.108(a) provides, in part, that:

> *An offender subject to retaking that may result in revocation shall be afforded the opportunity for a probable cause hearing before a neutral and detached hearing officer in or reasonably near the place where the alleged violation occurred. (Emphasis added)*

Second, an offender must be afforded a probable cause hearing where retaking is for other than the commission of a new criminal offense and revocation of conditional release by the sending state is likely. The purpose of the hearing is twofold: (1) to test the sufficiency and evidence of the alleged violations, and (2) to make a record for the sending state to use in subsequent revocation proceedings. One of the immediate concerns in *Gagnon* and *Morrissey* was geographical proximity to the location of the offender's alleged violations of supervision. Presumably, hearings on violations that occurred in a receiving state that was geographically proximate to the sending state could be handled in the sending state if witnesses and evidence were readily available to the offender. *See Fisher v. Crist*, 594 P.2d 1140 (Mont. 1979); *State v. Maglio*, 459 A.2d 1209 (N.J. Super. Ct. 1979) (when the sentencing state is a great distance from the supervising state, an offender can request a hearing to determine if a prima facie case of probation violation has been made out; hearing will save defendant the inconvenience of returning to that state if there is absolutely no merit to the claim that a violation of probation occurred). Consistent with *Gagnon* and *Morrissey*, Rule 5.108 (a) provides that an offender shall be afforded the opportunity for a probable cause hearing before a neutral and detached hearing officer in or reasonably near the place where the alleged violation occurred. While a judge is not required to preside at such hearings, care should be taken to conduct these proceedings in a fair manner consistent with the due process requirements set forth in these U.S. Supreme Court cases. An offender's due process rights are violated where a witness against an offender is allowed to testify via another person without proper identification, verification, and confrontation, e.g., with a complete lack of demonstrating good cause for not calling the real witness. *See State v. Phillips*, 126 P.3d 546 (N.M. 2005).

**PRACTICE NOTE:** If there is any question regarding the intent of the sending state to revoke an offender's conditional release based on violations in the receiving state, the offender should be given a probable cause hearing in accordance with Rule 5.108. This ensures a proper record is developed and that the offender's due process rights have been protected. Failure to do so may act to bar consideration of those violations in subsequent revocation proceedings in the sending state.



#### 4.7.3.2.1 Offender's Basic Rights at a Probable Cause Hearing

If the offender is entitled to a probable cause hearing, Rule 5.108(d) defines the offender's basic rights. However, each state may have procedural variations. Therefore, to the extent that a hearing officer is unclear on the application of due process procedures in a particular retaking proceeding, it is important to consult with local legal counsel to ensure compliance with state law. One example is an offender's right to counsel during a probable cause hearing. As stated in the preceding section, Rule 5.108 does not ensure an offender's right to counsel, however, local procedures may provide such right where warranted by the particular facts and circumstances of the case.

The offender is entitled, at a minimum, to (1) written notice of the alleged violations of the terms and conditions of supervision, (2) disclosure of non-privileged or non-confidential evidence, (3) the opportunity to be heard in person and present witnesses and documentary evidence, and (4) the opportunity to confront and cross examine witnesses. As previously discussed, the offender may also be entitled to the assistance of counsel. The requirements in Rule 5.108 are consistent with the minimum due process requirements established in *Morrissey* (offender entitled to (a) written notice of the violations; (b) disclosure of evidence against probationer or parolee; (c) opportunity to be heard and to

present witnesses and documentary evidence; (d) the right to confront and cross-examine witnesses; (e) a neutral and detached hearing body; and (f) a written statement by the fact finder as to the evidence relied upon). Rule 5.108 does not define the specific type of hearing required, only that it be a probable cause “type” hearing. At least one court has acknowledged that the language of Rule 5.108 simply contemplates some type of due process hearing that is a generally consistent with the due process requirements of *Gagnon* and *Morrissey*. *See Smith v. Snodgrass*, 112 Fed. Appx. 695 (10th Cir. 2004) (petitioner's claim that the state violated procedures specified in the interstate Compact authorizing her transfer to Arizona are meritless; relevant sections of the Compact simply acknowledge the due process requirement of a preliminary revocation hearing recognized in *Morrissey* and *Gagnon* and, given the interstate-transfer context, provide for it in the receiving state).

The probable cause hearing required by Rule 5.108 need not be a full “judicial proceeding.” A variety of persons can fulfill the requirement of a “neutral and detached” person for purposes of the probable cause hearing. For example, in the context of revocation, it has been held that a parole officer not recommending revocation can act as a hearing officer without raising constitutional concerns. *See Armstrong v. State*, 312 So. 2d 620 (Ala. 1975). *See also In re Hayes*, 468 N.E.2d 1083 (Mass. Ct. App. 1984) citing *Gerstein v. Pugh*, 420 U.S. 103 (1975) (while the offender was entitled to hearing prior to rendition, reviewing officer need not be a judicial officer; due process requires only that the hearing be conducted by some person other than one initially dealing with the case such as a parole officer other than the one who has made the violations report). However, the requirement of neutrality is not satisfied when the hearing officer has predetermined the outcome of the hearing. *See Baker v. Wainwright*, 527 F.2d 372 (5th Cir. 1976) (determination of probable cause at commencement of hearing violated the requirement of neutrality). This does not prohibit a judicial proceeding on the underlying violations, but merely provides states some latitude in determining the nature of the hearing, so long as it is consistent with basic due process standards. Presumably, if officials other than judicial officers are qualified to handle revocation proceedings, these same officials can preside over a probable cause hearing in the receiving state.



### 4.7.3.2.2 Probable Cause Hearing Report

Rule 5.108(e) requires the receiving state to prepare a written report of the hearing within 10 business days and to transmit the report along with any evidence or record from the hearing to the sending state. The report must contain (1) the time, date and location of the hearing, (2) the parties present at the hearing, and (3) a concise summary of the testimony and evidence relied upon. Under Rule 5.108(e), even if the probable cause hearing results in exoneration of the offender, the receiving state must transmit a report to the sending state.

> PRACTICE NOTE: Rule 5.108 requires the receiving state to prepare and transmit a report on the probable cause hearing to the sending state, despite any findings that the offender did not commit the alleged violations of supervision.

It is important that Rule 5.108 be read in conjunction with other rules regarding retaking and conditions, since this may affect the outcome of the proceedings and the impact of subsequent proceedings in the sending state. At the conclusion of a hearing, the presiding official must determine whether probable cause exists, believing that the offender committed the alleged violations of the conditions of their supervision. However, a determination made in a proceeding for mandatory retaking must be made in view of Rule 5.103(a). This rule provides, in part, that officials in the receiving state must show through documentation that the offender has engaged in behavior requiring retaking. *See*

*Rule 5.103(a)*. To support the receiving state's request for mandatory retaking, as well as to provide a basis for subsequent proceedings in the sending state, which could result in revocation, the hearing officer in the receiving state should determine whether sufficient cause exists to conclude that the act or pattern of non-compliant behavior committed by the offender is appropriately documented and deemed revocable. Behavior requiring retaking means "an act or pattern of non-compliance with conditions of supervision that could not be successfully addressed through the use of documented corrective action or graduated responses and would result in a request for revocation of supervision in the receiving state." *See* *Rule 1.101*.

If a hearing occurs based on violations of a condition imposed by the receiving or sending state, two considerations arise. First, the hearing officer must determine whether the offender violated the conditions of supervision, e.g., the offender indeed failed to comply with a condition. If the hearing officer so concludes, a second determination may need to be made. If the sending state notifies the receiving state of its intention to revoke probation or parole based upon the violation of a condition and requests a hearing, or if the receiving state intends to provide the sending state with a sufficient basis for revocation and voluntarily conducts such a hearing. Under *Gagnon* and *Morrissey*, the hearing officer must determine whether the violation is of sufficient nature that it would typically result in revocation in the receiving state. A hearing officer could conceivably find that the violation occurred, but that retaking is not warranted because it would not rise to the level of revocation in the receiving state. Two important points must be emphasized. First, the determination of "likelihood of revocation" would not be conclusively binding on the sending state, as only the state granting conditional release has jurisdiction to make a final determination on revocation. *See Scott v. Virginia*, 676 S.E.2d 343, 347 (Va. App. 2009); *Bills v. Shulsen*, 700 P.2d 317 (Utah 1985); *State ex rel. Reddin v. Meekma*, 306 N.W.2d 664 (Wis. 1981). There is, nevertheless, a potential for conflicting conclusions between officials in the sending and receiving states regarding the severity of a violation and its implication.

Second, despite the fact that the determination of "likelihood of revocation" is based on the receiving state's standards, a sending state could conceivably obviate the need for a probable cause hearing by asserting that it has no intention of revoking the offender's conditional release. Such an assertion by the sending state would prevent it from using the violation as a predicate for revocation, notwithstanding the jurisdiction to do so. This reading of Rule 5.108(a) is consistent with the general principles of *Gagnon* and *Morrissey*. The purpose of the probable cause hearing in the receiving state is not to test the sufficiency of a sending state's decision to retake, but to determine the merits of alleged violations that occurred in the receiving state *and* to secure a record for subsequent proceedings in the sending state. Under the due process principles articulated in *Gagnon* and *Morrissey*, an assertion by the sending state that it has no intention to revoke conditional release (thus negating the need for a probable cause hearing in the receiving state) would act to bar consideration of the violations in any subsequent revocation proceedings. Any other reading would allow a sending state to by-pass the minimum due process requirements established in *Gagnon*, *Morrissey* and *Rule 5.108* simply by affirming it has no intention to revoke and then subsequently not honor that position. *See e.g., Fisher v. Crist*, 594 P.2d 1140 (Mont. 1979) (a writ of habeas corpus will be granted when revocation of parole is based on violations that occurred in the receiving state and offender was not granted an on-site probable cause hearing prior to retaking; waiver of hearing will not be inferred by offender's failure to demand hearing).

**PRACTICE NOTE:** Under *Gagnon* and *Morrissey*, offenders have the right not to have their liberty interests – however limited – revoked arbitrarily. State officials must establish grounds for revocation. Therefore, if violations occurring in a state other than the sending state will form the basis of revocation, the offender is entitled to a more robust due process hearing which may be very similar to the revocation proceeding itself.

4.7.3.2.3 Post Probable Cause Hearing

If the hearing officer determines that probable cause exists and the offender has committed the alleged violations, the receiving state must detain the offender in custody pending the outcome of decisions in the sending state. Within 15 business days of receipt of the probable cause hearing report, the sending state must notify the receiving state of its intent to (1) retake the offender, or (2) take other action. *See Rule 5.108(f)*. The sending state must retake an offender within 30 calendar days of the decision to retake. Therefore, it is conceivable that a receiving state would have to hold an offender for up to 45 days after the hearing officer issues a report. The offender cannot be admitted to bail or otherwise released from custody. *See Rule 5.111*. *See also, discussion at § 4.7*. The cost of incarceration is the responsibility of the receiving state. *See Rule 5.106*.

The rules do not impose any timeframe for *initiating* the probable cause hearing on the receiving state. There are no time periods specified for holding a probable cause hearing or for providing notice and, therefore, no due process violation per se. *See People ex rel. Jamel Bell v. Santor*, 801 N.Y.S.2d 101 (App. Div. N.Y. 2005). However, Rule 5.108 imposes mandatory timeframes on the sending state *after* the issuance of the hearing officer's report. The failure to comply with these timeframes, could give rise to challenges to the incarceration in either the sending or receiving states. *See Williams v. Miller-Stout*, No. 205-CV-864-ID WO, 2006 WL 3147667, at *1 (M.D. Ala. Nov. 2, 2006). (person named as custodian in a habeas action and the place of a petitioner's custody are not always subject to a literal interpretation; jurisdiction under § 2241 lies not only in the district of actual physical confinement but also in the district where a custodian responsible for the confinement is present).

**PRACTICE NOTE:** A sending state's failure to comply with post-hearing report timeframes could give rise to habeas corpus relief in either the sending or receiving states.

If the hearing officer fails to find probable cause to believe the offender has committed the alleged violations, the receiving state must continue supervision. *See Rule 5.108(g)*. The offender must be released if in custody. *See Rule 5.108(g) (2) & (3)*. Additionally, the receiving state must notify the sending state of its determination at which point the sending state must vacate any warrant it has issued. Likewise, the receiving state must vacate any warrant it has issued.

In sum, offenders subject to retaking are entitled to a probable cause hearing only in the circumstances mandated under *Gagnon* and *Morrissey* and codified by the Commission's rules. This right cannot be waived unless accompanied by the offender's admission of having committed one or more of the violation(s). *See Rule 5.108*. This rule requires that an offender shall be afforded the opportunity for a probable cause hearing before a neutral and detached hearing officer (in many states a judicial officer but not necessarily so) in or reasonably near the place where the alleged violation occurred. This hearing shall have the basic elements of due process and fundamental fairness, yet does not have to rise to the level of a full adversarial hearing. Offenders may be entitled to appointment of counsel where warranted by the particular facts and circumstances of the case. A determination by a sending state that an offender violated the terms of supervision is conclusive in proceedings in the receiving or asylum state so long as fundamental principles of due process were afforded by the sending state. If the critical determinations are met at the conclusion of a hearing in the receiving state and the offender is not subject to further criminal proceedings in that state (or an asylum state), the offender may be "retaken" by sending state authorities, which are permitted to return the offender without interference from authorities of any ICAOS member state.

It is important to maintain the distinction between a probable cause hearing and a retaking hearing. Under the Compact, any sending state has the right to enter any other member state and retake an offender. Therefore, Rule 5.108 applies only in circumstances where the sending state intends to use violations in another state as a predicate for revocation of the offender's conditional release. Neither Rule 5.108 nor the *Gagnon* and *Morrissey* decisions require a probable cause type hearing in all circumstances of retaking. *See Johnson v. State*, 957 N.E.2d 660 (Ind. App. 2011).

For example, in *Ogden v. Klundt*, 550 P.2d 36, 39 (Wash. Ct. App. 1976), the court held that the scope of review in the receiving state in a retaking proceeding was limited to determining (1) the scope of the authority of the demanding officers, and (2) the identity of the person to be retaken. This principle applies in circumstances where the violations forming the basis of retaking occurred in a state other than the state of the offender's incarceration, *e.g.* a determination of probable cause by a sending state. In this context, it is sufficient that officials conducting the hearing in the state where the offender is physically located are satisfied in the face of any documents presented that an independent decision maker in another state has determined that there is probable cause to believe the offender committed a violation. *Cf., In re Hayes*, 468 N.E.2d 1083 (Mass. Ct. App. 1984). Such a determination is entitled to full faith and credit in the asylum state and can, therefore, form the basis of retaking by the sending state without additional hearings. Id. The offender is entitled to notice. The hearing may be non-adversarial. The offender, while entitled to a hearing, need not be physically present given the limited scope of the proceeding. *Id. Cf., Quinones v. Commonwealth*, 671 N.E.2d 1225 (Mass. 1996) (juveniles transferred under interstate Compact not entitled to a probable cause hearing in Massachusetts before being transferred to another state to answer pending delinquency proceedings when the demanding state had already found probable cause); In *re Doucette*, 676 N.E.2d 1169 (Mass. Ct. App. 1997) (once governor of the asylum state has acted on a request for extradition based on a demanding state's judicial determination that probable cause existed, no further judicial inquiry may be had on that issue in the asylum state; a court considering release on habeas corpus can do no more than decide (a) whether documents are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive).

Bench Book

4.7.3.3 Probable Cause Hearings Waiver

The offender may waive this hearing only if she or he admits to one or more violations of their supervision. *See* Rule 5.108(b), also *Sanders v. Pennsylvania Board of Probation and Parole*, 958 A.2d 582 (2008). The effect of waiving the probable cause hearing is twofold. First, the offender is not entitled to an on-site probable cause hearing at which the receiving state is required to present evidence of the violations. Second, and more important, the offender's waiver is, in effect, an admission that they have committed an offense of sufficient gravity as to justify revocation of release had the offender been under the exclusive control of the receiving state. Thus, by waiving the hearing, the offender is implicitly admitting that their actions could justify revocation of supervised release.

*The critical elements of such a waiver are:*

1. *The offender is apprised of the right to a probable cause hearing;*
2. *The offender is apprised of the facts and circumstances supporting their retaking;*
3. *The offender is apprised that by waiving the right to a hearing, he or she is also waiving the right to contest the facts and circumstances supporting their retaking;*
4. *The offender admits in writing to one or more violations of their supervision; and,*
5. *The offender is apprised in writing that by admitting to the offenses, supervised release may be revoked by the sending state based on the admissions.*

4.8 Bail Pending Return

An offender subject to retaking proceedings has no right to bail. Rule 5.111 specifically prohibits any court or paroling authority in any state to admit an offender to bail pending completion of the retaking process, individual state law to the contrary notwithstanding. Since the ICAOS mandates that the rules of the Commission must be afforded standing as statutory law in every member state, the "no bail" provision of Rule 5.111 has the same standing as if the rule were a statutory law promulgated by that state's legislature. *See Article V.*

The "no bail" provision in Rule 5.111 is not novel; states have previously recognized that under the ICPP officials in a receiving state were bound by no bail determinations made by officials in a sending state. *See, e.g., State ex rel. Ohio Adult Parole Authority v. Coniglio*, 610 N.E.2d 1196 (Ohio Ct. App. 1993) (probationer transferred from Pennsylvania could not be released on personal recognizance as Ohio authorities were bound under the ICPP by Pennsylvania decision as to consideration of probationer for release). States have recognized the propriety of the "no bail" requirements associated with ICPP, even where there was no expressed prohibition. In *State v. Hill*, 334 N.W.2d 746 (Iowa 1981), the state supreme court held that Iowa authorities were agents of Nevada, the sending state, and that they could hold the parolee in their custody pending his return to Nevada. The trial court's decision to admit the offender to bail was reversed notwithstanding a prohibition against such action. In *Ex parte Womack*, 455 S.W.2d 288 (Tex. Crim. App. 1970), the court found no error in denying bail to an offender subject to retaking as the Compact made no provision for bail. And in *Ogden v. Klundt*, 550 P.2d 36, 39 (Wash. Ct. App. 1976), the court held that:

> *Absent express statutory authorization, the courts of Washington are without power to release on bail or bond a parolee arrested and held in custody for violating his parole. The Uniform Act for Out-of-State Supervision provides that a parole violator shall be held, and makes no provision for bail or bond. The person on parole remains in constructive custody until his sentence expires. Restated, his liberty is an extension of his confinement under final judgment and sentence. Whether the convicted person is in actual custody within the prison walls or in constructive custody within the prison of his parole, the rule is unchanging; there is simply no right to release on bail or bond from prison.*

*See also, Aguilera v. California Department of Corrections*, 247 Cal.App.2d 150 (1966); *People ex rel. Tucker v. Kotsos*, 368 N.E.2d 903 (Ill. 1977); *People ex rel. Calloway v. Skinner*, 300 N.E.2d 716 (N.Y. 1973); *Hardy v. Warden of Queens House of Detention for Men*, 288 N.Y.S.2d 541 (N.Y. Sup. 1968); *January v. Porter*, 453 P.2d 876 (Wash. 1969); *Gaertner v. State*, 150 N.W.2d 370 (Wis. 1967). However, an offender cannot be held indefinitely. *See Windsor v. Turner*, 428 P.2d 740 (Okla. Crim. App. 1967) (offender on parole from New Mexico who committed new offenses in Oklahoma could not be held indefinitely under Compact and was therefore entitled to writ of habeas corpus when trial in Oklahoma would not take place for a year and New Mexico authorities failed to issue a warrant for his return).

**PRACTICE NOTE:** The ICAOS and its rules impose upon the member states and its courts an absolute prohibition against admitting an offender to bail pending retaking.

For purposes of revocation or other punitive action, a sending state is required to give the same force and effect to the violation of a condition imposed by the receiving state as if the condition had been imposed by the sending state. Furthermore, the violation of a condition imposed by the receiving state can be the basis of punitive action even though it was not part of the original plan of supervision established by the sending state. Conditions may be imposed by the receiving state at the time of acceptance of supervision or during the term of supervision. *See* Rule 4.103. For example, if the receiving state imposed a condition of drug treatment at the time of acceptance and the offender violated that condition, the sending state would be required to give effect to that violation even if the condition was not part of the original plan of supervision.

**PRACTICE NOTE:** The sending state must give effect to the violation of a condition or other requirement imposed by the receiving state, even if the condition or requirement was not included in the original plan of supervision.

Chapter 5

Liability and Immunity Considerations for Judicial Officers and Employees

Bench Book

## 5.1 Introduction

With thousands of offenders under supervision under the Interstate Compact for Adult Offender Supervision (ICAOS, or the Compact), lawsuits against the judicial officials, correctional officials, and others who administer the Compact are inevitable. This chapter discusses the various pathways through which those actors might face legal liability for their work. It also considers the different types of immunity and related defenses available to those actors when they are sued. This chapter is not intended as a comprehensive resource on these subjects, which turn out to be especially complicated and subject to numerous exceptions as a matter of state law. Rather, it is meant as a survey of liability and immunity issues that have actually arisen in the context of the Compact.

Bench Book

## 5.2 Liability

The two principal pathways through which government officers might face legal liability through their work related to ICAOS are (1) federal civil rights lawsuits under 42 U.S.C. § 1983 and (2) state law tort claims. Plaintiffs will also sometimes attempt to sue under the Compact itself, but courts have not deemed the agreement to give rise to a private right of action.

Bench Book

### 5.2.1 Liability under 42 U.S.C. § 1983

One of the primary vehicles through which officials might be sued for their work related to the Compact is 42 U.S.C. § 1983 (Section 1983), a federal statute that creates a cause of action for violations of a person’s civil rights. The statute gives a right to sue for “deprivations of any rights, privileges, or immunities secured by the Constitution and laws” caused by persons acting under color of law. To succeed on a Section 1983 claim, a plaintiff must show (1) a deprivation of a federal right and (2) that the person who caused the deprivation acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635 (1980).

As discussed below in section 5.3, many officials will enjoy either absolute or qualified immunity to suits under Section 1983.

Bench Book

#### 5.2.1.1 No Statutory Right under ICAOS Itself

The federal right in question in a Section 1983 action is typically a constitutional right (for example, the right to equal protection under the law or the right to be free from an unreasonable search under the Fourth Amendment to the United States Constitution). But, under the language of Section 1983, it could also be a right created by a federal statute. The question of whether a federal statute creates an individual right enforceable through Section 1983 turns out to be a difficult one—and the subject of a

fair amount of litigation. *See, e.g., Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) (holding that the Family Educational Rights and Privacy Act of 1974 did not create an individual right enforceable under Section 1983).

Fortunately, the question has been answered by the federal courts in the context of ICAOS. In *Doe v. Pennsylvania Board of Probation and Parole*, the United States Court of Appeals for the Third Circuit concluded that ICAOS contains neither express "rights creating" language nor an implied intent to create a federal right or remedy. Therefore Congress did not intend for it to give Compact offenders enforceable individual rights. 513 F.3d 95 (3d Cir. 2008); *accord M.F. v. N.Y. Exec. Dep't Div. of Parole*, 640 F.3d 491 (2d Cir. 2011).



### 5.2.1.2 Constitutional Violations Related to ICAOS

That the Compact itself does not create a private right of action does not mean that offenders subject to it are left without a remedy under Section 1983. Instead, it means that their complaints must be framed as violations of a right enumerated in the Constitution. Numerous reported cases give examples of the type of constitutional violations that offenders allege in relation to their supervision under the Compact.

A leading case is *Doe v. Pennsylvania Board of Probation and Parole*, 513 F.3d 95, the Third Circuit case noted in the subsection immediately above. In *Doe*, a sex offender who transferred his probation and parole supervision from New Jersey to Pennsylvania sued receiving state officials under Section 1983, claiming that they violated his equal protection rights by subjecting him to community notification requirements that exceeded those applicable to non- ICAOS offenders in Pennsylvania. Pennsylvania required every out-of-state sex offender who moved there to submit to community notification, whereas offenders convicted of similar offenses in Pennsylvania were subject to notification requirements only if, after a civil hearing, they were designated as sexually violent predators. The court rejected Pennsylvania's proposed justifications for the differential treatment, noting that Pennsylvania's own compact-enabling legislation specifically stated that the state will supervise ICAOS offenders under "the same standards that prevail for its own probationers and parolees." *Id.* at 108. Even applying the most deferential level of constitutional scrutiny (rational basis review), the court found no rational relationship between Pennsylvania's legitimate interest in public safety and its policy of disparate treatment for out-ofstate offenders. The court therefore held that Pennsylvania violated Doe's right to equal protection under the Fourteenth Amendment to the United States Constitution. *Id.* at 112.

In *Jones v. Chandrasuwan*, 820 F.3d 685 (4th Cir. 2016), the United States Court of Appeals for the Fourth Circuit held in the context of a Section 1983 action that probation officers from a sending state (North Carolina) violated an ICAOS probationer's Fourth Amendment rights when they sought his arrest without a reasonable suspicion of a violation. The alleged violations (a failure to pay fines and costs, absconding) were not properly coordinated through the receiving state's (Georgia) ICAOS office, which led to a misunderstanding about the probationer's address and whereabouts. He was arrested and improperly detained for seven days. Notwithstanding the finding that the probation officers had violated the defendant's constitutional rights, the court ultimately determined that the officers were entitled to qualified immunity, as discussed below in section 5.3.6.

Of course, not every alleged violation will be an actual constitutional violation. For example, in *Brock v. Washington State Department of Corrections*, No. C08-5167RBL, 2009 WL 3429096, at *1 (W.D. Wash. Oct. 20, 2009), a parolee transferred supervision from Montana to Washington through the Compact. The offender alleged, among other things, that Washington parole officials violated his federal constitutional rights (1) under the Due Process Clause by failing to hold a probable cause hearing on the alleged violation and (2) under the Confrontation Clause by offering hearsay testimony at his violation hearing. The court concluded that the failure to hold a preliminary hearing—even if required by statute—did not give rise to a constitutional violation when the final violation hearing was held three

days after the violation report was filed. And as for the alleged Confrontation Clause violation, the court found that Sixth Amendment confrontation rights apply in a criminal trial, not at a parole violation. *Id.* at *8. With no constitutional violation alleged, the court dismissed the suit without any need to consider whether the defendant-officials were protected by immunity or another defense.

Another recurring fact pattern that generally has not been deemed a constitutional violation is a receiving state's failure to release an offender from detention in a timely fashion upon learning that the sending state does not intend to retake the offender. In *Kaczmarek v. Longsworth*, 107 F.3d 870 (6th Cir. 1997) (unpublished), the United States Court of Appeals for the Sixth Circuit found no constitutional violation when a Compact probationer was held in the receiving state (Ohio) for more than a month after officials there learned that the sending state (Michigan) would not pursue retaking. The court rejected the offender's argument that the delay violated his rights to due process and to be free from cruel and unusual punishment, noting that the sending state alone does not "call[] the shots" in Compact cases. *Id.* at *4. To the contrary, the receiving state was entitled to apply the same standards to Compact offenders that it would apply to its own supervisees— including detaining them when they had other charges pending, as was the case here. *Id.* at *2. *See also Perry v. Pennsylvania*, No. 05-1757, 2008 WL 2543119, at *1 (W.D. Pa. June 25, 2008) (a receiving state did not violate an offender's constitutional rights by detaining him without bond during the pendency of charges in the receiving state, even after the sending state determined that it would not issue a probation warrant related to the receiving state charge).

Bench Book

### 5.2.1.3 No Supervisor Liability under Section 1983

In general, Section 1983 liability will not be predicated solely on a theory of *respondeat superior*. For example, a chief probation officer or other supervisor or manager will not automatically be deemed vicariously liable simply because he or she sits higher on the chain of command than an officer who violated an offender's constitutional rights. A supervisory official will be liable only when he or she plays an affirmative part in the complained-of misconduct. In *Warner v. McVey*, for example, the court dismissed an offender's suit against the chair of the state parole board who had never met or communicated with the offender, rejecting the offender's claim that the chair was "totally responsible for all of the subordinates that she oversees." No. 08-55 Erie, 2010 WL 3239385, at *1, *11 (W.D. Pa. July 9, 2010).

Bench Book

### 5.2.1.4 No Substitute for Appeal or Habeas Corpus

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court clarified that a Section 1983 action should not be used to challenge the validity of a criminal judgment. If the alleged civil rights violation would be one that would render a conviction, sentence, or—in the case of a Compact offender—a probation or parole revocation invalid, then it should be raised either as part of the criminal case or appeal or through habeas corpus. The distinction can be a fine one, though. For example, a Section 1983 action can be raised to challenge the use of improper revocation procedures in connection with the Compact. *Compare French v. Adams* Cty. Det. Ctr., 379 F.3d 1158 (10th Cir. 2004) (*Heck* did not bar a Compact parolee's suit alleging that he was held for 73 days without a hearing or counsel, when the claim was being used to seek damages for using the wrong procedure, not for reaching the wrong result, and when success on the claim would not invalidate the underlying conviction), *with Drollinger v. Milligan*, 552 F.2d 1220 (7th Cir. 1977) (holding that challenges to specific conditions of probation in an ongoing case should be raised through a petition for habeas corpus, not by a Section 1983 action).

## 5.2.1.5 Official Capacity versus Individual Capacity

Plaintiffs can bring Section 1983 actions against defendants in their official capacity or in their individual capacity. Defendants sued in their official capacity will generally be immune from suits for money damages under the Eleventh Amendment to the United States Constitution, but that immunity will not necessarily bar a suit seeking injunctive or declaratory relief. The Eleventh Amendment will not bar a Section 1983 suit for money damages against an official acting in his or her individual capacity, but officials may be able to raise qualified immunity defenses in those cases. Qualified immunity bars recovery from officials to the extent that their conduct did not violate clearly established rights of which a reasonable person would have been aware. Immunity issues are discussed in detail in section 5.3.



## 5.2.1.6 Persons Acting under Color of Law

There is rarely any doubt in the case law that probation and parole officials are "persons" and that, in performing their duties, they are acting under "color of law" within the meaning of Section 1983. The law also allows suits against municipalities and other local governments, but not merely because such an entity employs an officer who violates someone's civil rights. Instead, a local government unit will be liable under Section 1983 only when the alleged violation was the product of an official policy or custom. The test for determining whether a local government can be deemed liable was spelled out by the Supreme Court in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

Occasionally a plaintiff will sue a probation or parole official under Section 1983, claiming that an injury or death caused by an offender amounts to a violation of the constitutional rights of the victim or the victim's family. In *Martinez v. California*, the Supreme Court held that California parole authorities could not be held responsible under Section 1983 for a murder committed by a parolee five months after his release. 444 U.S. 277 (1980). The offender was in no sense an agent of the parole board, and the decedent's death was "too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." *Id.* at 285.



## 5.2.2 State Tort Claims

In addition to civil rights lawsuits, offenders (and others) sometimes file tort claims related to conduct arising under the Compact. In many cases some form of immunity will apply, and questions related to immunity will generally turn on the state law of the sending or receiving state. Nevertheless, some of the cases in which tort claims have been raised are illustrative, highlighting the types of claims likely to arise in the context of the Compact.



## 5.2.2.1 Tort Claims by Offenders

Offenders will sometimes allege that officers were negligent in carrying out their duties under the Compact. For example, in *Grayson v. Kansas*, No. 06-2375-KHV, 2007 WL 1259990, at *1 (D. Kan. Apr. 30, 2007), a probationer transferred under the Compact from Missouri to Kansas alleged that Kansas

officials were negligent in detaining him for more than five months after a preliminary violation hearing without notifying Missouri officials that he was incarcerated. The court concluded that, as a matter of controlling Kansas law, the Kansas officials' failure to act did not implicate a specific duty necessary to sustain a negligence claim. *Id.* at *5. The court reached a similar conclusion with respect to officials in the sending state. *Id.* at *8. None of the officials committed an affirmative act or made a specific promise to the plaintiff that would suffice to create an exception under Kansas' public duty doctrine, which states that law enforcement officers owe their duty to the public at large and not to any particular individual, absent an affirmative act causing injury or a specific promise to the individual. (The public duty doctrine is discussed in greater detail in section 5.3.7.)

In a later order issued in the same case, the court again noted the lack of an affirmative act sufficient to breach Kansas' public duty doctrine. *Grayson v. Kansas*, No. 06-2375-KHV, 2007 WL 2994070, at *1, *10 (D. Kan. Oct. 12, 2007). The court also noted that a special duty can arise under Kansas law for nondiscretionary responsibilities that an officer is required to carry out by law. Such a duty existed in the context of ICAOS Rule 4.109(a), which uses the word "shall" and thus requires a receiving state to notify a sending state of any violation within 30 calendar days of discovery of the violation. In this case, however, there was no dispute that Kansas officials fulfilled that duty, initially sending their violation report to Missouri in a timely fashion. Because no other nondiscretionary rule applied with respect to the offender's lengthy incarceration subsequent to the initial notification, there was no additional duty, and therefore no actionable negligence. Still, it is important to note the distinction between discretionary and nondiscretionary acts, which can play a role in the defenses available to officers sued in tort. (That distinction is discussed in section 5.3.2.)

Other cases have found that the language of the Compact and related state compact-enabling statutes can give rise to a duty of care supporting tort liability. In *Paull v. Park County*, 218 P.3d 1198 (Mont. 2009), a Compact probationer was injured when the contract van service hired to transport him from the receiving state (Florida) back to the sending state (Montana) for a violation hearing crashed, killing one of the drivers and injuring the probationer. The probationer sued Montana officials, alleging that the crash and his injuries were caused by the driver's negligence and that the drivers were agents of the state probation officials who had hired them to do the work. (The facts of the crash were extraordinary. The driver lost control of the van and rolled it as he was swerving, trying to spill plastic containers into which the shackled prisoners had urinated when the drivers would not allow them to make toilet stops.)

The Supreme Court of Montana held that under the language of Montana's compact-enabling statute, the state had a responsibility for its probationers and a responsibility for returning them to Montana when necessary. The court also held that the transportation of prisoners was an inherently dangerous activity and that, therefore, under Montana law, a governmental unit that contracts to transport prisoners may be held vicariously liable for injuries caused by an independent contractor carrying out the activity.



### 5.2.2.2 Tort Claims by Others

An unfortunate fact pattern that arises from time to time is when a Compact offender causes the injury or death of a victim. Victims of those incidents (or their family members or estate) will sometimes raise tort claims against correctional or judicial officials related those injuries or deaths.

In some of those case, courts will find that the officials' actions were not the proximate cause of the harm done to the victim, because the link between state action and the harm is too attenuated. *See, e.g., Goss v. State*, 714 A.2d 225 (N.H. 1998). Other courts have established a forgiving standard of care for officials, finding them liable only for the "grossly negligent or reckless release of a highly dangerous prisoner." *See Grimm v. Ariz. Bd. of Pardons & Parole*, 564 P.2d 1227 (Ariz. 1977). And finally in many cases, resolution of the case will turn on the various immunities enjoyed by the defendant-officials,

discussed in section 5.3.2. *See, e.g., Hodgson v. Miss. Dep't of Corr.*, 963 F. Supp. 776 (E.D. Wis. 1997) (a Compact case in which the sending state officials were deemed immune from a wrongful death suit filed by the father of a woman murdered in the receiving state).

Bench Book

## 5.2.3 Claims under the Compact Itself

Some federal statutes have their own enforcement mechanism through an express or implied cause of action in the federal statute itself. *See Alexander v. Sandoval*, 532 U.S. 275 (2001) (applying the test through which a court determines whether a statute creates a freestanding private right of action and determining that no such right of action exists to enforce disparate-impact regulations issued under Title VI of the Civil Rights Act of 1964). Courts have concluded that nothing in the Interstate Compact agreement or the underlying federal statute reveals any intent by Congress or the compacting states to create private rights or remedies for offenders. *M.F. v. N.Y.* Exec. Dep't Div. of Parole, 640 F.3d 491 (2d Cir. 2011). Along similar lines, a claim styled as one against the Compact itself will be dismissed. *Flinn v. Jones*, No. 3:17cv653-LC-CJK, 2018 WL 3372043, at *1, *2 (N.D. Fla. June 27, 2018) ("Any claim under the ICAOS, or against the 'Florida Interstate Compact,' therefore, is due to be dismissed.").

Offenders will sometimes argue that the Compact is a contract that creates enforceable rights for third-party beneficiaries—namely, the offenders themselves. Though courts (including the Supreme Court) agree that interstate compacts are contracts, *see, e.g., Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275 (1959), they have not found any express or implied intent by Congress and the compacting states that supervised offenders are intended third-party beneficiaries under ICAOS, *see Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 107 (3d Cir. 2008) ("The Compact speaks of cooperation between states, protection of the rights of victims, regulation and control of offenders across state borders and the tracking, supervision and rehabilitation of these offenders. . . . Doe and similarly situated parolees are not beneficiaries of this Compact; they are merely the subjects of it."); *Cuciak v. Ocean Cty. Prob. Office*, No. 08-5222 (MLC), 2009 WL 1058064 (D.N.J. Apr. 20, 2009) (ICAOS creates no private right of action through which a probationer can complain about one state's failure to effectuate a prompt transfer to another state— which in any event is not ever required under the Compact rules).

Bench Book

## 5.3 Immunity and Related Defenses

Under the doctrine of sovereign immunity, the government may not be sued without its consent. The concept flows from the common-law notion that the "the king can do no wrong" and that a lawsuit could not be brought against him in his own courts. Through an overlapping web of federal, state, and common-law rules, judicial and correctional officials and employees will often be immune from suit for their actions taken in relation to the Compact.

Bench Book

## 5.3.1 Eleventh Amendment Immunity

Under the Eleventh Amendment to the United States Constitution, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment thus bars most lawsuits seeking damages from states and from units of state government in federal court.

In many cases, the application of that rule will be straightforward. For example, when an offender names the State of Washington and the Washington Department of Corrections as defendants in his federal lawsuit seeking damages for an alleged civil rights violation, the court will readily dismiss the offender's claims against those defendants. They are immune from such suits under the Eleventh Amendment. *Brock v. Wash. Dep't of Corr.*, No. C08-5167RBL, 2009 WL 3429096, at *1 (W.D. Wash. Oct. 20, 2009); *see also Warner v. McVey*, No. 08-55 Erie, 2010 WL 3239385, at *1 (W.D. Pa. July 9, 2010) (finding the Pennsylvania Parole Board immune from suit on Eleventh Amendment grounds in a case involving an offender's interstate transfer from Iowa to Pennsylvania).

Bench Book

### 5.3.1.1 Official Capacity versus Individual Capacity

Eleventh Amendment immunity also extends to state government officers and employees to the extent that they are sued in *their official capacity*, but not to suits against them in their individual capacity. The distinction between *official-capacity* and *individual-capacity* lawsuits can be confusing.

Individual-capacity lawsuits are those seeking to impose *personal liability* on government officers or employees for actions taken under color of state law as a part of their government work. They are typically suits seeking damages to be paid from the pocket of the officer himself or herself (or from applicable insurance policies). Officers and employees are not immune to such suits under the Eleventh Amendment, but they might enjoy one of the common-law immunities discussed below.

By contrast, official-capacity lawsuits are actually suits against the entity of which the officer is an agent (the state or state agency), seeking a recovery from the state treasury. *See Kentucky v. Graham*, 473 U.S. 159 (1985). The naming of a specific officer in his or her official capacity is merely a pleading device that offers a way around the language of the Eleventh Amendment; it does not necessarily pierce the immunity afforded by the amendment. State officers and employees sued in their official capacity are immune from lawsuits seeking money damages. *Ford Motor Co. v. Dep't of the Treas.*, 323 U.S. 459, 464 (1945) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."). Applying that rule to ICAOS, suits seeking monetary damages from state probation officers and administrators acting in their official capacity typically will readily be dismissed on Eleventh Amendment grounds. *See, e.g., Hankins v. Burton*, No. 4:11-cv-4048-SLD-JAG, 2012 WL 3201947, at *1, *6 (C.D. Ill. Aug. 3 2012) ("Thus, as a state agency . . . . [t]he Missouri Department of Correction is therefore immune from this suit.").

Importantly, the Eleventh Amendment does not preclude suits against state officers and employees in their official capacity seeking prospective *injunctive relief*—that is, a court order requiring the defendant to take, or to refrain from taking, certain actions to protect the plaintiff's rights. *Ex parte Young*, 209 U.S. 123 (1908). Thus, a federal court will hear an offender's suit seeking an injunction of an ongoing constitutional violation. *Edelman v. Jordan*, 415 U.S. 651 (1974).

Bench Book

### 5.3.1.2 No Protection for Local Governments

Eleventh Amendment immunity does not extend to the political subdivisions of a state (its municipalities and counties) or to the officers and employees of those subdivisions. *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Those entities may therefore be sued in federal court as far as the Eleventh Amendment is concerned, although other immunities, discussed below, may apply.

Not every state organizes its probation and parole officers in the same way, and in some cases it will not

be clear whether they are state officers or local officers for the purposes of an Eleventh Amendment analysis. For instance, in *Hankins*, discussed in the subsection immediately above, the court concluded that "county" probation offices in Arkansas were actually local branches of a state agency and that officers sued in their official capacity under Section 1983 were therefore immune from suit under the Eleventh Amendment. 2012 WL 3201947, at *5.

Bench Book

### 5.3.1.3 Waiver of Eleventh Amendment Immunity

There are several ways a state might waive its Eleventh Amendment immunity from suit in federal court. First, immunity can be waived by express state law. It can also be waived by voluntary participation in a federal program that expressly conditions state participation on the state's consent to suit in federal court. *See, e.g., Westinghouse Elec. Corp. v. W.V. Dep't of Highways*, 845 F.2d 468 (4th Cir. 1988). Finally, it can be waived when a state removes a case from state court to federal court. *See, e.g., Grayson v. Kansas*, No. 06-2375-KHV, 2007 WL 1624630, at *1 (D. Kan. June 4, 2007).

It is clear, though, that no waiver of immunity should be inferred from the mere fact of a state's participation in an interstate compact. In *Hodgson v. Mississippi Department of Correction*, the court rejected the plaintiff's argument that a waiver of sovereign immunity could be inferred for any state that joined the Uniform Act for Out-of-State Parolee Supervision. 963 F. Supp. 776 (E.D. Wis. 2002).

Bench Book

### 5.3.2 State Sovereign Immunity

State sovereign immunity is, as noted above, the doctrine that prevents a state from being sued in its own courts without its consent. It will generally be a matter of state law, and of course not every state is the same. Many states have narrowed or waived their sovereign immunity to some degree through the purchase of liability insurance or by the enactment of a state tort claims act, which allows certain suits against the state and its officers in certain circumstances.

An application of state sovereign immunity in a case arising under the Compact can be seen in *Hodgson v. Mississippi Department of Corrections*. 963 F. Supp. 776 (E.D. Wis. 1997). As discussed in section 5.2.2.2, *Hodgson* involved a woman who was murdered in Wisconsin by a Mississippi parolee being supervised there under the Compact. The victim's father sued various Mississippi officials in tort for wrongful death.

As state officials acting in their official capacities, the Mississippi officials were deemed immune from suit. Under the applicable Mississippi law—as applied by the federal court in Wisconsin, where the suit was filed—state officials are immune from tort suits for their "discretionary" acts (those requiring personal deliberation, decision, and judgment) but not for their "ministerial" acts (those duties positively imposed by law and required in specified circumstances). The court concluded that the officials' acts under the Uniform Act for Out-of-State Parolee Supervision were discretionary, and thus found them to be immune from suit on the plaintiff's wrongful death claim. *Id.* at 789. (The father's claim against the Mississippi Department of Corrections and its officers in their official capacities was also deemed barred in federal court under the Eleventh Amendment.)

The distinction between discretionary and ministerial (some states use different terms, such as "operational") acts is not unique to Mississippi, and it could have a bearing on the sovereign immunity analysis under many states' tort laws. In those states, an official doing work related to the Compact would be likely to have stronger immunity protection when carrying out discretionary functions under the Compact, such as discretionary transfers under ICAOS Rule 3.101-2 or the imposition of conditions

under Rule 4.103, than he or she would carrying out functions susceptible to being interpreted as ministerial/operational, such as a sending state's failure to issue a warrant within fifteen (15) days of an offender's failure to appear as required by ICAOS Rule 2.110.

Bench Book

### 5.3.3 Immunity in Another State's Courts

Neither the Eleventh Amendment nor other formulations of sovereign immunity bar a suit against a state in the courts of another state. *Nevada v. Hall*, 440 U.S. 410 (1979). In *Mianecki v. Second Judicial Court of Washoe County*, 658 P.2d 422 (Nev. 1983), sovereign immunity did not prevent a tort suit in Nevada against the state of Wisconsin and one of its ICAOS administrators who failed to notify a transferring probationer's new housemates of his criminal and sexual history, leading to the sexual abuse of their minor son. Under *Nevada v. Hall*, Wisconsin and its administrator were not immune from suit in Nevada's courts. The Supreme Court of Nevada also held that Nevada was not required to grant full faith and credit to the immunity the defendants would have enjoyed in Wisconsin's courts. To the contrary, the law of Nevada applied. And under Nevada law, the complained-of failure to notify the victim's family of the nature of the offender's prior offense was an "operational" (that is, not discretionary) deficiency for which sovereign immunity would be waived. *Mianecki*, 658 P.2d at 424.

Bench Book

### 5.3.4 Judicial Immunity

Judges have absolute immunity from liability as long as they are performing a judicial act and there is not a clear absence of all jurisdiction. *Stump v. Sparkman*, 435 U.S. 349 (1978). A judge is not deprived of absolute immunity from liability for damages because an action he or she took was in error, illegal, or even done maliciously. *Mireles v. Waco*, 502 U.S. 9 (1991). Judicial immunity offers protection from suits for money damages, but it will not necessarily bar prospective injunctive relief. *Pulliam v. Allen*, 466 U.S. 522 (1984).

Under that framework, a federal court deemed a sentencing judge absolutely immune from a Compact offender's suit alleging that the judge's sentence violated the offender's rights by preventing him from transferring to his home state of Alabama. *Flinn v. Jones*, No. 3:17cv653- LC-CJK, 2018 WL 3372043, at *1, *3 (N.D. Fla. June 27, 2018).

Judicial immunity is not limited to judges; it can extend to others who perform functions "intimately related to" or that are "an integral part of" the judicial process. *Ashbrook v. Hoffman*, 617 F.2d 474 (7th Cir. 1980). For example, a hearing officer holding ICAOS preliminary violation hearings was deemed to have absolute judicial immunity to the extent that she was performing a function previously assigned to judges. *Brock v. Wash. Dep't of Corr.*, No. C08-5167RBL, 2009 WL 3429096, at *1, *9 (W.D. Wash. Oct. 20, 2009).

Judicial immunity can, in certain circumstances, extend to probation and parole officers. For example, an officer might have absolute judicial immunity for activities related to the preparation of a pre-sentencing report, *Burkes v. Callion*, 433 F.2d 318 (9th Cir. 1970), or when taking actions necessary to carry out and enforce the conditions of probation imposed by the court, *see Acevedo v. Pima Cty. Adult Prob.Dep't*, 690 P.2d 38 (Ariz. 1984). More generally, it has been said that probation and parole officers are absolutely immune from suits challenging conduct intimately associated with the judicial phase of the criminal process. *Copus v. City of Edgerton*, 151 F.3d 646 (7th Cir. 1998) (probation officer).

However, not all officer duties will be accorded judicial immunity. In *Grayson v. Kansas*, No. 06-2375-KHV, 2007 WL 1259990, at *1 (D. Kan. Apr. 30, 2007), a Compact offender sued probation officials in

the receiving state under Section 1983 for violating his due process rights. The state's ICAOS administrator, deputy administrator, and two probation/parole officers argued that they were entitled to absolute judicial immunity from liability stemming from the performance of their duties related to the judicial process. The court disagreed, noting that the functions of a parole officer were too far removed from the judicial process to be accorded absolute immunity. Id. at *7 (citing *Mee v. Ortega*, 967 F.2d 423 (10th Cir. 1992)); *see also Russ v. Uppah*, 972 F.2d 300 (10th Cir. 1992).

Bench Book

5.3.5 Prosecutorial Immunity

Like judges, prosecutors have absolute immunity from lawsuits seeking money damages. *Imbler v. Pachtman*, 424 U.S. 409 (1986). That immunity allows prosecutors to exercise the independence of judgment essential to their work—and to avoid the deluge of retaliatory lawsuits that criminal defendants would undoubtedly file against them were they not immune. Prosecutorial immunity extends to probation violation proceedings, *Hamilton v. Daley*, 777 F.2d 1207 (7th Cir. 1985), including proceedings related to a probationer who transferred under the Compact, *Tobey v. Chibucos*, 890 F.3d 634 (7th Cir. 2018).

Bench Book

5.3.6 Qualified Immunity

Government officials sued in their individual capacity have what is known as *qualified immunity* from suits for damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A qualified immunity analysis thus asks two questions: (1) was there a violation of a right?; and, (2) was the right at issue "clearly established," such that it would have been obvious to a reasonable officer in the situation that his or her conduct was unlawful? Qualified immunity is a high hurdle for plaintiffs to overcome; it has been said to "provide ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335 (1986).

Courts often engage in a fairly circumstance-specific inquiry when analyzing whether a right is clearly established for qualified immunity purposes. General awareness of the Bill of Rights will not suffice to put an officer on notice that his or her acts violated a clearly established right. Instead, the analysis typically focuses on whether case law from the Supreme Court, the controlling federal circuit, or the state high court had already decided a similar case or articulated a clearly governing rule. Few ICAOS cases have reached those courts, and even fewer have involved rules the court deemed "clearly established" in the manner necessary to overcome the defendants' qualified immunity protection.

For example, in *Jones v. Chandrasuwan*, 820 F.3d 685 (4th Cir. 2016), the United States Court of Appeals for the Fourth Circuit concluded that receiving state officers violated an offender's constitutional rights by seeking his arrest without reasonable suspicion. However, because the level of suspicion necessary to arrest a probationer had not been established "beyond debate" by the Supreme Court or the Fourth Circuit, the law was not sufficiently clearly established to put a reasonable official on notice that he or she was violating the right. The officers were therefore entitled to qualified immunity. *Id.* at 696.

In order to be "clearly established" for purposes of a qualified immunity analysis, the right in question must have been clearly established at the time of the alleged violation. Resolution of the right through other case law decided after the alleged violation will not render the right clearly established. For instance, in *Warner v. McVey*, 429 F. App'x 176, 178 (3d Cir. 2011), the United States Court of Appeals for the Third Circuit held that a sex offender's constitutional right to due process before being classified

as a sex offender was not clearly established at the time when Pennsylvania probation officials made that determination without a hearing. The appellate court case clarifying the scope of the right—*Renchenski v. Williams*, 622 F.3d 315 (3d Cir. 2010)—was not decided until after the offender was designated a sex offender, and so a reasonable official would not have been on notice of the rule.

None of this is to say that no constitutional right is clearly established in the context of the Compact. For example, in *Grayson v. Kansas*, No. 06-2375-KHV, 2007 WL 1259990, at *1 (D. Kan. Apr. 30, 2007), the court found it to be clearly established under relevant federal circuit precedent that the continued detention of an offender which a reasonable officer would know to be unlawful violated the offender's due process rights. The officers therefore were not entitled to qualified immunity—although they later succeeded in showing that they did not have any personal participation in the actual violation.

Bench Book

### 5.3.7 The Public Duty Doctrine

Some states recognize the so-called *public duty doctrine*—the idea that a government official has no legal duty to protect an individual citizen from harm caused by a third person. The rule recognizes the limited resources of law enforcement and a refusal to expose the police and others to liability for every criminal's act. The doctrine applies to probation officers in some jurisdictions. In North Carolina, for example, the public duty doctrine barred a claim against a probation officer who failed to take action when an offender's electronic leg band broke and the offender went on to kill a woman. *Humphries v. Dep't of Corr.*, 479 S.E.2d 27 (N.C. Ct. App. 1996).

There are exceptions to the public duty doctrine in the jurisdictions where it exists. In North Carolina, a promise by law enforcement to protect a specific person can give rise to a *special duty* that overrides the public duty doctrine. *See, e.g., Braswell v. Braswell*, 390 S.E.2d 752 (N.C. Ct. App. 1990). Additionally, certain categories of people fall within a *special relationship* exception to the doctrine, such as police informants. In the probation context, a probation officer might be deemed to have a special relationship with the children who live in the residence approved by the officer if the offender assaults those children. *Blaylock v. N.C. Dep't of Corr., Div. of Cmty. Corr.*, 685 S.E.2d 140 (N.C. Ct. App. 2009).

Bench Book

### 5.3.8 Personal Jurisdiction

The Compact necessarily involves offenders moving across state lines. Therefore, considerations of different courts' personal jurisdiction over the parties to a suit might come into play. Unfortunately, different courts have reached different results when considering the role of the Compact in evaluating their jurisdiction over the defendants to a suit.

In *Hansen v. Scott*, 645 N.W.2d 223 (N.D. 2002), the Supreme Court of North Dakota concluded that its courts had personal jurisdiction over Texas officials sued for their failure to fully disclose the criminal history of a Texas parolee who transferred to North Dakota under the Compact and wound up killing two people there. The court held that by affirmatively asking North Dakota to supervise the parolee under the Compact, the Texas officials purposefully availed themselves of the privilege of conducting activities in North Dakota, such that they could reasonably anticipate being hauled into court there—as they were when they were sued by the victims' children.

By contrast, in *Hankins v. Burton*, No. 4:11-cv-4048-SLD-JAG, 2012 WL 3201947, at *1 (C.D. Ill. Aug. 3 2012), a federal court in the receiving state (Illinois) determined that it did not have personal jurisdiction over probation officials from other states (Arkansas and Missouri) who were being sued

under Section 1983 for allegedly keeping the probationer under supervision beyond her lawful supervision term. The mere existence a compact between the states to transfer probationers did not, the court said, constitute purposeful availment by the defendants of the privilege of conducting activities in Illinois, and it would thus violate due process to exercise personal jurisdiction over them. *Id*. at *6.

| | | |
|---|---|---|
| | **Interstate Commission for Adult Offender Supervision ADVISORY OPINION** | **Opinion Number:** 2-2005<br>**Issued:** 2005-03-04<br>**Reviewed:** 2019-03-19 |

**Requested by:** Florida
**At Issue:** Arresting & Detaining Compact Probationers and Parolees. Authority of officers to arrest an out-of-state offender sent to Florida under the ICAOS on probation violations.

# Advisory Opinion 2-2005

**Issued by:** Don Blackburn, Executive Director and Richard L. Masters, Legal Counsel

## Background:

Pursuant to Rule 6.101, the State of Florida requested an advisory opinion concerning the authority of its officers to arrest an out-of-state offender sent to Florida under the ICAOS on probation violations. Relying in part on a 1947 Florida Attorney General Opinion (Fla. Op. Atty. Gen. 047-371) and a legal memorandum entitled *Illegality of Florida Probation Officers' Arrest of Out-of-State Probationers or Parolees*, which we understand was prepared by a public defender, the question has arisen regarding the power of Florida officials to arrest and detain an offender whose supervision was transferred pursuant to the ICAOS. Both the 1947 Attorney General Opinion and the legal memorandum assert that because the Interstate Compact on Probation and Parole (the precursor to the ICAOS) and the ICAOS itself speak only to "supervision" of out-of-state offenders, and because Florida has no statute vesting its officers with arrest powers over such offenders, there is no authority for its officers to arrest and detain an out-of-state offender for violating the terms and conditions of their supervision. The legal memorandum in particular relies on several Commission rules noting the limited circumstances under which an offender is subject to retaking by the sending state and the process of retaking. The memorandum also relies generally on the U.S. Supreme Court's holding in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), which outlined limited due process requirements in probation revocation proceedings.

Initially, it is necessary to address the due process considerations raised by the reliance on *Gagnon v. Scarpelli, supra*, and to clarify its application to retaking (as distinguished from revocation) proceedings. The *Gagnon* decision has proved to be a source of confusion, which has led to an understanding of due process and implied rights, which may not be appropriate or necessary in this context. Although Rule 5.108 requires that the offender be afforded a probable cause hearing prior to retaking, the rule does not define the nature of that hearing. Several courts have, however, addressed the nature of the retaking hearing. For example, in *Ogden v. Klundt*,550 P.2d 36, 39 (Wash. Ct. App. 1976), the court held that the scope of review in the receiving state in a retaking proceeding was limited to a determination of: (1) the scope of the authority of the demanding officers, and (2) the identity of the person to be retaken. Allegations of due process violations in the actual revocation of probation or parole are matters properly addressed during proceedings in the sending states after the offender's return. See, People ex rel. *Crawford v. State, 329 N.Y.S.2d 739* (N.Y. 1972); *State ex rel. Nagy v. Alvis,* 90 N.E.2d 582 (Ohio 1950); *State ex rel. Reddin v. Meekma*, 306 N.W.2d 664 (Wis. 1981); *Bills v. Shulsen*, 700 P.2d 317 (Utah 1985).

While other courts have held that an offender subject to retaking may be entitled to a more robust due process hearing, those cases have generally dealt with circumstances where there is a great geographical difference between the sending and receiving states. In *California v. Crump*, 433 A.2d 791 (N.J. Super. Ct. App. Div. 1981), for example, the court held that before an offender could be

returned to the sending state pursuant to the ICPP, the trial court was required – considering the distance between California and New Jersey – to conduct an on-site probable cause hearing and determine whether a *prima facie* case of violation was established. Relying on *Morrissey* and *Gagnon*, the court held that due process requires some minimal inquiry be conducted at or reasonably near the place of the alleged violation as promptly as possible while information is fresh and sources are available. The court noted that, "It may be that the evidence at the hearing will demonstrate that appellant at all times attempted to comply with the conditions of probation but was prevented from doing so by administrative confusion, as his attorney suggests. Or it may appear that appellant has been uncooperative and obdurate in performing his end of his bargain for his liberty. This may swiftly be determined and he will be fairly returned to the sending sovereign." *California v. Crump*, 433 A.2d at 794. *See also, Fisher v. Crist*, 594 P.2d 1140 (Mont. 1979); *State v. Maglio*, 459 A.2d 1209 (N.J. Super. Ct. 1979)(when a sentencing state is a great distance from a supervising state, an offender can request a hearing to determine if a *prima facie* case of probation violation has occurred; the hearing will save the defendant the inconvenience of returning to that state if there is absolutely no merit to a probation violation claim).

However, if the violation on which the claim was based occurred in a state other than the state in which the offender is held, the probable cause hearing may be substantially less than what is required in other contexts. In this latter situation, it is sufficient for officials conducting the probable cause hearing be satisfied on the face of any documents presented by the demanding state that an independent decision maker in that state has made a *preliminary* determination that there is probable cause to believe the offender committed a violation. *In re Hayes*, 468 N.E.2d 1083 (Mass. Ct. App. 1984). Such a determination is entitled to full faith and credit in the asylum state and can, therefore, form the basis of retaking by the sending state without additional hearings. Id. The offender is entitled to notice. The hearing may be non-adversarial. The offender, while entitled to a hearing, need not be physically present given the limited scope of the proceeding. Id. Cf., *Quinones v. Commonwealth*, 671 N.E.2d 1225 (Mass. 1996) (juveniles transferred under the interstate compact not entitled to a probable cause hearing in Massachusetts before being transferred to another state to answer pending delinquency proceedings when the demanding state had already found probable cause); *Doucette*, 676 N.E.2d 1169 (Mass. Ct. App.1997) (once the governor of the asylum state has acted on a request for extradition based on a demanding state's judicial determination that probable cause existed, no further judicial inquiry may be had on that issue in the asylum state; a court considering release on habeas corpus can do no more than decide (a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive).

In summary, these cases represent the proposition that, with a limited exception, an offender subject to retaking generally does not enjoy the same due process rights in the asylum state as those enjoyed in the sending state during the actual revocation proceedings. Therefore, to the extent that any party relies upon *Gagnon* or *Morrissey v. Brewer*, 408 U.S. 471 (1972) for the proposition that offenders subject to retaking enjoy the same due process rights as offenders subject to revocation, such a reliance is misplaced. To be clear, an offender subject to retaking is entitled to due process both under the Rule 5.108 and court precedence. However, the level of due process to which the offender is entitled may be less in the retaking context than in the actual revocation process. Offenders subject to revocation have a right to not to have their probation or parole arbitrarily revoked. Offenders subject to retaking enjoy Compact transfers purely as an exercise of discretion by the sending state; that is, there is minimal liberty interest involved because there is no "right" to transfer that creates a recognized liberty interest and there is no immediate danger of the offender's liberty interests will be irrevocably affected.

This discussion is important when considering the question: Do officers in a receiving state have the authority to arrest and detain an out-of-state probationer for probation violations that occur in that state? To answer this question, it is necessary to examine the nature of the relationship between the

authorities in the sending state and receiving state and the three general circumstances under which an arrest can be made.

Courts define the relationship between sending state and receiving state officials as an agency relationship. Courts generally recognize that in supervising out-of-state offenders the receiving state is acting on behalf of and as an agent of the sending state. In *State v. Hill*, 334 N.W.2d 746 (Iowa 1983), the Iowa Supreme Court reversed a trial court decision admitting an out-of-state offender to bail. The Court found that the offender's status was not determined by Iowa's domestic law, but rather the Interstate Compact for Probation and Parole and the sending state's authorities. The Court further found that, "For purposes of determining appellee's status in the present case, we believe that the Iowa authorities should be considered as agents of the sending state." Other courts have similarly held. See e.g., State ex rel. *Ohio Adult Parole Authority v.Coniglio*, 610 N.E.2d 1196, 1198 (Ohio Ct. App. 1993) ("For purposes of determining appellee's status in the present case, we believe that the Ohio authorities should be considered as agents of Pennsylvania, the sending state. As such, the Ohio authorities are bound by the decision of Pennsylvania with respect to whether the apprehended probationer should be considered for release on bond and the courts of Ohio should recognize that fact."). Therefore, in supervising out-of-state offenders, officials in the receiving state do not act exclusively as authorities of that state and its domestic law, but also act as agents of the sending state and are, therefore limited to a certain extent by the decisions of sending state officials.

## Applicable Rules & Statute

Arrests of out-of-state offenders generally occur under one of three broad categories. First, an out-of-state offender is clearly subject to arrest and detention for committing a new offense in the receiving state. Rules 5.101[1] and 5.102 recognize that an offender may be held in a receiving state for the commission of crime and *is not* subject to retaking unless the receiving state consents, the term of incarceration on the new crime has been completed, or the offender has been placed on probation. The authority to incarcerate an offender principally implies that the offender is subject to arrest for committing an offense.

Second, an out-of-state offender is subject to arrest and detention upon demand of the sending state based on its intention to retake the offender. This can occur based on a demand by the receiving state or because the sending state intends to revoke probation or parole. Under this circumstance, the sending state may issue a warrant for the offender and request that the receiving state arrest and detain the offender pending retaking. Courts have routinely recognized the right of a receiving state to arrest and detain an offender based on such a demand from a sending state. See e.g., State ex rel. *Ohio Adult Parole Authority v. Coniglio*, 610 N.E.2d 1196 (Ohio Ct. App. 1993) (offender cannot be admitted to bail pending retaking); *Crady v. Cranfill*, 371 S.W.2d 640 (Ky. Ct. App. 1963) (detention of offenders proper as only courts in the sending state can determine the status of their jurisdiction over the offender); *Stone v. Robinson*, 69 So.2d 206 (Miss. 1954). The ICAOS recognizes the right of a sending state to retake an offender at any time. See, INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, ART. I, PURPOSE. The sending state's demand to retake an offender implies the power of receiving state officials to arrest and detain the offender pending the completion of retaking proceedings. Rule 5.111 recognizes this implied power by prohibiting receiving state officials from allowing bail or other release conditions to an offender.

The third circumstance under which officials in a receiving state may effectuate the arrest of an out-of-state offender is for probation violations that occurred in the receiving state. This third circumstance creates misunderstandings because the offender may or may not be charged with committing a new offense in the receiving state and the sending state may not have initiated retaking proceedings. Nevertheless, courts have recognized that out-of-state offenders are subject to arrest for probation violations that occur in the receiving state. For example, in *Kaczmarek v. Longsworth*, 1997 U.S. App. LEXIS 3406 (6th Cir. 1997), the Court of Appeals held that an out-of-state probationer

was entitled to be released from detention for a probation violation under the standards set by Ohio *for its own probationers and parolees*. (Emphasis added). In that case, a Michigan probationer residing in Ohio was investigated for inappropriate conduct towards a minor. Ohio officials arrested the offender for violating his probation,conducted a probable cause hearing and found probable cause for repeated conduct constituting serious supervision violations. The probationer argued that his due process rights were violated and that it was cruel and unusual punishment for Ohio officials to incarcerate him after being informed by a Michigan probation officer that Michigan had not authorized a hold or detainer and was not currently seeking the probationer's extradition. In upholding the dismissal of the offender's § 1983 action, the court held:

> *The Interstate Compact expressly provides that "each receiving state [Ohio, in this instance] will assume the duties of visitation of and supervision over probationers or parolees of any sending state [i.e. Michigan] and in the exercise of those duties will be governed by the same standards that prevail for its own probationers and parolees." (Citation omitted). There has been no showing that Mr. Kaczmarek was entitled to be released on April 1, 1994, under the standards set by Ohio for its own probationers and parolees*

Although the *Kaczmarek* decision occurred within the context of the Interstate Compact on Probation and Parole, the decision does purport that at least one federal court of appeals considers it permissible to arrest and detain an out-of-state probationer. The ICAOS rules require the receiving state to supervise out-of-state offenders under the same standards as it would supervise in-state offenders. *See*, Rule 4.101. Following the *Kaczmarek* reasoning, if an in-state offender is subject to arrest by a probation officer, an out-of-state offender would also be subject to arrest.

Additionally, there are public policy reasons under the ICAOS that support the power to arrest an out-of-state offender for violating the terms and conditions of supervision. The purpose of the ICAOS is not solely to regulate the *movement* of adult offenders across state lines. Rather,regulating the movement of adult offenders fulfills the critical purposes of promoting public safety and protecting the rights of crime victims. *See*, INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, ART. I. All activities of the Interstate Commission and the member states are directed at promoting these two overriding purposes. All member states, their courts and agencies, are required to take all necessary action to "effectuate the Compact's purposes and intent." *See*, INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, ART. IX, § A. It does not fulfill the purpose and intent of the ICAOS for a state to maintain that it has the power to arrest its own offenders for probation violations, but is powerless to arrest an out- of- state offender for similar violations, regardless of whether the latter threatens the safety of the community or disregards the direct purposes of probation supervision.

In seeking to have supervision transferred to another state, the offender accepts that a sending state can retake, that no formal extradition proceeds are required, and that he or she is subject to the same type of supervision as other offenders in the receiving state. *See*, INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, ART. I. *See also*, Rules 3.109 & 4.101. The receiving state can even add additional requirements on an offender as a condition of transfer. *See*, Rule 4.103. In short, a probationer or parolee is subject to whatever reasonable conditions the sentencing court or corrections authority deems necessary to promote both community safety and offender rehabilitation. The offender accepts probation or parole on a conditional basis – fulfilling the requirements imposed upon him or her. Failure to comply with these requirements,whether in the sending state, receiving state, or third party asylum state, requires state officials to take all reasonable and necessary measures to ensure compliance or to return the offender to the same status held before probation or parole. If a receiving state fails to arrest and detain an out of-state offender for probation violations that if committed by an in-state offender would warrant arrest, it does not promote community safety

or comply with terms and conditions the offender agreed to when they accepted release and requested transfer.

Two final points should be noted. First, it is possible that certain officers in a receiving state charged with supervising offenders do not have the power to arrest. Such officers may, however,have the power to effectuate an arrest through an appropriate law enforcement agency. Therefore, even in the absence of the power to physically arrest an offender, officers may effectuate an arrest in cooperation with the appropriate local or state law enforcement officials. Second, officials in a receiving state should not confuse the power to arrest with the right of indefinite detention. When an out-of-state offender is arrested and detained for a probation violation, minimal due process considerations require that the offender's status be resolved reasonably quickly. Officials in the sending state should be notified and the offender given a preliminary hearing to determine whether the arrest is justified and whether the offender should be held pending retaking by the sending state. Officials conducting such a hearing can release the offender should the arrest prove unwarranted or the sending state deem the violations insubstantial to justify retaking. Absent providing the offender with quick access to such a hearing, authorities in a receiving state could arbitrarily detain out-of-state offenders with little regards to the offender's liberty interests or the consequences of their actions. Such an arrest and detention policy would clearly be unconstitutional even under the most minimal standards of due process.

[1] On August 28, 2013, the Commission adopted Rule 5.101-1, which now applies to pending felony or violent crime charges

## Analysis & Conclusion

In supervising out-of-state offenders, authorities in a receiving state possess a dual status. First,they act to supervise such an offender under the same standards as any in-state offender. Second, they act as agents for the sending state to supervise and effectuate the purposes of the offender's supervision. Courts have unequivocally recognized that out-of-state offenders can be arrested and detained for (1) committing new crimes in the receiving state and (2) upon request of the sending state pending retaking. Additionally, out-of-state offenders may be arrested and detained for failing to comply with the terms and conditions of their supervision if such a failure would have resulted in an arrest of a similarly situated in-state offender. As noted above, these arrests can be effectuated by the supervising officer or, in absence of their arrest powers, in cooperation with local and/or state law enforcement.